**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| KINGBIRD VENTURES LLC, a foreign limited liability company, | § § § | **CASE NUMBER 4:26-cv-05000** |
| *Plaintiff*, | § § § | |
| v. | § § | **DEMAND FOR JURY TRIAL** |
| INNO HOLDINGS INC., a Texas corporation; DING WEI, an individual; PRINCE HOLDING GROUP, a Cambodian corporation, and its successor and affiliated entities; CHEN ZHI, a/k/a "VINCENT," an individual; JOHN DOE, a/k/a "MR. LI," an individual, and JOHN DOES 1-10, individuals, | § § § § § § § § § § § § § | |
| *Defendants.* | § | |

## <u>PLAINTIFF'S ORIGINAL VERIFIED COMPLAINT</u>

Plaintiff, Kingbird Ventures LLC, ("Kingbird" or "Plaintiff") files this Complaint against

Defendants Inno Holdings Inc. ("Inno Holdings," "INHD," or "Issuer"), a Texas corporation, Ding

Wei, an individual, Prince Holding Group ("Prince Group"), a Cambodian corporation, and its

successor and affiliated entities,[1] Chen Zhi a/k/a "Vincent," an individual, John Doe, a/k/a "Mr.

Li," an individual, and John Does 1-10, individuals (collectively the "Defendants") and, in support

thereof, states as follows:

---

[1] As of October 14, 2025, Prince Group was designated by the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") as a Transnational Criminal Organization and as such operates through consortiums and confederates that cannot be readily ascertained without expedited discovery, as such John Does are also named. https://home.treasury.gov/news/press-releases/sb0278. And on June 23, 2026, the U.S. Department of Treasury took further coordinated action to dismantle the Prince Group TCO with OFAC's sanctions announced against nine individuals and 26 entities linked to the TCO. https://home.treasury.gov/news/press-releases/sb0538. "Scam centers in Southeast Asia steal billions of dollars from American victims each year," said Secretary of the Treasury Scott Bessent. (*Id.*).

## I.    PRELIMINARY STATEMENT

1.    The scheme being perpetrated by the Defendants can be boiled down to the following: a criminal group acquired control of a Nasdaq-listed company, replaced its board and management, and used secret stock deals to concentrate the tradable shares while hiding their ownership. On June 8, 2026, the Defendants and others executed coordinated trading that generated massive artificial volume and drove the stock price sharply higher even though almost no real shares were available to trade. This triggered a Nasdaq trading halt. Rather than promptly resolving the issues that caused the halt, the group deliberately delayed so short sellers could not close their positions. By keeping the halt in place and controlling the limited available shares, Defendants and others continue to charge short sellers extremely high daily borrow fees that are then being paid to Defendants and conspirators who are profiting from investors who remain trapped in their positions.

2.    Defendants Prince Group and Chen Zhi are not ordinary market participants, and this is not an ordinary securities case. According to the United States Department of Justice, they are part of a criminal conspiracy that spans the globe and involves actors who are engaging in modern day slavery through massive, forced labor camps, and cryptocurrency fraud schemes.[2] The U.S. Department of Justice conservatively estimates the profits of these bad actors to number in the tens of billions of dollars. Unhappy with billions in crypto at their disposal, it appears members of the Prince Group's newest foray is boldly playing in U.S. Capital Markets, including the NASDAQ. Further as noted in footnote 1, the Prince Group has been designated by OFAC as a

---

[2] Justice Department Press Release dated October 14, 2025 – "Chairman of Prince Group Indicted for Operating Cambodian Forced Labor Scam Compounds Engaged in Cryptocurrency Fraud Schemes. https://www.justice.gov/opa/pr/chairman-prince-group-indicted-operating-cambodian-forced-labor-scam-compounds-engaged. According to the Press Release, "As alleged [in the indictment], the defendant directed one of the largest investment fraud operations in history, fueling an illicit industry that is reaching epidemic proportions."

PLAINTIFF'S COMPLAINT

Transnational Criminal Organization and Prince Group's chairman Chen Zhi have been the subject of sweeping sanctions.[3]

3.      Kingbird alleges that persons acting for or with the Prince Group criminal network obtained control or influence over a Nasdaq-listed Texas issuer, Inno Holdings (Nasdaq: INHD), displaced its governing personnel, shifted its operational center offshore, concealed the persons behind material transactions, and repurposed Inno Holdings as one instrumentality of a broader cross-border fraud being used by this Transnational Criminal Organization.

4.      Inno Holdings was not the whole scheme. It was the monetization layer of a structure built through undisclosed control, offshore shell companies, opaque Regulation S placements, cryptocurrency-funded acquisition activity, sham or misleading business announcements, concealed beneficial ownership, coordinated communications, and control over the scarce supply of shares available for lending. The Nasdaq listing of Inno Holdings supplied legitimacy; the Inno Holdings' filings supplied a public narrative; offshore entities supplied opacity; concentrated accounts supplied control; and the securities-lending system supplied recurring revenue from investors who could not escape once trading stopped.

5.      The conduct here is not an isolated trading irregularity. Rather, the Defendants used INHD's Nasdaq listing to generate the *appearance* of market legitimacy, used offshore and insider-affiliated accounts to concentrate the freely tradable float, used coordinated trading to create an artificial price-and-volume event, and then used the securities-lending system to extract borrow fees from short sellers at rates reaching 600 percent per annum.[4]

---

[3] A copy of Treasury's June 23, 2026 Press Release, following up on the original announcement in October 2025, announcing additional sanctions against nine individuals and 26 entities linked to the Prince Group is attached hereto as **Exhibit C**.

[4] The borrow fees are fluctuating constantly and the figures above are *conservative* estimates. At one point interest was reported in writing from Plaintiff's broker to reach as high as 3,500% per annum. To put that in perspective on a one-million-dollar position, the daily interest is $95,890.41 assuming simple interest. Annualized, without excessive compounding the annual interest would near **thirty-five million dollars**. As discussed later, the scheme locks parties

6.    On June 8, 2026, an INHD trading event exposed that fraudulent scheme. That is, INHD trade value moved from approximately $1.11 to approximately $39.49 in a *single trading session on reported volume of approximately 278,900,100 shares*, even though INHD had *only 4,520,698 shares outstanding* as of its most recent disclosure of its share count and only *approximately 410,000 freely tradable shares* actually deposited in trading accounts.

7.    This arithmetic is not a technical Regulation SHO[5] dispute. It is evidence that a controlled public-company float was activated as a weapon by a known criminal organization—the Prince Group: first to manufacture INHD's share price and wrest control of available trading volume, then to trigger or exploit regulatory intervention, and finally to convert the resulting market paralysis into extraordinary borrow charges reaching 600 percent per annum. This resulted in a company with a *de minimis* disclosed share base, Inno Holdings, generating more than sixty times its total outstanding shares in reported volume, while the allegedly available tradeable supply was only a fraction of the number even reported as outstanding—let alone actually freely tradeable. That is not ordinary market behavior. It is the signature of a controlled float being used as a trading weapon against our American capital markets.

8.    Market participants such as Plaintiff Kingbird were essentially being manipulatively enticed to short the shares in response to irregular market activity. Then, the fraud occurred—coordinated activity by the Defendants that would most assuredly, and did, result in a regulatory halt by Nasdaq that locked short sellers into the interest rates described  above-without any exit path. All the while, interest racks up daily.

---

into short positions so that paying these interest rates is unavoidable and will not stop without Court or federal law enforcement or regulator intervention.
[5] "Key Points About Regulation SHO" is found at https://www.sec.gov/investor/pubs/regsho.htm.

9.      The regulatory halt confirms the public dimension of the emergency, but does not dismantle the machinery that produced it. On June 12, 2026, Nasdaq halted INHD under Code T12 after the extraordinary June 8, 2026 trading event, and the halt continues as of the date of this Complaint because additional information remains unresolved and, based on the continued hold, has yet to be adequately provided to Nasdaq in response to its reasonable requests. While Nasdaq may be able to stop an issuer's public trading and request that an issuer provide information in response to Nasdaq's requests, it cannot by that act alone: (a) identify every beneficial owner; (b) preserve every WeChat communication; (c) trace every cryptocurrency transfer; (d) restrain offshore assets; (e) prevent alteration of issuer and transfer-agent records; or (f) stop persons in active concert from continuing to profit from the trapped positions.

10.     On the facts alleged, the scheme transformed the T12 halt into a collection mechanism by the Defendants because: the market remains closed; investors cannot cover; information remains unresolved; and the persons controlling the borrowable supply continue to benefit from the disruption they created or prolonged. The United States' public capital markets are not a sanctuary for OFAC-linked criminal networks, undisclosed control groups, coordinated offshore trading accounts, issuer insiders, or market actors who use a Nasdaq halt as leverage against trapped investors.

11.     Immediate judicial relief is therefore necessary, and emergency preliminary relief requests will follow shortly in the aftermath of the filing of this Complaint. The requested relief is directed at the public revelation of the full architecture of the scheme: e.g. prevention of continued asset dissipation and money being sent to Defendants and unknown individuals who do not reside in the United States; preservation of evidence; restraint of further deceptive business or trading activity; protection of issuer and transfer-agent records; noninterference with Nasdaq's

information process; disclosure of beneficial owners and controlling accounts; and expedited discovery into the persons, entities, communications, funds, and accounts through which the scheme operated.

12.     The requested relief prevents asset dissipation and transfer to locations where it cannot be retrieved, preserves evidence, prevents money from continuing to be provided to one or more OFAC sanctioned entities; prohibits interference with the float and the T12 process; requires targeted cooperation; and authorizes expedited, category-specific discovery directed to the persons, accounts, records, communications, transfer-agent materials, broker records, Nasdaq communications, and assets through which the scheme participants operated. The trading event happened; the halt happened; the short sellers remain trapped; the borrow fees continue to accumulate and be remitted overseas; and the Issuer's control, operations, disclosures, offshore ties, and float mechanics present a public-market emergency requiring immediate judicial intervention and control. The United States capital markets cannot be used as a safe harbor or revenue engine for an OFAC-designated criminal network while the victims are left to finance the scheme day by day.

## II.     JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because this action is between citizens of different states and citizens or subjects of foreign states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

14.     Plaintiff Kingbird is a limited liability company organized under the laws of the State of Wyoming, whose members are citizens of states other than Texas or any state in which any Defendant is domiciled or incorporated.

15.     Defendant Inno Holdings is a corporation incorporated under the laws of the State of Texas, with its principal place of business located in Hong Kong, China. The Issuer is therefore a citizen of Texas for purposes of diversity jurisdiction.

16.     Based upon Plaintiff's information and belief, Defendant Ding Wei is a citizen and resident of the People's Republic of China or Hong Kong Special Administrative Region, China, and is not a citizen of any U.S. state in which any Plaintiff is domiciled.

17.     Defendant Prince Group is a corporation organized and headquartered in Phnom Penh, Cambodia, and is therefore a subject of a foreign state for purposes of 28 U.S.C. § 1332(a)(2). Prince Group has been designated by OFAC as a Transnational Criminal Organization pursuant to Executive Order 13581, as amended.[6]

18.     Based upon Plaintiff's information and belief, Defendant Chen Zhi (a/k/a "Vincent") is an individual who, is a citizen of Cambodia, and is therefore a subject of a foreign state for purposes of 28 U.S.C. § 1332(a)(2).

19.     Defendant John Doe, a/k/a "Mr. Li"[7] is an individual who, is a citizen and resident of Hong Kong, China, and is therefore a subject of a foreign state for purposes of 28 U.S.C. § 1332(a)(2).

---

[6] U.S. Dept of Treasury Press Release, "U.S. and U.K. Take Largest Action Ever Targeting Cybercriminal Networks in Southeast Asia" (Oct. 14, 2025) - https://home.treasury.gov/news/press-releases/sb0278. U.S. Dep't of Justice Press Release, "Chairman of Prince Group Indicted for Operating Cambodian Forced Labor Scam Compounds Engaged in Cryptocurrency Fraud Schemes" (Oct. 14, 2025). https://www.justice.gov/opa/pr/chairman-prince-group-indicted-operating-cambodian-forced-labor-scam-compounds-engaged. Treasury's October 14, 2025 designation did not describe Prince Group as a conventional business touched by isolated misconduct. It described a Cambodia-based transnational criminal empire operating online investment scams against victims worldwide and imposed sanctions on 146 targets across the network. The Department of Justice's parallel criminal action alleges that Prince Group trafficked hundreds of workers into fortified compounds and compelled them, under threats of violence, to execute cryptocurrency-investment frauds. Plaintiff pleads those governmental allegations not to obtain a civil adjudication of the criminal case, but because they bear directly on the overall scheme as well as practical risk presented here: a network already found responsible by the United States of coercion, cyber-enabled fraud, money laundering, and global asset movement has obtained access to a Texas corporation and a Nasdaq listing and is utilizing that corporation to further its conspiracy.

[7] As part of its investigation, Kingbird was able through investigators to contact someone named "Mr. Li" who would not further identify himself. Furthermore there were prior board members named Mr. Li. Discovery will determine if

20.    Defendants John Does 1–10 are the ten unidentified non-U.S. investors who acquired an aggregate of 3,000,000 shares of INHD common stock in the December 26, 2025, Private Investment in Public Equity ("PIPE").[8] Transaction. Each such investor is, by definition, a non-U.S. person who participated in the transaction as an "offshore transaction" within the meaning of Regulation S under the Securities Act of 1933. Accordingly, each John Doe 1–10 is, a subject of a foreign state for purposes of 28 U.S.C. § 1332(a)(2). Their precise citizenship is currently unknown and is subject to discovery, but they are diverse for purposes of 28 U.S.C. § 1332(a)(2)-(3).

21.    Accordingly, complete diversity of citizenship exists between Plaintiffs and all Defendants pursuant to 28 U.S.C. § 1332(a)(2)-(3).

22.    Regardless of diversity, this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 over claims arising under Section 10(b) of the Securities Exchange Act of 1934, (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; Section 9(a) of the Exchange Act, 15 U.S.C. § 78i(a); and Section 18 of the Exchange Act, 15 U.S.C. § 78r(a). The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a), as those claims form part of the same case or controversy as the federal claims asserted herein.

23.    Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1391(b)-(c). The Issuer Inno Holdings is incorporated in Texas and maintains a registered agent and registered office in the State of Texas. The Issuer's principal executive offices and registered place

---

they are the same actors and/or if Mr. Li that was interviewed was using a common Chinese sur name to avoid further detection. For this reason Mr. Li is listed as a distinct John Doe separate from John Doe 1-10.

[8] "Frequently Asked Questions About Pipes" are found at https://www.sec.gov/info/smallbus/gbfor25_2006/pinedo_tanenbaum_pipefaq.pdf.

of business in the United States is listed as 2465 FM359, Brookshire, Texas which is located within the Southern District of Texas, Houston Division.

24.     Venue is further proper under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because Defendants directly or indirectly used the means and instrumentalities of interstate commerce and the mails in connection with the acts and transactions complained of herein, including transactions on The Nasdaq Stock Market, a national securities exchange.

25.     All conditions precedent to the filing of this lawsuit have been performed, excused or waived. Counsel has been retained, and Defendants are responsible for their fees and costs as a result of the conduct described throughout.

## III.     STATEMENT OF FACTS[9]

### A.     The Issuer and Its Corporate Structure

26.     Inno Holdings (Nasdaq: INHD) is a Texas corporation that completed its initial public offering ("IPO") on Nasdaq in or about December 2023. At the time of its IPO, the Issuer's stated business was light-gauge steel building materials manufacturing.

27.     Following the IPO, unknown conspirators associated with the scheme described herein targeted the Issuer as a vehicle for their scheme. The Issuer underwent a wholesale transformation engineered by the conspirators: its management team and board of directors were replaced in their entirety; its business was moved offshore; and its public listing was repurposed as the market instrument of a coordinated securities fraud.

28.     In furtherance of the scheme, the Issuer dismissed its U.S.-based independent registered public accounting firm, which certified public accounting firm's name is known to Plaintiff, and replaced it with a Singapore-based firm, JWF Assurance PAC, a change that further

---

[9] Attached hereto and incorporated by reference are Declarations of the following persons: Jim Wang – **Exhibit D**; Robert Miley, Chief Compliance Officer of Kingbird Ventures – **Exhibit E**; and Aharon Diveroli – **Exhibit F.**

PLAINTIFF'S COMPLAINT                                                                                          9

insulated the conspirators' operations from U.S. regulatory scrutiny, as disclosed in the Issuer's Current Report on Form 8-K filed with the SEC on January 16, 2025.[10]

29.     The conspirators relocated the Issuer's ostensible operations to Hong Kong, describing the Issuer's principal offices as being located there. As of the events described herein, the Issuer had no meaningful active operations in the United States; however, its Texas incorporation was retained not for operational purposes, but to maintain Nasdaq listing eligibility and to ground the scheme in a U.S.-regulated public market. This was not properly disclosed to the market participants, including Plaintiff Kingbird.

30.     As of May 19, 2026, the Issuer had *4,520,698 shares of common stock issued and outstanding*, as reflected in its most recent SEC filing prior to the events of June 8, 2026.[11]

**B.      The Criminal Scheme: Acquisition and Control of the Issuer**

31.     After Plaintiff began piecing the puzzle together related to the Defendants' brazen fraud scheme that uses Nasdaq stocks as vehicle for theft, investigations by Plaintiff began in earnest. First Plaintiff contacted the brokers it held short positions with, Brokerage Firm A with headquarters listed in Carrollton, Texas, and Brokerage Firm B with headquarters listed in New Jersey, to request information regarding Issuer. While one of the two FINRA regulated broker dealers offered to "split" or "eat" part of the excessive short fees neither was willing to disclose the required information on the short positions, including the due diligence and contracts they were required to maintain before executing the trades.

32.     To try to understand what was taking place, how it was being accomplished, and who the participants were, Plaintiff engaged Jim Wang. Mr. Wang is, an expert with approximately 17 years of experience in investment banking and private equity with particular expertise in the

---

[10] https://www.sec.gov/ix?doc=/Archives/edgar/data/1961847/000149315225002551/form8-k.htm
[11] https://www.sec.gov/Archives/edgar/data/1961847/000149315226024367/form424b5.htm

listing and trading of securities of Asian companies on U.S. national exchanges. Through his prior work and experience, Mr. Wang identified a co-conspirator referred to herein as Defendant "Mr. Li," who identified himself as a senior operative responsible for orchestrating the coordinated trading activity in INHD on June 8, 2026. Attached hereto and incorporated by reference as **Exhibit D** is a Declaration of Jim Wang.

33. Mr. Li disclosed to Jim Wang the mechanics of the scheme's seizure of the Issuer: (a) Mr. Li and scheme-affiliated trading accounts acquired the Issuer from its founder, for approximately $7 million; (b) following the acquisition, Mr. Li replaced the Issuer's board of directors with scheme-affiliated personnel, ensuring that the Issuer would operate as a wholly controlled instrument of the scheme without either actual independence to exercise proper oversight or no desire to do so as confederates of the Defendants; and (c) the funds used to acquire the Issuer were provided by an associate of Defendant Prince Group. This was accomplished through funds transmitted in a USDT cryptocurrency from Cambodia. Given the fact that Prince Group is a known Transnational Criminal Organization that preys on victims using scams involving cryptocurrency, Plaintiff has reason to believe that the funds that underlay the Issuer's recent actions also involve sanctioned funds that were and are being potentially laundered.

34. According to Mr. Wang's investigation the Prince Group and its affiliates are not passive investors; they are the financial architects of the scheme. The Prince Group provided the acquisition capital for the purchase from Dekui Liu, maintains an ongoing operational role in the scheme, and is a direct and continuing financial beneficiary of the conduct described herein.

35. According to Mr. Wang's investigation, Defendant Ding Wei served as the scheme's installed insider at the Issuer, acting as Chairman and Chief Executive Officer under the direction

and control of Mr. Li and Prince Group-affiliated co-conspirators. And to further the Defendants' scheme, Ding Wei executed material agreements in furtherance of the scheme, including:

a.   the September 2025 Securities Purchase Agreement,

b.   the February 2026 equity investment agreement with Megabyte Solutions Limited, and

c.   the June 2026 development-services agreement,

each of which served to concentrate control, obscure beneficial ownership, and generate the appearance of legitimate business activity.

36.   The scheme described herein was not conducted in isolation from the public capital markets; it was dependent upon them. Defendants and their co-conspirators utilized the Issuer's status as a Nasdaq-listed public company as a central component of their liquidity strategy, exploiting the mechanisms of the U.S. public securities markets to concentrate the Issuer's float, generate artificial trading activity, and extract ongoing financial benefit from short sale market participants through the exorbitant interest charges and borrow fees that continue to be paid and transmitted to Defendants daily by the brokerage firms. Access to U.S. public markets provided the scheme's participants with the infrastructure necessary to execute coordinated trading at scale, to lend shares at manipulated rates to short sellers, and to monetize the artificial conditions they created through the imposition and prolongation of the T12 Halt.

37.   Upon receiving Mr. Wang's reports and findings, as further detailed below, Plaintiff conducted its own immediate due diligence and began independently uncovering and verifying the network and the bad acts described herein.

### C.    The Issuer as One Instrumentality of a Broader Cross-Border Scheme

38.    Plaintiff alleges upon information and belief that the Defendants and co-conspirators did not acquire the Issuer to operate its historic *light-gauge steel business*. It acquired access to a regulated public-market platform not only as a methodology to obtain liquidity but also as a conduit to camouflage its fraudulent business purposes. Control of the corporation provided the scheme participants with a Nasdaq symbol, SEC filing access, a transfer-agent relationship, corporate authority to issue and place securities, the ability to announce transactions as market-moving events, and a public-facing vehicle through which offshore actors could appear to conduct legitimate commerce.

39.    The scheme participants then separated the appearance of corporate legitimacy from the location of actual control. The Issuer remained incorporated in Texas, but its management, counterparties, communications, financing sources, and purported operations shifted to Hong Kong, Cambodia, the British Virgin Islands, and other offshore jurisdictions. That separation increased the difficulty of identifying who made decisions, who owned the relevant shares, who received transaction proceeds, and who controlled the accounts that traded or lent INHD stock.

40.    Opacity was not incidental. Material transactions repeatedly involved unidentified investors, redacted counterparties, offshore entities, or agreements in which the entity publicly associated with the transaction was not the entity named as the contracting party. The recurring pattern permitted Defendants to create the public appearance of capital formation and operating activity while withholding the most important facts: the identities, relationships, beneficial owners, funding sources, and common control connecting the participants.

41.    The scheme also used corporate governance as an operational tool. By replacing the Issuer's board and installing Ding Wei and other aligned personnel, the Defendants obtained

the ability to authorize securities issuances, select auditors and counsel, make SEC filings, control responses to Nasdaq, direct the "maintenance" of books and records, and determine what information would or would not be disclosed to the market. The Issuer was therefore not merely a victim or passive venue. On the allegations here, it became a controlled platform through which the other parts of the scheme could be executed.

42.     The movement of acquisition funds through USDT cryptocurrency from Cambodia, the use of BVI, and Hong Kong entities, and the concentration of shares in unidentified offshore accounts are consistent with an architecture designed to move value quickly while obscuring origin, ownership, and destination.

43.     Plaintiff has learned that federal financial-crime authorities warn that opaque cross-border payment and ownership structures are national-security vulnerabilities because they can facilitate money laundering, sanctions evasion, transnational organized crime, and terrorist financing. Plaintiff does not allege without discovery that every participant financed terrorism. The allegation is narrower: Defendants employed the same secrecy-enhancing structures that federal authorities require financial institutions to scrutinize, and they did so for the benefit of a network that OFAC has already designated as a Transnational Criminal Organization. That circumstance materially heightens the need for immediate relief, preservation, tracing, disclosure, and judicial control.

44.     The public-market manipulation alleged below was thus not an isolated violation layered onto an otherwise legitimate company. It was the liquidity event of the broader scheme. The prior acquisition, board replacement, offshore migration, concealed placements, shell-company agreements, and beneficial-ownership opacity positioned the Defendants to control

supply and information. The June 8 trading event activated that control, and the ensuing halt converted it into a continuing extraction mechanism.

### D.    Use of Securities Transactions to Concentrate the Float

45.    Beginning in late 2025 and continuing through June 8, 2026, the Defendants orchestrated a carefully choreographed sequence of securities and business transactions designed to concentrate control of the Issuer's float while maintaining the appearance of legitimate capital formation and business development. These transactions were not discrete, unrelated events. Each was a calculated step toward a unified objective: (1) concentrate tradable shares in accounts under Defendant control or influence; (2) obscure the true beneficial owners and the common control linking the accounts; (3) create public narratives suggesting legitimate operating activity to discourage market scrutiny; (4) preserve exclusive Defendant control over the borrowable supply; and (5) position the Defendants to profit simultaneously from both the engineered price event and the market paralysis that would follow. The timeline is deliberate and revealing: September 2025 initial concentration with concealed investors; December 2025 PIPE places 3,000,000 shares (42.4% of outstanding) with undisclosed offshore investors under Regulation S; February 2026 $3 million equity transaction routed through offshore entities; June 2026 a purported AI development agreement fabricating operational substance days before the coordinated trading event. Each transaction advanced the scheme. None were inadvertent or isolated.

46.    According to SEC filings on September 10, 2025, in an act in furtherance of the Defendants' scheme, the Issuer entered into a Securities Purchase Agreement with unidentified "institutional investors," issuing 1,200,000 shares at $3.60 per share and pre-funded warrants to purchase up to 800,000 additional shares, for aggregate net proceeds of approximately $6.7 million. Ding Wei executed this agreement as the Defendants installed insider. The purchasers

were concealed from the Issuer's public disclosures, consistent with the scheme's pattern of obscuring beneficial ownership and float concentration

47.     On December 26, 2025, acting in furtherance of the scheme's float-concentration strategy, the Issuer entered into a securities purchase agreement with ten undisclosed non-U.S. "investors" (the "PIPE Transaction"), issuing an aggregate of 3,000,000 shares of common stock at $1.31 per share for total proceeds of $3,930,000. Upon closing, those 3,000,000 shares represented approximately 42.4% of the Issuer's then-outstanding shares. The ten Defendant-affiliated investors were not publicly identified. This is because the transaction was deliberately structured under Regulation S as an "offshore transaction," a structure that placed the shares beyond the reach of ordinary U.S. disclosure requirements and facilitated the Defendants' control over the tradeable float. In addition, the use of multiple insiders rather than one allowed a plausible excuse for the filing of certain securities documents that may have identified the conglomeration of shares and enabled victims to detect the scheme more easily and before taking short positions.

48.     On February 2, 2026, the Defendants caused the Issuer, through its BVI-domiciled affiliate Equicap Holdings Ltd., to enter into an equity investment agreement with Megabyte Solutions Ltd., an entity whose identity, jurisdiction of formation, and beneficial ownership were concealed through redactions in the publicly filed exhibit. The transaction transferred $3,000,000 to a counterparty for whom the public was given no means to identify, consistent with the Defendants' use of offshore vehicles and deliberate opacity to obscure the flow of funds and conceal co-conspirators.

49.     In or about June 2026, acting in furtherance of the scheme to generate the appearance of legitimate business operations while executing the coordinated trading event described below, Ding Wei and co-conspirators caused the Issuer to publicly announce a

development-services agreement for a purported $3 million "AI Agent" project. The announcement was materially false. The underlying exhibit filed with the SEC reveals that the actual contracting party designated as "Party A" was not the Issuer, but Apexvest Holdings, Ltd. ("Apexvest Holdings"), a British Virgin Islands company, not the Issuer itself. The counterparty was Ninetech Technology (HONGKONG) Ltd., the agreement was governed by Hong Kong law, and it was executed by Ding Wei acting in his capacity as an operative. The deliberate substitution of a BVI shell entity as the actual contracting party, while publicly announcing the transaction as the Issuer's own, constitutes, amongst other things, wire fraud and a material misrepresentation in a document filed with the SEC.

### E.    The June 8, 2026, Coordinated Trading Event

50.    On June 8, 2026, the Defendants executed the coordinated trading event at the center of this action.

51.    INHD's share price was driven from approximately $1.11 at the open to approximately $43.37 at its intraday high, closing the regular session at approximately $39.49, a price at which the Issuer, which had no active U.S. operations and no genuine business activity, had never previously traded. **Prior to June 8, 2026, INHD had exceeded $2.00 per share on only one occasion during the preceding five weeks.**

52.    Reported trading volume on June 8, 2026, was approximately 278,900,100 shares, compared to 144,300 shares traded the day before, representing an increase of approximately 193,000% in a single session. That reported volume exceeded the Issuer's total outstanding share count of 4,520,698 by more than sixty times.

53.    Two independent sources confirmed to Jim Wang that only approximately 410,000 freely tradeable shares of INHD were actually deposited in trading accounts, held back by

Defendants and co-conspirators as a mechanism of control, and those shares were being deliberately withheld from the market by Defendants and co-conspirators. The contrast is dispositive: the Issuer generated reported trading volume of approximately 278.9 million shares while withholding the overwhelming majority of the tradeable supply. This was not a market anomaly. It was a controlled float being weaponized by a criminal enterprise to manufacture the appearance of a legitimate trading event.

54.    As alluded to above, a holding sufficient to control trading of this magnitude would require disclosure on a Schedule 13D under Section 13(d) of the Exchange Act. The Defendants deliberately failed to make that disclosure, concealing the identity of the beneficial owners of the concentrated float as part of its scheme to defraud market participants and evade regulatory detection.

55.    However, no Schedule 13D on file identifies the person or group controlling the Issuer's concentrated float.

56.    The June 8, 2026 trading event was the signature market act of the scheme, but it was not the beginning of the scheme. It was the point at which the previously assembled corporate, financing, disclosure, ownership, and stock-loan components were used together. The concentrated float supplied scarcity; coordinated accounts supplied volume and price; issuer announcements supplied apparent legitimacy; undisclosed control prevented the market from understanding supply; and the forthcoming halt supplied the conditions for continued extraction from short sellers unable to close.

57.    This is not a description of ordinary market forces. It is a description of a criminal enterprise executing a pre-planned fraud.

58.　　Mr. Li confirmed to Jim Wang that he and scheme-affiliated trading accounts orchestrated the coordinated trading activity that drove INHD's share price on June 8, 2026.

59.　　Mr. Li further confirmed that he is among the primary lenders of INHD shares to broker-dealers, a position that placed him at the center of the Defendants' ongoing extraction of borrow fees from trapped short sellers following the T12 Halt.

**F.　　The T12 Halt: The Defendants Mechanism for Ongoing Extraction**

60.　　Following the close of regular trading hours on June 8, 2026, at approximately 5:18 p.m. Eastern Time, Nasdaq imposed a trading halt under Code T12 on INHD's common stock (the "T12 Halt"). The after-hours timing of the T12 Halt, outside normal trading hours and after the regular market close, demonstrates that Nasdaq acted unusually rapidly in response to the circumstances presented. A copy of the Nasdaq press release announcing the T12 Halt is attached as **<u>Exhibit A</u>**.

61.　　A T12 Halt is indefinite in duration and continues until the issuer satisfies Nasdaq's outstanding information requests. The T12 Halt remains in effect as of the filing of this Complaint. Furthermore, Plaintiff has seen no real evidence that the Issuer is taking any meaningful steps to stop the T12 Halt, after all, its co-conspirators are juicing victims through margin and other finance charges every single day the T12 halt continues.

62.　　The T12 Halt was not an unforeseen regulatory problem to be solved. It was an anticipated and deliberately engineered component of the Defendants' broader scheme—the mechanism through which they convert market control into ongoing profit extraction through interest and borrow fees. Co-conspirators, including Defendant Mr. Li and others with direct knowledge of the coordinated trading event, knew that the extraordinary June 8 trading activity— generating 278.9 million shares of reported volume against only 410,000 shares they permitted in

the market—would inevitably trigger regulatory intervention. But the evidence suggests Defendants engineered the June 8 trading event specifically because they knew it would trigger the halt. The purpose was dual: (1) to create the appearance of massive market traction and liquidity when in fact no such market existed, and (2) to engineer the conditions under which short sellers would become trapped in closed-market positions. Once trapped, Defendants weaponized their control of the borrowable supply by charging interest rates that trapped investors cannot escape without Defendants' permission. The T12 Halt thus functions not as a regulatory protection but as a profit extraction mechanism—a cell that locks short sellers in positions where they must pay daily fees to the same persons who deliberately trapped them there in the first place. By deliberately prolonging the Issuer's responses to Nasdaq requests for information and maintaining the halt, Defendants continue to profit from the market dislocation they engineered. Defendants and co-conspirators coordinated the scheme through WeChat communications. **Jim Wang was informed that a WeChat conversation relating to the coordinated trading scheme was among the information reported to Nasdaq and formed part of the circumstances that triggered, or materially contributed to, Nasdaq's decision to impose the T12 Halt.** In other words, the Defendants or their confederates effectively "snitched" on itself to cause a T12 Halt.

63.    To perpetuate the scheme's ongoing extraction of borrow fees, Defendant Ding Wei and co-conspirators directed the Issuer to engage in deliberate delay tactics in responding to Nasdaq's information requests. The Issuer's responses were not designed to resolve the T12 Halt, they were designed to forestall delisting while leaving the underlying requests unresolved, ensuring that trading neither resumed nor migrated to a venue where short positions could be closed. Each such submission constitutes an act in furtherance of the scheme to defraud. As a

result, the T12 Halt functions as an indefinite mechanism to extract ongoing financial benefit from trapped short sellers on behalf of the Defendants.

64.    Defendant Ding Wei, acting in his capacity as the scheme's installed insider at the Issuer, instructed the Issuer's executives and counsel to deliberately prolong the T12 Halt and obstruct its resolution, notwithstanding that they were simultaneously being inundated with requests from short sellers seeking to purchase shares, close out, or otherwise cover their positions. (**Exhibit D**).

65.    The deliberate prolongation of the halt, for the purpose of maintaining the accrual of borrow fees and interest charges in favor of the Defendants and co-conspirators, constitutes an ongoing act of fraud in furtherance of the scheme and a continued harm to American investors.

**G.      The Regulatory Framework Confirms the Locate Process Cannot Be Fictional**

66.    The SEC has repeatedly emphasized that a broker-dealer may not accept or effect a short sale unless it has borrowed the security, entered into a bona fide arrangement to borrow it, or documented reasonable grounds to believe the security can be borrowed and delivered. 17 C.F.R. § 242.203(b)(1). The locate requirement is a pre-trade protection; it is not satisfied by creating the appearance that shares exist and then transferring the consequences of nonavailability to the customer after the market is halted.

67.    In *In the Matter of IMC Chicago, LLC,* Exchange Act Release No. 95487 (Aug. 12, 2022), the Commission found that a registered broker-dealer executed millions of short sales without borrowing or locating shares while improperly invoking the bona-fide market-making exception. The Commission stressed that the exception applies only when the dealer is actually engaged in bona-fide market making at the time of the sale, and that the party asserting an

PLAINTIFF'S COMPLAINT                                                                                          21

exemption bears the burden of establishing eligibility. The Commission found a willful violation, censured the firm, ordered it to cease and desist, and imposed a civil penalty.

68.     The SEC's order is important here for what it demonstrates about the scheme's design. The federal rules treat an actual borrow, a bona-fide arrangement, or documented reasonable grounds as indispensable because a fictional or circular locate can manufacture trading capacity that the underlying share supply cannot support. Where the same concentrated group allegedly controls the float, lends the shares, coordinates the trading, and profits when delivery or covering becomes impossible, the locate and lending machinery is not a collateral detail. It is one of the instruments through which Defendants convert control of a tiny float into artificial volume and recurring charges.

69.     The extraordinary mismatch alleged here - approximately 278.9 million shares of reported volume against 4.52 million shares outstanding and approximately 410,000 shares said to be deposited for trading - requires discovery beyond the face of individual locate confirmations. Plaintiff seeks the identity of every lender, locating source, introducing broker, clearing broker, stock-loan intermediary, beneficial owner, and account through which the same shares were represented as available, lent, relented, recalled, or withheld.

### H.      Damages Resulting From Defendants' Scheme

70.     As a direct and proximate result of Defendants' conduct, Plaintiff and other short sellers in INHD have been unable to purchase shares in the market to close their short positions since the imposition of the T12 Halt on June 8, 2026—a period of 16 days. During this entire period, Defendants have maintained complete control over: (1) the Issuer's governance and decision-making regarding Nasdaq correspondence and halt resolution; (2) the borrowable supply of shares (the approximately 410,000 shares Defendants deliberately withhold from the market);

and (3) the narratives and information flow to Nasdaq determining whether and when the halt will be lifted. Borrowing rates on INHD short positions have been artificially manipulated by Defendants' exclusive control over the borrowable float, reaching as high as 600% per annum. This has resulted in quantifiable, documented, and continuing daily interest charges to Kingbird alone of $15,000 to $20,000 **per day**—charges that flow directly to the Defendants' control network and accumulate each day the Defendants maintain the trading halt. Since June 8, 2026, Plaintiff has accrued hundreds of thousands of dollars in damages from these interest charges alone. These are not diminishing damages fading with time. They are mounting, continuing, and directly proportional to Defendants' ongoing control of the halt, the float, and the borrowing market. Plaintiff faces the continuing risk of insolvency if Defendants maintain this control indefinitely.

71.     Borrowing rates on INHD short positions, manipulated by the scheme's control over the borrowable float, have reached as high as 600% per annum at certain broker-dealers, resulting in interest charges to Kingbird routinely approaching and sometimes exceeding $15,000 to $20,000 **per day**. These charges are not the product of ordinary market forces but are the manufactured and intended result of Defendants' deliberate manipulation of the Issuer's float, trading activity, and the securities lending market.

72.     INHD has appeared on the Regulation SHO Threshold Securities List, indicating persistent settlement failures consistent with the artificial restriction of lendable shares described herein. A copy of the Regulation Threshold Securities List from NasdaqTrader.com for June 23, 2026, is attached hereto as **Exhibit B**. In other words, it is not just Kingbird and its team that have noted the end result of this scheme, regulators have received reports of inability of market participants to close.

PLAINTIFF'S COMPLAINT                                                                            23

73. Kingbird has suffered, and continues to suffer, economic harm in the form of mounting interest charges, borrowing costs, and margin costs imposed on short positions they are unable to close—all of which flow directly from the coordinated scheme. The harm is not the incidental result of market forces. It is the intended consequence of a Transnational Criminal Organization that used the public capital markets as its instrument and trapped short sellers as its revenue source.

74. Kingbird's reputation in the investment community is being decimated as well given its unwanted affiliation with a Cambodian / Chinese Transnational Criminal Organization involved in forced labor prisons and cryptocurrency scams.

75. Kingbird faces risk of insolvency from the inability to close out a short position due to the intentional conduct aimed at making short position exits literally impossible.

76. The continuing injury is not limited to daily interest. So long as the Defendants retain undisclosed control over the Issuer, its records, its offshore counterparties, and the relevant share supply, it can move assets, alter records, coordinate accounts, obstruct the T12 information process, and preserve the conditions under which Plaintiff remains trapped. Monetary relief at the end of the case, even if such could be had from individuals and entities associated with a Transnational Criminal Organization (which is exceptionally unlikely), it cannot reconstruct deleted encrypted communications, recover dissipated offshore assets, or restore market integrity after the controlling actors and evidence have disappeared.

## COUNT I – Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### (*Against All Defendants*)

77. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

78.     This Count is asserted against all Defendants pursuant to Section 10(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

79.     Defendants, directly or indirectly, by use of the means or instrumentalities of interstate commerce, the mails, or the facilities of a national securities exchange, employed devices, schemes, and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Plaintiff, according to proof,  in connection with their transactions in INHD common stock.

80.     Defendants acted with knowing and deliberate scienter, not mere negligence. The specific knowledge elements are: (1) Defendants knew the float was artificially constrained to approximately 410,000 shares while maintaining public filings disclosing 4,520,698 outstanding shares. (2) Defendants knew that generating 278.9 million shares of reported volume—more than 60 times the actual outstanding share count and nearly 700 times the actual freely tradable float— would inevitably trigger a regulatory halt. (3) Defendants knew this halt would trap short sellers in closed-market positions where they could neither cover nor exit. (4) Defendants knew that trapped short sellers would be forced to pay daily interest charges at rates of 600% per annum flowing directly to Defendants' control network. (5) Defendants engineered the June 8 trading event specifically to trigger this regulatory intervention and the resulting market paralysis. The WeChat communications among Defendants, reported to Nasdaq, further corroborate this knowing coordination and consciousness of guilt. Plaintiff relied on the integrity of the market for INHD

common stock and on Defendants' material misrepresentations and omissions in connection with their transactions in INHD securities.

81. Specifically, Defendants: (a) coordinated trading activity in INHD on June 8, 2026 that generated artificial volume of approximately 278,900,100 shares against a total outstanding share count of 4,520,698, driving the share price from approximately $1.11 to approximately $43.37 in a single session; (b) artificially constrained the freely tradeable float to approximately 410,000 shares while causing the appearance of massive market activity; (c) anticipated and precipitated the Nasdaq T12 Halt for the purpose of trapping short sellers in their positions; (d) made material misrepresentations in the Issuer's SEC filings, including by publicly announcing a development-services agreement as the Issuer's own while the actual contracting party was Apexvest Holdings, a BVI entity; (e) concealed the identities of the beneficial owners of the Issuer's concentrated float, including by failing to file a required Schedule 13D disclosure; and (f) deliberately prolonged the T12 Halt to continue extracting borrow fees and interest charges from trapped short sellers at rates as high as 600% per annum, and continue to do so.

82. Defendants acted with scienter. The conduct alleged herein was not the product of negligence or mistake. Defendants knew that the float was artificially constrained, knew that the T12 Halt would trap short sellers, and knowingly used the halt as a mechanism to extract ongoing financial benefit. The WeChat conversation relating to the pump-and-dump scheme, which was among the information reported to Nasdaq, further evidence knowing coordination among the scheme's participants.

83. Plaintiff relied on the integrity of the market for INHD common stock and on Defendants' material misrepresentations and omissions in connection with their transactions in INHD securities. Plaintiff is entitled to a presumption of reliance under the fraud-on-the-market

PLAINTIFF'S COMPLAINT

doctrine because INHD common stock traded on Nasdaq, an efficient market, and Defendants' manipulative conduct and misrepresentations were reflected in the market price of INHD securities.

84.    As a direct and proximate result of Defendants' violations of Section 10(b) and Rule 10b-5, Plaintiff has suffered damages, including but not limited to ongoing interest charges and borrowing costs of approximately $15,000 to $20,000 per day incurred by Plaintiff alone, and substantially greater aggregate losses across the market as a whole, making this a matter of public importance.

**WHEREFORE**, Plaintiff Kingbird Ventures LLC, respectfully requests that this Court enter judgment in Plaintiff's favor and against Defendants, and grant the following relief: an award of compensatory damages in favor of Plaintiff against all Defendants, jointly and severally, for all losses sustained as a result of Defendants' manipulative scheme, fraudulent misrepresentations, and omissions, in an amount to be proven at trial; an award of rescissory damages where applicable; attorneys' fees and costs, and any other relief this Court deems just and proper.

## COUNT II – Violation of Section 9(a) of the Exchange Act
### (*Against All Defendants*)

85.    Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

86.    This Count is asserted pursuant to Section 9(a) of the Exchange Act, 15 U.S.C. § 78i(a), and Section 9(f), 15 U.S.C. § 78i(f), which provides a private right of action for damages caused by violations of Section 9(a).

87.    Section 9(a)(2) of the Exchange Act makes it unlawful for any person to effect, alone or with one or more other persons, a series of transactions in a security registered on a national securities exchange creating actual or apparent active trading in such security or raising

or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

88.     Defendants effected a series of coordinated transactions in INHD common stock on June 8, 2026, generating reported volume of approximately 278,900,100 shares, more than sixty times the Issuer's total outstanding share count of 4,520,698, while the actual freely tradeable float consisted of only approximately 410,000 shares. This coordinated trading activity created the appearance of massive active trading and drove the share price from approximately $1.11 to approximately $43.37 in a single session, for the purpose of inducing purchases by other market participants at artificially inflated prices.

**WHEREFORE**, Plaintiff Kingbird Ventures LLC, respectfully requests that this Court enter judgment in Plaintiff's favor and against Defendants, and grant the following relief: an award of damages in favor of Plaintiff pursuant to Section 9(f) of the Exchange Act, 15 U.S.C. § 78i(f), equal to the damages sustained by Plaintiff  as a result of the artificial price inflation and manipulative trading activity described herein, in an amount to be proven at trial; an award of rescissory damages where applicable; attorneys' fees and costs, and any other relief this Court deems just and proper.

<u>**COUNT III – Violation of Section 18 of the Exchange Act**</u>
(*Against Inno Holdings and Ding Wei*)

89.     Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

90.     This Count is asserted pursuant to Section 18 of the Exchange Act, 15 U.S.C. § 78r, which imposes civil liability on any person who makes or causes to be made any false or misleading statement of material fact in any application, report, or document filed with the SEC pursuant to the Exchange Act.

91.    Defendants Inno Holdings and Ding Wei made or caused to be made materially false and misleading statements of fact in documents filed with the SEC, including: (a) the June 2026 Form 8-K publicly announcing the development-services agreement as an agreement of Inno Holdings, when the actual contracting party identified in the underlying exhibit was Apexvest Holdings, a BVI entity unaffiliated on the face of the document with the Issuer; (b) the Issuer's prospectus supplement (Form 424B5) and related filings disclosing the PIPE Transaction with ten unidentified non-U.S. investors without disclosing the identities of those investors or their relationship to the scheme participants; and (c) the Issuer's Current Reports on Form 8-K and periodic filings that described the Issuer's business and operations in materially misleading terms.

92.    Plaintiff's reliance upon one or more of the foregoing statements in connection with transactions in INHD securities is established as a matter of law and, in any event, will be further demonstrated according to the proof developed in this action; Plaintiff was damaged thereby.

**WHEREFORE**, Plaintiff Kingbird Ventures LLC, respectfully requests that this Court enter judgment in Plaintiff's favor and against Inno Holdings and Ding Wei, equal to the damages sustained by Plaintiff as a result of the false and materially misleading statements made in the SEC filings as described herein, in an amount to be proven at trial; an award of rescissory damages where applicable; attorneys' fees and costs, and any other relief this Court deems just and proper.

### COUNT IV – Violation of Texas' Deceptive Trade Practices-Consumer Protection Act (DTPA)
#### (*Against Inno Holdings and Ding We*i)

93.    Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

94.    The Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"), Tex. Bus. & Com. Code § 17.46, declares unlawful false, misleading, or deceptive acts or practices in

the conduct of any trade or commerce, and independently prohibits unconscionable courses of action. Tex. Bus. & Com. Code § 17.50(a)(3).

95.     Defendants Inno Holdings and Ding Wei engaged in an unconscionable course of action in the conduct of trade or commerce in Texas. Specifically, Defendants: (a) caused the Issuer, a Texas-incorporated Nasdaq-listed company, to be used as the public-market instrument of an OFAC-designated criminal enterprise operating out of Cambodia and Hong Kong; (b) engineered a coordinated trading event on June 8, 2026 that drove INHD's share price from approximately $1.11 to approximately $39.49 in a single session on reported volume exceeding sixty times the Issuer's total outstanding shares; (c) anticipated, precipitated, and deliberately engineered the Nasdaq T12 Halt for the purpose of trapping short sellers in positions they could not close; and (d) deliberately prolonged the T12 Halt, directing the Issuer's executives and counsel to obstruct its resolution, for the purpose of extracting borrow fees and interest charges from trapped short sellers at rates as high as 600 percent per annum, potentially for a period of up to three years.[12]

96.     Plaintiff and those in its position were consumers within the meaning of the DTPA who engaged in transactions, specifically, securities transactions in INHD common stock on Nasdaq, that were directly harmed by Defendants' deceptive acts and practices.

97.     The foregoing conduct constitutes an unconscionable course of action within the meaning of DTPA. Tex. Bus. & Com. Code § 17.46(a). Defendants exploited the asymmetry between their control over the Issuer's float, the securities-lending market, and the T12 Halt on the one hand, and Plaintiff's complete inability to close their short positions or obtain relief through ordinary market mechanisms on the other, to extract ongoing financial benefit from trapped

---

[12] Plaintiff has been informed that a T12 Halt can stay in place for up to three years.

investors who had no means of self-help. That course of conduct, using a Nasdaq-listed Texas issuer as the instrument of an OFAC-linked criminal enterprise, engineering a regulatory halt, and deliberately prolonging it to extract ongoing financial benefit from investors who could not exit, shocks the conscience and constitutes an unconscionable course of action under the DTPA.

98.     As a direct and proximate result of Defendants' unconscionable course of action, Plaintiff has suffered economic damages in an amount to be proven at trial, including but not limited to ongoing interest charges and borrow fees assessed against Plaintiff's short position in INHD common stock at rates as high as 600% per annum, resulting in losses to Plaintiff alone of approximately $15,000 to $20,000 per day since the imposition of the T12 Halt on June 8, 2026, with aggregate losses to Plaintiff substantially exceeding that amount and compounding each day the T12 Halt remains in effect.

**WHEREFORE,** Plaintiff Kingbird Ventures LLC, respectfully requests that this Court enter judgment in Plaintiff's favor and against Inno Holdings and Ding Wei, for: actual economic damages in an amount to be proven at trial; damages of up to three times the amount of actual damages for Inno Holdings and Ding Wei's knowing and intentional conduct; attorneys' fees and costs; and such other and further relief as the Court deems just and proper.

## COUNT V – CIVIL CONSPIRACY
### (*Against All Defendants*)

99.     Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

100.     Defendants entered into an agreement, express or implied, to use the Issuer and related offshore entities as components of a unified fraudulent scheme. The agreed objectives included obtaining control of a Nasdaq-listed Texas corporation with funds supplied through an OFAC-designated criminal or quasi-criminal network; replacing its governance; obscuring

beneficial ownership and the flow of funds; manufacturing the appearance of legitimate operating and financing activity; concentrating control of the freely tradeable and lendable float; coordinating the June 8 price-and-volume event; exploiting the resulting T12 Halt; and extracting continuing borrow charges from investors unable to cover.

101. In furtherance of the conspiracy, Defendants committed interlocking overt acts at the corporate, financial, disclosure, trading, communications, and stock-loan levels. Those acts included the cryptocurrency-funded acquisition of control; replacement of the Issuer's board; migration of operations and records offshore; use of BVI and Hong Kong entities; placements to undisclosed investors; concealment of common beneficial ownership; publication of misleading transaction announcements; coordinated WeChat communications; concentration and withholding of the lendable float; algorithmic or matched trading that created artificial price and volume; repeated representation of scarce shares as available to borrow; and calibrated responses to Nasdaq that maintained the halt without resolving the information deficiencies that caused it.

102. As a direct and proximate result of the conspiracy and the overt acts committed in furtherance thereof, Plaintiff has suffered damages in the form of ongoing interest charges, borrowing costs, and other losses described herein, in an amount to be proven at trial.

103. As a further consequence of the conspiracy, Plaintiff is entitled to punitive damages against all Defendants in an amount sufficient to punish and deter the conduct described herein.

**WHEREFORE,** Plaintiff Kingbird Ventures LLC, respectfully requests that this Court enter judgment in Plaintiff's favor and against all Defendants for compensatory damages for all losses caused by the conspiracy described herein, in an amount to be proven at trial; punitive damages in an amount sufficient to punish Defendants and deter the conduct described herein; pre-

PLAINTIFF'S COMPLAINT

judgment interest; attorneys' fees and costs, and any such other relief this Court deems just and proper.

Dated this 24th day of June 2026            **DYKEMA GOSSETT PLLC**

*/s/ Tiffany H. Eggers*
TIFFANY H. EGGERS
Florida Bar No. 0193968
Texas Bar No. 24151965
SDTX Federal Bar No. 3934304
Attorney in Charge for Plaintiff
1717 Main Street, Suite 4200
Dallas, Texas 75201
T: (214) 462-6400/ F: (214) 462-6401
TEggers@dykema.com

/s/ *Stephanie Sepulveda*
STEPHANIE SEPULVEDA
Texas Bar No. 24106418
SDTX Federal Bar No. 3630278
5 Houston Center
1401 McKinney St., Suite 1625
Houston, Texas 77010
T: 713-904-6900/ F: 214-462-6401
SSepulveda@dykema.com

**ATTORNEYS FOR PLAINTIFF**