# **<u>Exhibit D</u>**

## DECLARATION OF JIM WANG

I, Jim Wang, declare as follows:

### I. BACKGROUND AND QUALIFICATIONS

1. I am over the age of 18 and am a United States citizen residing in the State of California. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently thereto.

2. I have approximately 17 years of experience in investment banking and private equity, with a focus on technology, healthcare, and real estate sectors in North America and Asia. I am currently a director for a family office responsible for investments across diversified sectors. Previously, I served as Senior Investment Director for Fosun International, with postings in both New York and Shanghai. Prior to that, I was a Vice President with H.C. Wainwright & Co. and its Rodman & Renshaw unit, where I focused on private placements, initial public offerings, reverse takeover transactions, and cross-border mergers and acquisitions. I hold a B.A. in Political Science and Business Administration from the University of California, Berkeley. I have previously held a FINRA securities license.

3. In the course of my career, I have developed extensive experience with the listing and trading of securities of Asian companies on U.S. national exchanges, including Nasdaq and the New York Stock Exchange. That experience is directly relevant to the observations set forth below.

### II. ENGAGEMENT

4. On or about June 8, 2026, I was contacted by principals of Kingbird Ventures LLC ("Kingbird") to consult regarding market conditions surrounding the common stock of Inno Holdings Inc. (Nasdaq: INHD) (the "Issuer"). I have no financial interest in the outcome of any dispute involving INHD and no position—long or short—in the Issuer's securities.

5. The following statements reflect my observations, conclusions, and the information I have gathered to date. These statements are based on my personal knowledge, my review of the circumstances, and information provided to me by parties involved in the matter. Where I describe information obtained from parties, I have identified the source/s of that information.

### III. OBSERVATIONS REGARDING INHD TRADING ACTIVITY ON JUNE 8, 2026

6. On June 8, 2026, INHD's common stock experienced what I consider to be extraordinary and highly abnormal trading activity. Based on publicly available data: (a) the share price rose from approximately $1.11 to approximately $39.49 in a single session (b) reported volume was approximately 278,900,100 shares; and (c) the Issuer had 4,520,698 shares outstanding as of May 19, 2026. Reported volume thus exceeded total shares outstanding by more than 60 times. A holding large enough to control trading of this magnitude would ordinarily be disclosed on a

EXHIBIT D

Schedule 13D under Section 13(d) of the Securities Exchange Act of 1934, yet I am aware of no Schedule 13D on file identifying the person or group controlling the Issuer's concentrated float.

7. Two independent sources confirmed the same critical fact: approximately 410,000 freely tradeable Issuer shares were actually deposited in trading accounts, but those shares were being held back rather than released into the market as ordinary tradeable supply. One source was Mr. Li; the other was a separate contact who communicated directly with the Issuer and its former chairman in response to inquiries regarding the availability of Issuer shares. When compared against the reported June 8, 2026 trading volume of approximately 278.9 million shares, the 410,000-share figure demonstrates an artificially constrained tradeable supply. That figure can be verified through the Issuer's transfer agent records.

8. Following the close of regular trading hours on June 8, 2026, Nasdaq imposed a trading halt under Code T12 ("Additional Information Requested") on INHD's common stock (the "T12 Halt"). A T12 Halt is indefinite in duration and continues until the issuer satisfies Nasdaq's outstanding information requests. The T12 Halt remains in effect as of the date of this Declaration.

## IV. PROFESSIONAL ASSESSMENT: CHARACTERISTICS CONSISTENT WITH MARKET MANIPULATION

9. Based on information I obtained regarding the listing and trading of securities of Asian companies on U.S. exchanges, the trading pattern observed in INHD on June 8, 2026 is, in my opinion, highly consistent with what is commonly referred to as a "pump-and-dump" scheme. I am aware of numerous documented instances of similar schemes involving Nasdaq-listed companies with concentrated share ownership tied to overseas trading accounts. Publicly available reporting on such patterns includes, among others:

- https://news.bloomberglaw.com/securities-law/sec-foreign-firm-suspension-blitz-spurs-monthslong-trading-halts
- https://finance.yahoo.com/news/doj-works-compensate-victims-214m-173957519.html
- https://www.cbsnews.com/newyork/news/stock-market-day-trading-pump-and-dump-schemes-nasdaq/

10. In a typical scheme of this character, a thinly traded company's freely tradeable float is concentrated in accounts controlled by or affiliated with company insiders or their associates. Those accounts conduct coordinated trading among themselves—often algorithmically—to drive the share price upward artificially. Social media and other promotional channels are then used to attract retail investors at inflated prices, at which point the insiders exit their positions. Taken together, the constrained float, extraordinary trading volume, extreme price appreciation, lack of meaningful revenue, absence of active U.S. operations, and coordinated trading activity among

EXHIBIT D

persons affiliated with or acting in concert with the Issuer establish that INHD was the subject of a pump-and-dump scheme on June 8, 2026.

**11.** Based on information I have gathered through my professional network, as further described in Section V, and based on statements made to me by persons with direct knowledge of the relevant events, I state that the T12 halt was not merely an unforeseen regulatory event. The facts known to me establish that the halt was anticipated, precipitated, and used by parties acting in concert with Inno Holdings, the Issuer, and persons affiliated with or acting on behalf of the Issuer, including its Chairman and Chief Executive Officer, Ding Wei.

I further state that the Inno Holdings parties involved in the conduct described herein knew of the coordinated scheme, knew that the T12 halt would prevent short sellers from covering their positions, and knew that maintaining the halt would allow parties controlling the borrowable float to continue collecting borrowing fees at highly elevated rates. These parties were not passive participants, uninvolved counterparties, or persons who merely became aware of events after the fact. They were active participants who knowingly assisted, supported, and benefited from the strategy described herein.

Specifically, I understand that a WeChat conversation relating to a pump-and-dump scheme was among the information reported to Nasdaq and formed part of the circumstances that triggered, or materially contributed to, Nasdaq's decision to impose the T12 halt. That WeChat conversation was not the sole basis for my understanding, but rather one component of a broader body of information, statements, and circumstances demonstrating knowing coordination among the Issuer, Ding Wei, persons connected to the Issuer, Inno Holdings-related parties, and parties with control over the Issuer's float.

Based on statements made to me by individuals involved in the scheme and acting in concert with the Issuer and Ding Wei, I state that the halt was knowingly used as part of a broader strategy to trap short sellers in their positions while parties controlling the borrowable float, directly or indirectly and in coordination with the Issuer and related parties, continued to collect borrowing fees at highly elevated rates during the pendency of the halt, potentially for a period of up to three (3) years.

## V. INFORMATION OBTAINED THROUGH INVESTIGATION

**12.** Following my initial consultation with Kingbird, I undertook efforts through my professional contacts in Asia to gather additional information about the entities and individuals connected to INHD's trading activity and corporate structure. Where information was obtained from a specific individual, I identify the source as such.

**13.** Through a contact in Asia, I was connected with an individual named "Mr. Li." Mr. Li represented himself as the head of a trading operation with control over a large number of securities accounts—potentially in the tens of thousands—and as responsible for the coordinated

EXHIBIT D

trading activity that drove INHD's share price on June 8, 2026. The statements attributed to Mr. Li in paragraphs 14 through 16 below reflect what he told me in that conversation.

**14.** According to Mr. Li: (a) he and associated trading accounts acquired INHD from the company's founder, Dekui Liu, for approximately $7 million, and thereafter replaced INHD's board of directors with individuals he described as his own associates; (b) INHD's business was subsequently changed from light-gauge steel building materials manufacturing—its business at the time of its December 2023 Nasdaq IPO—to electronics trading conducted out of Hong Kong; (c) the funds used to acquire the INHD shell were provided, according to Mr. Li, by an associate of the Prince Group, an organization that has been the subject of U.S. Department of Justice and U.S. Treasury enforcement actions (cited at paragraph 15 below); and (d) those funds were transmitted via USDT cryptocurrency from Cambodia.

**15.** Publicly available information regarding the Prince Group and related U.S. government enforcement actions includes the following sources:

- https://www.justice.gov/opa/pr/Chairman & Chief Executive Officer-prince-group-indicted-operating-cambodian-forced-labor-scam-compounds-engaged
- https://home.treasury.gov/news/press-releases/sb0278
- https://www.occrp.org/en/scoop/how-sweeping-sanctions-missed-a-business-partner-of-the-alleged-head-of-an-major-asian-crime-organization
- https://www.rfa.org/english/news/cambodia/cambodia-airways-prince-group-ipo-sec-10112024100042.html

The Prince Group maintains a role in this transaction and is materially benefitting from it.

**16.** Mr. Li further stated that, following the T12 Halt, short sellers in INHD have been unable to purchase shares in the market to close their positions because the tradeable float remains concentrated in accounts he controls. He stated that he is among the primary lenders of INHD shares to broker-dealers and that borrowing rates have reached as high as 500% per annum at some broker-dealers. He described the continuation of the T12 Halt as financially beneficial to him for this reason.

**17.** I note that a number of the factual representations made by Mr. Li are consistent with publicly verifiable information reflected in the Issuer's SEC filings: (a) the Issuer's current management team and board of directors bear no overlap with those in place at the time of the December 2023 IPO; (b) the Issuer dismissed its U.S.-based independent registered public accounting firm, Simon & Edward, LLP, and engaged a Singapore-based firm, JWF Assurance PAC, in its place, as disclosed in the Issuer's Current Report on Form 8-K (Item 4.01) reporting an earliest-event date of January 13, 2025 and filed with the SEC on January 16, 2025; and (c) the Issuer's principal operations are now described as being conducted in Hong Kong.

**18.** I was informed by Li, who works with or is otherwise connected to the Company's Chairman & Chief Executive Officer, that the Company was not particularly active, that the Company was

EXHIBIT D

a total fraud, and that its operating company had not maintained active operations in Texas since 2025. Li further informed me that, in his view, the Company had no meaningful operations. This understanding was corroborated by the Company's June 10, 2026 Form 8-K and related disclosure concerning a purported approximately $3 million development-services agreement for a used-phone-sales "AI Agent." Although the transaction was publicly announced in the issuer's name, the underlying exhibit reflects that the contracting party, as "Party A," was APEXVEST HOLDINGS LIMITED, a British Virgin Islands company, and not the issuer itself. The exhibit further reflects that the counterparty was NINETECH TECHNOLOGY (HONGKONG) LIMITED, that the agreement was governed by Hong Kong law, and that it was signed by Ding Wei. In my view, the discrepancy between the issuer's public announcement and the actual contracting party identified in the exhibit was a significant red flag and further supported the conclusion that the issuer lacked a real operating business and was using affiliated or non-issuer entities to create the appearance of commercial activity. Based on the information provided to me, including Li's statements and the Ding Wei-signed APEXVEST agreement, Ding Wei was acting in concert with others involved in the scheme and directly benefitting, rather than merely approving information in an administrative capacity. This information further supported my understanding that the Company's public representations regarding its business and operations were materially misleading.

## VI. IMPACT ON SHORT SELLERS

**19.** The combination of circumstances described in this Declaration—including extreme artificial price inflation, concentration of the float in insider-affiliated accounts, the imposition of an indefinite T12 halt at 5:18 p.m. Eastern Time on June 8, 2026, after the regular market close at 4:00 p.m. Eastern Time, as reflected in the Nasdaq notice, and elevated borrow rates charged to short sellers who are unable to cover their positions—is consistent with a deliberate scheme designed to extract ongoing financial benefit from short sellers through manipulated securities lending conditions. The after-hours timing of the halt further supports the conclusion that the action was unusually rapid and occurred under circumstances consistent with the broader manipulative pattern described herein.

**20.** The Nasdaq trading halt notice reflects that a T12 halt was imposed at 5:18 p.m. Eastern Time on June 8, 2026, after the regular market close at 4:00 p.m. Eastern Time. The after-hours timing of the halt is significant because it demonstrates that Nasdaq acted unusually quickly and outside normal trading hours in response to the circumstances presented.

**21.** Based on information provided to me, interest charges on INHD short positions may exceed $15,000 per day at rates as high as approximately 600% per annum. I have not independently verified the precise figure, and I understand that account statements reflecting these charges contain line items that shall require further reconciliation to confirm the exact daily amount.

## VII. LIMITATIONS AND ONGOING INVESTIGATION

EXHIBIT D

**22.** The foregoing reflects information gathered to date. My investigation is ongoing. I have endeavored to distinguish throughout this Declaration between my own professional observations—which I hold with a high degree of confidence—and information obtained from third parties, which remains subject to further verification.

**23.** I am prepared to testify to the matters stated in this Declaration and to provide further information, including the full identity of Mr. Li.

**24.** I was informed by Li, and separately spoke with counsel for Inno Holdings, that counsel had been instructed by Chairman and Chief Executive Officer Ding Wei and members of the Inno Holdings team to deliberately prolong this matter and delay its resolution. At the same time, Inno Holdings' executives and counsel were inundated with requests from short sellers seeking to purchase shares, close out, or otherwise cover their short positions. The purpose of the delay was to maintain the T12 trading halt, which prevented short sellers from covering their positions and thereby enabled the continued accrual and collection of interest, fees, and elevated borrow charges against them.

**25.** To accomplish this, the Issuer is expected to continue submitting responses to Nasdaq's information requests, which are only calibrated to forestall delisting while leaving those requests unresolved. Thus trading neither resumes nor moves to a venue where short positions could be closed.  In substance, it is a prolongation of the halt - rather than its resolution.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on _____ June 15 _____, 2026, at _____ Sierra Madre _____, California.

**Jim Wang**
Declarant