# **<u>Exhibit E</u>**

DECLARATION OF KINGBIRD VENTURES, LLC
IN SUPPORT OF INJUNCTIVE & OTHER RELIEF

I, ROBERT MILEY as authorized agent of Kingbird Ventures, a Wyoming limited liability company, declare as follows:

1.    I am the Chief Compliance Officer of Kingbird Ventures LLC ("Kingbird") which takes compliance seriously in all material respects. I have held this position since approximately early 2022. I held the position of Chief Compliance Officer for all times material to the issues described in the Complaint. In this role, I am involved in Kingbird's due diligence, day-to-day operations, and other facets of Kingbird's endeavors as they develop. I have personal knowledge of the facts set forth in this Declaration, including by having read the Declaration of Jim Wang, and, if called as a witness, could and would testify competently thereto.

2.    Kingbird is a professional investment firm that prioritizes disciplined risk management, thorough due diligence, and exacting execution of its trading strategies—including certain short-selling strategies— in a responsible manner. Kingbird's standing with investors, brokers, clearing firms, and other market participants depends upon its reputation and the industry's perception of Kingbird's integrity and sound judgment at the core of its trading strategies.

3.    On or about June 8, 2026, Kingbird observed that the common stock of public company Inno Holdings Inc. (Nasdaq: INHD), an issuer trading on Nasdaq's exchange, was beginning to climb dramatically. Whereas INHD's common stock opened at $1.11 per share, according to publicly available trading information, its share price would ultimately climb to a closing price of $39.49 by the end of the day. Its Icarian rise is easier to visualize from a trading chart like Yahoo Finance's:



Meanwhile, although Yahoo Finance reported trading volume of 144,300 on June 5, 2026 (the prior trading day) the same source reports a June 8 trading volume of *278,900,100*—more than 1,932 *times* the prior

EXHIBIT E

trading day's volume. At the same time, INHD's stock was also subjected to a number of Limit Up-Limit Down ("LULD") pauses throughout the day because of its rapid price climb.

4.      From what Kingbird could piece together at the time, the only significant event that could serve to—at least partially—explain INHD's trading activity was INHD's June 8 press release, published at 9:40AM EDT.[1] The press release described a "Development Services Agreement" that INHD had entered into with a "Hong Kong based AI service provider" whose name the press release altogether neglected to provide. According to the press release, the agreement had a "total contracted service value of USD 3,000,000" and would involve the service provider's development of a "Sales AI Agent Project": essentially, an artificial intelligence-oriented sales system to automate INHD's sale of used mobile phones.[2]

5.      Kingbird did not find the press release to warrant such a significant rise in the company's share price and proceeded to open short positions with two separate brokerages. Although INHD's share price would continue to climb throughout the day, an event which Kingbird now believes to have been caused by certain actors' efforts to artificially control INHD's supply of freely tradeable shares rather than because of the press release, Kingbird had and continues to have conviction that INHD's share price would plummet.

6.      Following June 8, 2026, however, INHD's shares would not resume trading: instead, their share price would be frozen at the price last reported prior to the close of market. This is because immediately after hours (within 90 minutes of markets closing) a T12 halt issued by Nasdaq. This left the share price at $39.49. On June 11, 2026, Nasdaq issued a press release at 9:00AM in which it officially announced that Nasdaq had halted the trading of INHD's shares as of 5:18pm on June 8, 2026 at a closing price of $39.49.[3]

7.      It is my understanding that to create a short position, an investor is required to either purchase or borrow shares of a given issuer. The failure to do so is considered "naked" short selling and depending on the circumstances may be violative of securities regulations. It is a customary practice—if not the industry standard—for short traders to borrow shares rather than purchase them when opening a position like Kingbird's short positions in INHD's common stock. To borrow shares, an investor will pay interest and fees that generally correlate with an issuer's share price and the availability of shares to be borrowed. To effectuate its trades, Kingbird borrowed shares through two separate brokerages. To maintain its positions, Kingbird would then be required to pay interest rates: however, Kingbird could not have anticipated that the interest rates would soon increase to 500-600% due to trading irregularities and a T12 Halt that would soon issue from Nasdaq—unless, in the alternative, Kingbird could locate alternate INHD shares (a practical impossibility in light of the T12 Halt). When the T12 halt took effect, Kingbird was no longer able to freely locate shares and was instead required to continue paying 500-600% fees into what is effectively an uncertain perpetuity. However, when the T12 halt took effect, the "borrowing" rates would be based upon INHD's last closing price before the T12 halt took effect: $39.49. Given the combination of shares

---

[1]      https://www.nasdaq.com/press-release/inno-holdings-inc-enters-development-services-agreement-build-ai-powered-used-mobile

[2]      https://www.nasdaq.com/press-release/inno-holdings-inc-enters-development-services-agreement-build-ai-powered-used-mobile "Hong Kong, China, June 08, 2026 (GLOBE NEWSWIRE) -- INNO HOLDINGS INC. (NASDAQ: INHD) ("INNO" or the "Company") today announced the execution of a Development Services Agreement (the "Agreement") with a Hong Kong based AI service provider (the "Service Provider"). Under the Agreement, the Service Provider will develop an AI-powered used mobile phone sales agent system (the "Sales AI Agent Project") on behalf of the Company, with a total contracted service value of USD 3,000,000."

[3]      https://www.nasdaq.com/press-release/nasdaq-halts-inno-holdings-inc-2026-06-11

that were generally already difficult to locate and an issuer's share price that multiplied by a magnitude of more than 35 in the span of a single trading day, Kingbird was faced with the perfect storm of interest rates as high as 600% that would continue to drain Kingbird's accounts indefinitely, absent intervention.

8.     In response to these events, Kingbird engaged consultant Jim Wang ("Wang"). Initially, Wang was engaged for two primary reasons: a) to help Kingbird understand the events that occurred on June 8, 2026 and in the period of time leading up to it, and b) to determine whether Kingbird could compliantly locate and obtain shares of INHD through shares via mechanisms other than the Nasdaq exchange.

9.     In the process, however, Wang conducted a number of phone calls with individuals that readily admitted their effectuation of a securities manipulation scheme designed to: a) artificially control INHD's supply of shares by buying up as much of INHD's shares as possible with an untold number of unique accounts; b) drive the price of those shares upward (more than a 35x multiplier on June 8, 2026 for example); and c) lock short traders into extraordinary interest rates for an indefinite period of a time by using a T12 halt to "freeze" the interest rates and underlying lending instruments in place so that the shares would not be "naked"—potentially a year or years-long affair. These explanations completely aligned with the facts that Kingbird observed through news reporting and the market.

10.     Thereafter, Kingbird began conducting a detailed investigation into INHD's public disclosures and discovered additional irregularities that aligned with the narrative thus far.

a.   For example, in a December 29, 2025 Form 8-K[4], INHD reported that it had entered into a securities purchase agreement with ten non-U.S. investors whereby it sold the investors a total of 3,000,000 shares for an aggregate amount of $3,930,000. The same Form 8-K reported that the number of shares funneled to these ten investors amounted to more than 42% of INHD's shares in existence at the time, and the underlying agreement specified that no individual investor would own more than 4.99% of INHD's total shares.[5] If these investors owned more than 4.99% they would be required to identify themselves in certain filings. See 17 CFR 240.13d-1.

b.   In another transaction disclosed in a Form 8-K[6] received by EDGAR on September 12, 2025—but dated September 11, 2025 according to the filing and its signatory themselves, INHD sold 1,200,000 shares and pre-funded warrants for an additional 800,000 shares in exchange for net proceeds of "approximately $6.7 million" and, all told, gross proceeds of "approximately $7.2 million" according to the securities purchase agreement itself.[7]

c.   In INHD's July 8, 2025 Form 8-K[8], the company similarly announced another agreement for the sale of its securities: a "Standby Equity Purchase Agreement" between INHD and certain investors for the sale of up to $6 million shares. Oddly, however, the purchase price

---

[4] https://www.sec.gov/Archives/edgar/data/1961847/000149315225029388/form8-k.htm
[5] https://www.sec.gov/Archives/edgar/data/1961847/000149315225029388/ex1-1.htm
[6] https://www.sec.gov/Archives/edgar/data/1961847/000164117225027144/form8-k.htm
[7] https://www.sec.gov/Archives/edgar/data/1961847/000164117225027144/ex10-1.htm
[8] https://www.sec.gov/Archives/edgar/data/1961847/000164117225018252/form8-k.htm

EXHIBIT E

was set to only 40% of the company's "Minimum Price" of $1.20[9], and odder still, the agreement allowed for the company, in its discretion, to adjust the sale price to a lower number between 20 and 40% of its "Minimum Price." As described in the Form 8-K, "[t]he purchase price per share is equal to 40% of the Minimum Price, subject to adjustment by the Company to an amount between 20% and 40% of the Minimum Price."

d.  And again, in a June 6, 2025 Form 8-K, INHD announced *another* securities purchase agreement whereby it would sell an aggregate of 1,058,000 shares for a purchase price of $0.50 per share. In the same Form 8-K, the company disclosed that its last reported sale price at the time was 2.5 times that price: on May 30, 2025, its share price was $1.25.

11.  In the course of its investigation, Kingbird submitted a letter to broker Cobra Trading Inc. and its clearing firm, Wedbush Securities Inc., in addition to a similar letter to broker Velocity Clearing, LLC. In those letters, Kingbird's requests including the following:

a.  "Investigate and identify the beneficial owners of the Issuer's shares that are being lent in connection with Kingbird's short position and determine whether any such beneficial owners are affiliated with, controlled by, or otherwise related to the Issuer, its management, or its significant shareholders;"

b.  "Provide a current account statement of Kingbird's account and a written explanation of the interest charges, margin costs, administrative fees, and any other fees imposed on Kingbird's account; and please specify the exact amount of cash and/or securities that are currently available for Kingbird to withdraw or transfer at this time;"

c.  "Confirm all compliance obligations have been, and are being, met with respect to the Issuer, the Insiders, Kingbird, and the situation described in this letter, including, without limitation, know-your-customer requirements and AML, SEC, and Nasdaq rules and regulations;" and

d.  "Preserve and not destroy all Relevant Information."

Cobra Trading Inc., Wedbush Securities Inc., and Velocity Clearing, LLC have not yet provided information in response to any of Kingbird's requests.

12.  The events surrounding Kingbird's short position in Inno Holdings Inc. (Nasdaq: INHD) have caused—and are continuing to cause—significant and ongoing reputational harm and damage to Kingbird's goodwill: not to mention economic damages that are continuing to accrue. Since the imposition of the Nasdaq T12 trading halt on June 8, 2026, and Kingbird's subsequent inability to cover its short positions except by continuing to borrow shares at extraordinary interest rates—while at the same time being seemingly relegated to borrowing shares and paying these heightened fees to maintain the short positions in INHD's common stock, as evidenced by the responses that Kingbird has received in response to its

---

[9] https://www.sec.gov/Archives/edgar/data/1961847/000164117225018252/ex10-1.htm

EXHIBIT E

inquiries about the T12 halt, trading irregularities, and outlandish interest and fees thus far—, Kingbird has been forced into a highly visible and protracted situation involving a stock that is now widely perceived in the market as having been subject to manipulation: manipulation which seems to have been perpetrated by certain OFAC-sanctioned individuals and entities, as more particularly described in the Declaration of Jim Wang. This has created the impression—both internally and externally—that Kingbird is "trapped" in a tainted stock and circumstance through no fault of its own. This also risks Kingbird becoming insolvent, imminently.

13.    As Chief Compliance Officer, I am particularly concerned about the reputational harm arising from Kingbird's continued forced participation in transactions that appear connected to parties with documented U.S. enforcement and sanctions concerns. Even though Kingbird is the victim of the alleged scheme, the optics of ongoing payments flowing through U.S. broker-dealers in connection with this position have created internal and external compliance discomfort and have begun to erode the firm's reputation for maintaining clean and well-managed exposures. In addition, Kingbird has legitimate concerns that it may be subject to sanctions on a strict liability basis if it is found that its funds are being sent to individuals on US Sanctions lists. This as well will cause reputational harm once confirmed if Kingbird does not act proactively. This is not supposition regarding the nature of liability in light of Kingbird's efforts to familiarize itself with OFAC compliance. Kingbird reviewed the OFAC compliance websites which state verbatim, "OFAC may impose civil penalties for sanctions violations based on strict liability, meaning that a person subject to U.S. jurisdiction may be held civilly liable even if such person did not have knowledge that it was engaging in a transaction that was prohibited under sanctions laws and regulations administered by OFAC."[10]

14.    The reputational damage is not theoretical or speculative. It is immediate, compounding daily, and cannot be fully remedied by a later award of monetary damages. Once market participants form the view that a firm is entangled in a manipulated or compromised situation, that perception is extremely difficult to reverse, regardless of the eventual outcome of litigation or regulatory proceedings. This harm threatens Kingbird's ability to maintain and grow its investor base, negotiate favorable terms with counterparties, and operate effectively as a going concern in the securities industry.

15.    In addition to reputational damage, however, Kingbird is concerned about what certain individuals disclosed to Wang throughout various phone calls. In particular, it seems that certain parties involved in facilitating a scheme designed to manipulate INHD's shares to the detriment of Kingbird and other similarly-situated investors may be subject to continuing sanctions by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"). Whereas Kingbird would never knowingly facilitate payments or become involved in any transaction with an OFAC-sanctioned party, Kingbird is particularly concerned that the shares that it is being forced to borrow may be tied to such individuals and that, in turn, the same extraordinary interest rates that Kingbird is being forced to pay—despite multiple requests by Kingbird to the broker-dealers and clearing agent managing its accounts to halt the damage being done who have thus far been altogether uncooperative—, are being paid to such individuals. Furthermore, as set out above, Kingbird's relative innocence in the whole situation is of no relevance to OFAC because liability is strictly based on flow of monies rather than a given party's intent.

---

[10] https://ofac.treasury.gov/faqs/65

16.    All press-releases that are being produced in support of this Affidavit are true and correct copies of either (1) press releases authored by the Defendants or NASDAQ about the Defendants or (2) public filings that my team pulled copies from publicly available sources and did not alter or amend in anyway except to upend them to the Court in a reviewable manner.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on June 23, 2026 in Mecklenburg County, North Carolina

*Robert Miley*
_____
Robert Miley, Chief Compliance Officer
Kingbird Ventures, LLC

EXHIBIT E