# **Exhibit F**

DECLARATION OF KINGBIRD VENTURES, LLC
IN SUPPORT OF INJUNCTIVE & OTHER RELIEF

I, Aharon Diveroli, as authorized agent of Kingbird Ventures, a Wyoming limited liability company, declare as follows:

1.     I am the Manager of Kingbird Ventures LLC ("Kingbird"). I have held this position since 2023 and have held that position for all times material to the events described in thie Complaint. In this role, I oversee Kingbird's compliance program in its day to day operations, including its general operation policies, risk management procedures, and regulatory reporting obligations. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently thereto.

2.     Kingbird is a professional investment firm that prioritizes disciplined risk management, thorough due diligence, and exacting execution of its trading strategies—including certain short-selling strategies— in a responsible manner. Kingbird's standing with its primary capital source, in addition to its relationships with brokers, clearing firms, other market participants, and other actual and prospective counterparties now and in the future depends upon its reputation and the industry's perception of Kingbird's integrity and sound judgment at the core of its trading strategies.

3.     On or about June 8, 2026, Kingbird observed that the common stock of public company Inno Holdings Inc. (Nasdaq: INHD), an issuer trading on Nasdaq's exchange, was beginning to climb dramatically. Although INHD's common stock opened at $1.11 per share, it rose to a closing price of $39.49 by end of day: an increase that did not seem to be supported by the only material news reporting from the Issuer—a "Development Services Agreement" announced on the morning of June 8, 2026 whereby the Issuer announced its plan to develop an AI system designed to sell used mobile phones.

4.     In response, Kingbird opened short positions against INHD's common stock. Nasdaq's own response, however, was to issue a T12 halt that came into effect at 5:18pm ET on June 8, 2026 and has frozen the share price of INHD's common stock at $39.49 ever since.

5.     Following June 8, 2026, however, INHD's shares would not resume trading: instead, their share price would be frozen at the price last reported prior to the close of market. This is because immediately after hours (within 90 minutes of markets closing) a T12 halt issued by Nasdaq. This left the share price at $39.49. On June 11, 2026, Nasdaq issued a press release at 9:00AM in which it officially announced that Nasdaq had halted the trading of INHD's shares as of 5:18pm on June 8, 2026 at a closing price of $39.49.[1]

6.     When the events described began, I (together with the rest of the Kingbird team involved in the matter) immediately began investigating further the circumstances, to wit:

   a. I personally participated in multiple efforts to obtain information that would allow Kingbird to understand the supply of lendable shares, identify the beneficial owners or lenders of those shares, and explore any possible path to covering or mitigating Kingbird's short position. These efforts included both informal outreach and formal written requests.

---

[1] https://www.nasdaq.com/press-release/nasdaq-halts-inno-holdings-inc-2026-06-11

EXHIBIT F

I have received no response of any substance from any party with information.

b. Between June 9 and June 14, 2026, I personally placed or participated in calls to Cobra Trading, Inc. (Kingbird's executing broker) and Wedbush Securities Inc. (its clearing firm), as well as to Velocity Clearing, LLC / Guardian Trading (another executing broker of Kingbird's that self-clears its transactions). On these calls, I or members of my team specifically requested: (a) identification of the beneficial owners or ultimate lenders of the INHD shares being lent to cover Kingbird's short position; (b) any documentation or information supporting the availability (or lack thereof) of additional lendable shares; (c) an explanation for the dramatic spike in borrow rates to 500–600% per annum; and (d) any information regarding the reported restriction of the freely tradeable float to approximately 410,000 shares.

c. In each instance, the responses were uniformly unhelpful and evasive. Representatives at Cobra and Wedbush stated that they did not have visibility into the ultimate beneficial owners or lenders of the shares, that borrow rates were "market-driven," and that they could not provide any documentation or backup regarding the source or concentration of the lendable supply. No one was able to confirm or deny the 410,000-share figure or provide any records supporting the actual availability of shares in the lending market. Similar calls to Velocity / Guardian Trading produced the same result: vague references to "market conditions" with no specific information, no documentation, and no willingness or ability to identify who was actually lending the shares Kingbird had borrowed.

d. Specifically, when I and members of my team asked Guardian's representative to identify the party from which Kingbird's borrowed INHD shares were sourced, the representative stated that Guardian was 'not allowed to disclose who we're borrowing from, how many shares, [or] the rate'; that this information was 'all internal'; that Guardian's stock-loan desk was not providing it to him; and that the lender was 'not legally obligated to disclose' its identity. Cobra and Wedbush representatives likewise stated they had no visibility into the ultimate lenders. As a result, Kingbird has been unable to determine the identity of the person or entity to whom its borrow interest is ultimately paid, or to confirm that such payments are not flowing, directly or indirectly, to any sanctioned or blocked person. No broker confirmed that it had screened the ultimate lender against applicable sanctions or anti-money-laundering requirements.

e. On June 15, 2026, Kingbird, through its counsel, sent formal written requests to Cobra Trading/Wedbush and to Velocity Clearing demanding, among other things, an investigation into the beneficial owners of the lent shares, a written explanation of the interest charges, confirmation of AML and compliance obligations, and preservation of all relevant records. Despite these detailed and specific requests, follow-up calls I personally made or participated in after June 15, 2026, yielded no meaningful additional information. Broker representatives continued to state that they lacked visibility into the ultimate lenders and could not provide any backup documentation or confirmation regarding the supply of

EXHIBIT F

shares or the reasons for the elevated rates.

f.  On Wednesday, June 17, 2026, I spoke directly by telephone with representatives of both Guardian Trading/Velocity Clearing and Cobra Trading. On those calls, I specifically requested that they each provide, as applicable: (a) any locate records or other information identifying the source from which the borrowed INHD shares had been obtained; (b) stock loan confirmations or related paperwork evidencing the borrow; (c) the rate schedules or historical pricing showing how the borrow rate had been calculated over time; and (d) any details regarding how the borrow rate is determined or passed through to Kingbird. Representatives of both brokerages instructed me to submit these requests by email so that they could be routed to the appropriate personnel. I sent the requests to both brokerages by email that same day, June 17, 2026. Both requests were ultimately rejected in full, and none of the requested information or documentation was provided.

g.  On Sunday, June 21, 2026, Kingbird, through its counsel, sent letters to Cobra Trading Inc., Wedbush Securities Inc., and Velocity Clearing, LLC in which Kingbird made additional requests for information. Some of Kingbird's requests included the following:

  i.    "Investigate and identify the beneficial owners of the Issuer's shares that are being lent in connection with Kingbird's short position and determine whether any such beneficial owners are affiliated with, controlled by, or otherwise related to the Issuer, its management, or its significant shareholders;"

  ii.   "Provide a current account statement of Kingbird's account and a written explanation of the interest charges, margin costs, administrative fees, and any other fees imposed on Kingbird's account; and please specify the exact amount of cash and/or securities that are currently available for Kingbird to withdraw or transfer at this time;"

  iii.  "Confirm all compliance obligations have been, and are being, met with respect to the Issuer, the Insiders, Kingbird, and the situation described in this letter, including, without limitation, know-your-customer requirements and AML, SEC, and Nasdaq rules and regulations;" and

  iv.   "Preserve and not destroy all Relevant Information."

h.  Subsequently, on Monday, June 22, 2026, Kingbird's outside counsel, Ryan Clancy, contacted the legal and compliance departments of both Guardian Trading/Velocity Clearing and Cobra Trading and made substantively the same requests in an effort to obtain clarity on Kingbird's information request. As with Kingbird's written requests the day before, counsel's requests were likewise rejected in full by both brokerages.

i.  At no point during any of these calls—before or after the formal June 21 letters—was anyone at Cobra, Wedbush, or Velocity able to provide concrete information,

EXHIBIT F

documentation, or even a clear explanation of who controlled the lendable float or why Kingbird was unable to cover its position. The consistent inability or unwillingness of these firms to provide any substantive backup or transparency, even after being placed on formal notice of the alleged manipulation and supply restriction, has left Kingbird with no practical means to mitigate its ongoing daily losses of $15,000 to $20,000 or more. Worse, Kingbird has no visibility into who owns the shares it's paying lending fees for, causing severe concerns related to US-sanctioned individuals as set out below and in the declaration of Jim Wang.

j.  These experiences have confirmed to me that the opacity in the securities lending market for INHD is not a normal market condition but is directly tied to the alleged scheme described in the Complaint and the Wang Declaration. The complete inability of Kingbird's brokers to provide any meaningful information or assistance, despite repeated and escalating requests, has materially contributed to the irreparable harm Kingbird is suffering.

k.  I continued the investigation with my team on June 23, 2026, and found even more disturbing information that supports the concerns raised. During a telephone call on June 23, 2026, I was informed that V Stock Transfer, INHD's transfer agent, stated that INHD has only twelve (12) holders of record, all located in Asia (China), with the balance of the shares held beneficially in street name by objecting and non-objecting beneficial owners. Transfer Agents I interviewed characterized this extremely low number of registered holders—all concentrated in Asia—as incredibly unusual for a Nasdaq-listed company. The transfer agent will not voluntarily disclose the identities of the record holders, which would require compelled discovery through subpoena or court process.

7.  As Manager, I am particularly concerned about the reputational harm that has already been inflicted and is continuing to be inflicted upon Kingbird due to its forced participation in transactions that appear connected to parties with documented U.S. enforcement and sanctions concerns, in addition to any loss of standing that Kingbird may continue to suffer with its existing contacts. Kingbird's primary capital source has already voiced concern regarding the position. Similarly, I am concerned that these circumstances stand to jeopardize Kingbird's relationship with its brokers, clearing firms, employees, consultants, partners, and attorneys—both in the form of reputational harm and in the form of impacting Kingbird's ongoing operations as its capital remains locked up with its current INHD positions.

8.  This perception has already begun to affect Kingbird's relationships and standing. Counterparties such as brokers that Kingbird relies on to trade and other market participants have expressed concern about associating with a firm that remains exposed to an allegedly manipulated security under regulatory scrutiny. Potential investors and limited partners have raised questions about the situation during routine discussions, creating hesitation and requiring extensive explanations that damage confidence in Kingbird's risk controls. The daily public accrual of extraordinary borrow fees at rates of interest as high as 500–600% per annum, debited against Kingbird's accounts on a near daily basis further reinforces the narrative that Kingbird has been made a baffling victim of an irregular circumstance in the U.S. public capital market. This circumstance, in turn, seems to have been caused by certain actors' manipulation of INHD's freely tradeable shares which itself seems to have caused the Nasdaq T12 halt and the assessment of unbearable—but

EXHIBIT F

steadily continuing—interest rates that Kingbird is expected to pay indefinitely or for however long the Nasdaq T12 halt continues.

9.      All press-releases that are being produced in support of this Affidavit are true and correct copies of either (1) press releases authored by the Defendants or NASDAQ about the Defendants or (2) public filings that my team pulled copies from publicly available sources and did not alter or amend in anyway except to upend them to the Court in a reviewable manner.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on June 23rd 2026 in Miami-Dade, Florida

Aharon Diveroli (Jun 23, 2026 20:40:47 EDT)

Aharon Diveroli, Manager
Kingbird Ventures, LLC

EXHIBIT F