**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| KINGBIRD VENTURES LLC, §<br>a foreign limited liability company, §<br>　　*Plaintiff*, §<br>　　§<br>v. §<br>　　§<br>INNO HOLDINGS INC., a Texas §<br>corporation; DING WEI, an individual; §<br>PRINCE HOLDING GROUP, a Cambodian §<br>corporation, and its successor and affiliated §<br>entities; CHEN ZHI, a/k/a "VINCENT," an §<br>individual; JOHN DOE, a/k/a "MR. LI," an §<br>individual, and JOHN DOES 1-10, §<br>individuals, §<br>　　*Defendants.* § | CASE NUMBER 4:26-CV-5000 |

**PLAINTIFF'S RESPONSE TO DEFENDANTS INNO HOLDING INC. AND DING WEI'S EMERGENCY MOTION TO MODIFY TEMPORARY RESTRAINING ORDER**

Plaintiff Kingbird Ventures LLC ("Plaintiff") files this Response in Opposition to Defendants Inno Holdings Inc., ("Inno Holdings" or "INHD") and Ding Wei's Emergency Motion to Modify Temporary Restraining Order ("Defendant's Motion"), Dkt. 9, and states as follows,

**I.	NATURE AND STAGE OF THE PROCEEDINGS**

This action arises from a coordinated securities fraud and market manipulation scheme involving the securities Inno Holdings Inc. (Nasdaq: INHD) that has caused Plaintiff severe, immediate, and ongoing irreparable harm at on-going and critically unstopped basis (by anyone besides a Court or Regulator) with rates as high as approximately 600% per annum. As a result of the conduct, on June 24, 2026, Plaintiff filed a 5-count Complaint alleging: Count 1 - Violation of Section 10(b) of the Exchange Act and Rule 10b-5 (All Defendants);  Count 2 -  Violation of Section 9(a) of the Exchange Act (All Defendants); and Count 3 – Violation of Section 18 of the Exchange Act (Inno Holdings and Ding Wei); Count 4 – Violation of Texas's Deceptive Trade

Practices-Consumer Protection Act (Inno Holdings and Ding Wei); and Count 5 – Civil Conspiracy(All Defendants).  (Dkt. 1).

Also on June 24, 2026, Plaintiff filed an Emergency *Ex Parte* Application for Temporary Restraining Order ("TRO"), Preliminary Injunction, and Expedited Discovery.[1] (Dkt. 2). On June 25, 2026, the Court entered an Order Granting the TRO and referred Plaintiff's Application for a Preliminary Injunction and Expedited Discovery to the Magistrate Judge. (Dkt. 6 at ¶ 7).

On June 29, 2026, Defendants Inno Holdings and Ding Wei filed an Emergency Motion to Modify the TRO, specifically asking the Court to lift paragraphs 1 and 4 that provide,

> 1.       Defendants, . . . , are hereby enjoined from directly or indirectly continuing, resuming, facilitating, financing, promoting, transferring, clearing, settling, borrowing, lending, or otherwise participating in any business, brokerage, securities, or associated trading activity involving the halted securities or related accounts, transactions, instruments, or proceeds at issue in this action. This injunction includes, without limitation, any activity that is currently halted, restricted, frozen, suspended, or otherwise subject to regulatory limitation, inquiry, or prohibition by the SEC, FINRA, Nasdaq, any clearing form, transfer agent, broker-dealer, or other governmental, self-regulatory, or market authority, and any effort to evade such restrictions through affiliates. . .
>
> . . .
>
> 4.       Defendants, . . . are temporarily restrained from transferring, dissipating, encumbering, pledging, concealing, otherwise disposing of any assets, including but not limited to cash, cryptocurrency (including USDT and any other digital assets), securities, brokerage accounts, real property and ***any proceeds derived from the scheme*** described in the Complaint, pending further order of the Court. This restraint applies to assets held directly or indirectly, in the United States or abroad, . . .

 (***emphasis added***) (Dkt. 6 at pgs. 2 – 4).

Paragraph 1 merely prohibits Defendants from doing that which they were not otherwise legally authorized to do due to the ongoing T12 Halt and the still continuing placement on the Reg SHO list. Furthermore, the record evidence in this case shows Defendant Inno Holdings is not a legitimate ongoing business. Paragraph 4 merely prohibits Defendants from "transferring,

---

[1] On June 24, 2026, a copy of the Emergency *Ex Parte* Application for Temporary Restraining Order, Preliminary Injunction, and Expedited Discovery was sent to Defendant Inno Holdings Inc.'s email address found on its website-contact[@]innoholdings.com.

dissipating, encumbering, pledging, concealing, otherwise disposing of any assets" that are "*proceeds derived from the scheme*." However, complying with paragraph 4's prohibition may be difficult for Defendants Inno Holdings and Wei because everything since on or about September 6, 2024 (the date of purchase of Inno Holdings or at best shortly thereafter when Defendants initiated a wholesale replacement of Board) which is when the conspirators began their scheme, has resulted in fraudulent proceeds. As will be shown below and as discussed in Mr. Wang's Original Affidavit filed as **Exhibit D** to the Complaint (Dkt. 1-5), and his supplemental Affidavit attached hereto as **Exhibit G**, there is no legitimate ongoing business by Inno Holdings so all assets are "proceeds derived from the scheme."

## II.    STATEMENT OF FACTS[2]

In summary, Defendants Inno Holdings, Wei, and others have engaged in a securities fraud scheme wherein Plaintiff, and other individuals who took a short on INHD, are stuck in financial and regulatory limbo paying exorbitant interest and borrow fees on a daily basis because of a T12 Halt caused by the Defendants INHD, Wei, and other conspirators.  More specifically, On June 8, 2026, the Defendants and conspirators executed their scheme in the open market using INHD stock. At the time, reported trading volume in INHD reached approximately 278,900,100 shares, more than sixty times the Issuer's total outstanding shares of 4,520,698, while the actual freely tradeable supply was limited to approximately 410,000 shares that were and are being deliberately withheld from the market by Defendants' conspirators. In a single trading session, INHD's share price was driven from approximately $1.11 at the open to approximately $43.37 at its intraday high before closing at approximately $39.49. That is not a market event. It is the signature of a controlled float being used as a trading weapon by a criminal scheme.

---

[2]   The Court is respectfully referred to Plaintiff's Verified Complaint, Dkt. 1, including all exhibits attached thereto, which are incorporated by reference, for a recitation of the relevant facts and circumstances.

Following the close of trading on June 8, 2026, Nasdaq imposed a trading halt under Code T12 (the "T12 Halt"), a halt the Defendants and their conspirators anticipated, precipitated, and have since deliberately prolonged.[3] The T12 Halt is not an obstacle to the Defendants' scheme. *It is an integral component of it.* It has been 22-days since the T12 Halt was instituted by the Nasdaq, although according to FINRA they "typically last[ ] less than an hour" and it is *still in place* as of the filing of this response.[4]

By maintaining this T12 Halt that prevents short sellers from covering their positions, conspirators who control the borrowable float, continue to collect extracted borrow fees at rates up to 600% per annum–not just from Plaintiff, but from any individual or entity who took a short position on the stock.[5] Borrow fees and interest charges on Plaintiff's short position are thousands upon thousands of dollars a day while Plaintiff (and any other person similarly situated) has no mechanism to close its position. The Defendants' scheme was designed to cause exactly that. This slow bleed is perpetual, causes Plaintiff to be associated with the OFAC-sanctioned Defendants' and conspirators, destroys the reputation and goodwill of Plaintiff, and risks leaving Plaintiff

---

[3] "A trading halt typically lasts less than an hour (but can be longer) and is called during the trading day to allow a company to "announce important news or where there is a significant order imbalance between buyers and sellers in a security."  https://www.finra.org/investors/investing/investment-products/stocks/trading-halts-delays-suspensions. "When a trading halt is implemented for a listed stock, the listing exchange notifies the market that trading is not allowed in that stock for the duration of the halt. All other U.S. markets trading the stock must observe the trading halt as well, including trading that occurs off-exchange in the OTC market. While the halt is in effect, brokerage firms are prohibited from publishing quotations or indications of interest and from trading the stock. The listing exchange will end the trading halt by taking the steps required by its individual rules …" (*Id*.).

[4] Further, at or near imposition of the T12 Halt by Nasdaq, Defendant INHD was placed on Reg SHO list, a/k/a the Threshold Securities List. In order for a security, here INHD, to be placed on the Reg SHO list that means that for five consecutive settlement days there has been a failure to deliver shares totaling 10,000 or more that equaled at least 0.5% of the INHD's total outstanding shares. "Fails to deliver" happen when a seller fails to hand over the underlying shares to a buyer by the standard settlement date. Although "fails to deliver"[4] do not automatically mean a stock has been illegally shorted; however, it can be an indicator of improper manipulation of the market.

[5] To put this in perspective for the Court, Plaintiff has tens of thousands of shares and is facing imminent insolvency from this scheme, at least one clearing firm has already told Plaintiffs that they personally ordered over two **million** (2,000,0000 shares). The risk and harm that Defendants have caused to the American markets in addition to being coordinated is also substantial in light of the scope in just one clearing firm. On information and belief there are over one hundred firms that are registered as clearing firms in the United States to put this scale into perspective. Source: https://www.finra.org/media-center/reports-studies/2024-industry-snapshot/firm-data.

insolvent because Plaintiff's fate and money is literally in the Defendants' hands. Unless and until regulators, e.g. the Nasdaq (through delisting), the SEC (through emergency action), etc., or the Defendants themselves choose to provide sufficient information to the Nasdaq's inquiry under the T12 Halt, Plaintiff's brokers will continue to pull and transfer downstream exorbitant interest and borrow fees[6] from Plaintiff's accounts, and there is absolutely nothing Plaintiff can do other than watch it happen—that is unless this Court or regulators intervene.

**Exhibit D** of the Plaintiff's Complaint was the Declaration of Jim Wang which is incorporated by reference. (Dkt. 1-5). Attached hereto as **Exhibit G** is a Supplemental Declaration of Mr. Wang dated June 30, 2026, which is also incorporated by reference. In summary, Mr. Wang's Declarations show the following:

- In or about September 6, 2024, Defendant John Doe, a/k/a Mr. Li acquired INHD from the company's founder Dekui Liu using money provided by OFAC sanctioned entity Prince Group Holdings ("Prince Group") for $7M in USDT crypto[7] (Ex. D at ¶ 14);
- INHD was then changed from steel building manufacturing to electronic trading company out of Hong Kong (*Id*.);
- Defendant Mr. Li told Mr. Wang that he, Mr. Li, is among the primary lenders of INHD shares to broker-dealers (*Id*. at ¶ 16);
- Defendant Mr. Li told Mr. Wang that the borrowing rates for the shares is as high as 500%, and the continuation of the T12 Halt is financially benefiting him because of the borrow fees being charged to short sellers (*Id*.);
- Defendant Mr. Li told Mr. Wang that he, Mr. Li, works with INHD's Chairman and CEO, Defendant Ding Wei, and that the company is a "total fraud," and it had not "maintained active operations in Texas since 2025" (*Id*. at ¶18);
- Mr. Li further told Mr. Wang that in his view INHD "had no meaningful operations" (*Id*.);
- Mr. Wang has reviewed INHD's public filings and based upon his review those are consistent with the lack of ongoing business, that is, INHD disposed of its operating subsidiaries in 2025, dismissed its registered public accounting firm, and now has operations in Hong Kong (Ex. G at ¶ 13);

---

[6] Plaintiff has been trying to work with its brokers on these exorbitant interest and borrow fees, that Plaintiff has reason to believe are being transferred downstream into the hands of Defendants, their conspirators, and individuals associated with the Prince Group, an OFAC sanctioned entity. However, to date discussions with the brokers has not resulted in a halt of imposition of the fees because the brokers are under a "contractual obligation" to pay to the third-party institutions they entered into agreements to locate the shares. Plaintiff does not concede these brokers' points.

[7] USDT crypto is a form of stablecoin cryptocurrency with a 1:1 value against the U.S. Dollar but lacks the regulatory oversight of the US Treasury and can be transferred among transnational criminal organizations outside the US monitored "SWIFT" and similar banking systems.

-        Counsel for INHD **and** separately Defendant Mr. Li told Mr. Wang that Defendant Wei had instructed counsel for INHD and members of INHD to "deliberately prolong this matter (referring to the T12 Halt) and delay its resolution (*Id.* at ¶ 23; Ex. G at ¶11);[8]

-        Counsel for INHD indicated to Mr. Wang that INHD representatives and counsel were receiving numerous inquiries from short sellers seeking to cover their positions; however, the object was to maintain the T12 Halt so the short sellers could not cover their positions and would continue to accrue borrow charges against them (Ex. G. at ¶ 11);

In Defendant's Motion, they claim to need money for "(1) wages due today to Inno Holdings' Hong Kong-based employees; (2) rent due on or about July 1, 2026; and (3) payments to ordinary course vendors in the near future." (Dkt. 9 at pg. 3). Interestingly Defendants were unable to procure a single sworn statement to support their position and rely on arguments of counsel rather for example, (1) a single invoice that is due, (2) a lease or rent bill that is due, (3) bank statements that show legitimate operations or anything of the source. The lack of record evidence or sworn testimony is beyond telling.

Inno Holdings' public filings, when read in combination with Mr. Wang's sworn Declarations show quite a different story. That is, other than possibly Defendant Wei's salary[9] and salaries of the four or five unnamed purported employees of Inno Holdings, most if not all Defendant Inno Holdings' expenses appear to have been pre-paid and/or are not sufficiently described for this Court to have a full understanding of the actual alleged "obligations."[10] For example, a review of Defendant Inno Holdings' most recent 10K for period ending March 31, 2026, shows that Defendant has prepayments listed as assets held by the company including,

---

[8] Mr. Wang noted his conversation with counsel Lou in his original Declaration, Ex. D at ¶ 24, and provided more details concerning that conversation in his Supplemental Declaration, Ex. G at ¶11, in light of the claims now being made by different counsel at reputable law firm.  Inclusion of this information is not intended to suggest that current counsel has done anything untoward or made any misrepresentations to the Court, but rather to explain that counsel may not have all information and a full understanding of the fraud that has been ongoing and involved INHD's counsel to prior transactions and who is currently "engaging" with the Nasdaq regarding the T12 Halt.

[9] According to Defendant Inno Holdings' Form 10-K filed for FY Ending September 30, 2025, Defendant Wei's compensation in 2025 was $60,000 salary and $775,000 in stock awards. https://www.sec.gov/Archives/edgar/data/1961847/000149315225027805/form10-k.htm

[10] Further, according to Defendant Inno Holdings' Form 10-K filed for FY Ending September 30, 2025, Defendant Inno Holdings only had four purported employees in 2024 and five purported employees in 2025. (*Id.*).

**Note 4 — Prepayments and other current assets**

As of March 31, 2026 and September 30, 2025, prepayments and other current assets consisted of the following:

| | | March 31, 2026 (unaudited) |
|---|---|---|
| Loan and Interest receivable | $ | 5,012,575 |
| Prepaid software system development | | 1,600,000 |
| Receivable from sales of equity investment | | 350,100 |
| Advance to suppliers | | - |
| Prepaid rent | | 44,000 |
| Prepaid insurance | | - |
| Prepaid for legal fee | | 24,649 |
| Deposits | | 35,499 |
| Advance to other service providers | | 803,333 |
| Other prepayments and current assets | | 42,000 |
| Total | $ | 7,912,156 |

12

https://www.sec.gov/Archives/edgar/data/1961847/000149315226020818/form10-q.htm

Regardless of the claimed use, no one is permitted to use "proceeds derived from the scheme" to pay bills, or even attorney's fees.

## III.    STATEMENT OF THE ISSUES

Defendants Inno Holdings and Wei are requesting a modification of two paragraphs of the TRO, claiming that they are unable to do business and need to be able to pay expenses. The evidence shows this is no longer an ongoing legitimate business and the only money Defendants have generated is from their scheme to defraud investors in the American financial market.

## IV.    SUMMARY OF THE ARGUMENT AND ARGUMENT

### A.    Summary of the Argument

The restrictions put into place by those paragraphs merely prevent Defendants Inno Holdings and Wei from a) doing what they are not authorized to do by Nasdaq, the SEC, and other regulations; and b) using proceeds of a scheme to defraud the American financial market for their "claimed expenses." Paragraph 1 of the TRO does not limit Defendants from doing anything that the T12 Halt, the SEC, or other regulations prohibit, setting aside the fact that the only record evidence is that the business is a total fraud. Defendants' purported need for money rings hollow because no one is permitted to use "proceeds derived from the scheme" to pay bills or attorney's fees.

### B.    Argument

> 1.    *Inno Holdings is no longer a legitimate ongoing business and paragraph 1 does nothing more than the T12 Halt and placement on Reg SHO.*

Paragraph 1 merely enjoins Defendants from,

> directly or indirectly continuing, resuming, facilitating, financing, promoting, transferring, clearing, settling, borrowing, lending, or otherwise participating in any business, brokerage, securities, or associated trading activity involving the halted securities or related accounts, transactions, instruments, or proceeds at issue in this action. This injunction includes, without limitation, any activity that is currently halted, restricted, frozen, suspended, or otherwise subject to regulatory limitation, inquiry, or prohibition by the SEC, FINRA, Nasdaq, any clearing form, transfer agent, broker-dealer, or other governmental, self-regulatory, or market authority, and any effort to evade such restrictions through affiliates, . . .

The only *record evidence* in this case so far are the sworn declarations attached to the Complaint, including that of Mr. Wang, Ex. D and G. And that evidence shows that Defendant Inno Holdings, which is being run by Defendant Wei, is a "total fraud," has "no meaningful operations," and has not "maintained active operations in Texas since 2025." (Ex. D at ¶18). This evidence is further supported by the fact that for **22-days** Inno Holdings has not satisfied the requests for information from Nasdaq to end the T12 Halt, something that "typically lasts less than an hour." One is hard pressed to think of a legitimate company on Nasdaq that would allow a T12 Halt to continue this long. That is, unless either (a) it does have the requested information (because it does not exist) or (b) the true beneficiaries of the business are benefitting by each day the halt continues.

> 2.    *Defendant Inno Holdings is and has been a scheme since it was acquired in 2024, and the money Defendants seek access to is proceeds derived from the scheme, which no one is authorized to use, for any purpose-even attorney's fees.*

In support of their request to modify paragraph 4, Defendants claim they need to pay Defendant Wei's salary, the salary of unidentified individuals in Hong Kong, rent, and other contractual obligations. Notably, in support of this claimed need, Defendants have provided no record evidence in the form of either an affidavit, declarations, or exhibits. In light of wholesale fraud detailed in the Complaint and the record evidence provided by Plaintiff, Defendants motion alone is insufficient to support their claimed *need*.

Furthermore, cases across the United States make clear both in criminal and civil cases no one is permitted to use ***proceeds derived from the scheme*** for any purpose, not even attorneys' fees in a criminal case where someone's liberty is at stake. *See SEC v. Brooks*., 3:99-CV-1326-D, 1999 U.S. Dist. LEXIS 10858 \*7 (N.D. Tex. July 12, 1999) (holding that freezing the assets of a defendant who was diverting "investor funds for personal expenses" was proper "to ensure that these assets will be available to satisfy a judgment that the SEC or a victimized investor may obtain…The court is empowered to freeze defendants' assets to preserve the status quo and prevent dissipation of ill-gotten gains so that they remain available to pay subsequent disgorgement orders and civil penalties."); *SEC v. Dobbins*, 3:04-CV-0605-H, 2004 U.S. Dist. LEXIS 6362 \*6 (N.D. Tex. April 14, 2004) (denying defendants' emergency motions to protect certain assets and to modify an Order of Preliminary Injunction to allow access to pay ordinary business expenses and attorney fees without prejudice so they could provide an accounting). In reaching its conclusion in *Dobbins*, the court cited *SEC v. Cherif,* 933 F.2d 403, 416-17 (7th Cir. 1991), cert. denied, 502 U.S. 1071, 117 L. Ed. 2d 131, 112 S. Ct. 966 (1992) for the point that "use of frozen assets to pay attorney fees can be disallowed even in criminal cases, a civil litigant has no greater right to counsel than one who stands accused of a crime." *Dobbins*, 2004 U.S. Dist. LEXIS 6362 \*6; *SEC v. Comcoa Ltd.,* 887 F.Supp. 1521, 1524-25 (S.D. Fla. March 13, 1995) (noting that in "imposing a freeze of assets, there is no requirement that the court exempt sufficient assets for the payment of legal fees") (citing *Cherif*).  The use of frozen assets for attorney's fees has been disallowed in a variety of circumstances. *See, e.g., Caplin & Drysdale Chartered v.  United States,* 491 U.S. 617, 105 L. Ed. 2d 528, 109 S.  Ct. 2646, 109 S. Ct. 2667 (1989) (criminal forfeiture statute - defendant paid attorney $ 25,000.00 in violation of restraining order); *United States v.  Monsanto,* 491 U.S. 600, 105 L. Ed. 2d 512, 109 S. Ct.  2657 (1989) (criminal forfeiture statute - defendant's motion to vacate restraining order to permit use of frozen assets to retain attorney denied); *United States v.  One Residential Property*

*Located at 501 Rimini Road,* 733 F. Supp. 1382 (S.D. Cal. 1990) (civil forfeiture statute - no constitutional right to civilly forfeitable assets for payment of legal fees). Further, in other situations, attorneys have been required to return nonrefundable retainers *See, e.g., In re Mondie Forge Co.,* 154 Bankr. 232, 239 (N.D. Ohio 1993) (bankruptcy case); *United States v. Harvey,* 814 F.2d 905, 913, 918 (4th Cir. 1987) (RICO/CCE action).  Simply put, it is clear that no defendant, even a criminal defendant whose liberty is at stake, has a "right to spend another's money for services rendered by an attorney, even if those funds are the only way that the defendant will be able to retain counsel of choice." *Comcoa*, 887 F.Supp. at 1524.

## V.    CONCLUSION

For the foregoing reasons, Plaintiff Kingbird respectfully asks the Court to deny Defendant's Motion and/or schedule this for a hearing pursuant to Rule 65(b)(4) so the Defendants can provide record evidence and an appropriate accounting to show whether non-tainted assets are available and the amounts being requested.

Dated this 30th day of June 2026                          **DYKEMA GOSSETT PLLC**

*/s/ Tiffany H. Eggers*
TIFFANY H. EGGERS
Florida Bar No. 0193968
Texas Bar No. 24151965
SDTX Federal Bar No. 3934304
Attorney in Charge for Plaintiff
1717 Main Street, Suite 4200
Dallas, Texas 75201
T: (214) 462-6400/ F: (214) 462-6401
TEggers@dykema.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2026, a true and correct copy of the foregoing document was transmitted via the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

*/s/ Tiffany H. Eggers*
TIFFANY H. EGGERS