# **<u>Exhibit G</u>**

# <u>SUPPLEMENTAL DECLARATION OF JIM WANG</u>

I, Jim Wang, declare as follows:

## I. INTRODUCTION

**1.** I submit this Supplemental Declaration to supplement the Declaration of Jim Wang previously submitted in this matter (the "First Declaration"), which I incorporate herein by reference. Unless otherwise defined herein, capitalized terms have the meanings given in the First Declaration. The matters stated in this Supplemental Declaration are based on my personal knowledge and on my continued investigation; where I state a matter on information and belief, I believe it to be true. If called as a witness, I could and would testify competently to the matters stated herein.

**2.** I submit this Supplemental Declaration in connection with the Inno Holdings Defendants' Emergency Motion to Modify the Temporary Restraining Order (ECF No. 9) (the "Motion"). The Motion describes the Inno Holdings Defendants as an ordinary operating business whose routine obligations—payroll, rent, payments to vendors, and the retention of counsel—are being impaired by the Court's asset-preservation order. The facts set out below, together with those set forth in my First Declaration, are not consistent with that description.

## II. IDENTIFICATION OF "MR. LI" AND THE PERSONS ACTING IN CONCERT

**3.** In my First Declaration, I described statements made to me by an individual who identified himself to me only as "Mr. Li," and who represented that he controlled a large number of brokerage accounts—potentially in the tens of thousands—and was responsible for the coordinated trading in the common stock of Inno Holdings Inc. (Nasdaq: INHD) (the "Issuer") on June 8, 2026. That individual is the person identified in the caption of this action as "John Doe, a/k/a 'Mr. Li.'"

**4.** Since executing the First Declaration, and through continued investigation and information provided to me by sources in Asia and the United States, I have identified the principal individuals I understand to be operating, financing, or otherwise in contact and coordinating the conduct described in my First Declaration directly with the Company and Ding Wei. These individuals informed me directly that they are the affiliated with the Prince Group and orchestrating this scheme, the individuals who are involved are as follows: (a) Gang Li, located in Qingdao, People's Republic of China, who owns and operates the computer servers through which the coordinated trading in INHD was conducted, and whose funding that are linked to the Prince Group; Gang Li to be the person referred to in my First Declaration, and in the caption of this action, as "Mr. Li"; (b) Dewei Tong, located in Hong Kong, who identified himself as an associate of the Prince Group, to have procured the brokerage accounts through which that coordinated trading and intentional T12 halt was conducted, and to oversee the day-to-day operations of the Issuer on behalf of, or together with, the Issuer's Chairman and Chief



Executive Officer, Ding Wei, who is aware that these individuals are all Prince Group affiliates; The Issuer's public shell was acquired by these persons for approximately $7 million, which permitted the Issuer's former principal, Dekui Liu, to exit. The parties have no intention of leaving any assets in the company or making any bona fide effort to remove the T12 trading halt or relist the company. Instead, they intend to liquidate any assets the company may have and distribute the proceeds among the co-conspirators, notably the aforementioned Prince Group members.

**5.** My identification of the foregoing persons is based on information obtained through my investigation.

## III. PRIOR CONDUCT OF THE SAME CHARACTER

**6.** I am further informed that the individuals described above are implementing the same scheme in the securities of Paranovus Entertainment Technology Ltd. (Nasdaq: PAVS) that they previously employed with respect to INHD. This belief is based upon objective, publicly available facts demonstrating substantial overlap between the two matters. Specifically: (a) like INHD, PAVS is a foreign micro-capitalization issuer—a Cayman Islands company formerly known as Happiness Biotech/Development Group—that has effected a rapid succession of reverse stock splits, including in December 2025, March 2026, and June 2026, and whose share price has declined by more than 99% over the past year; (b) on or about June 9, 2026—within days of the June 8, 2026 trading activity in INHD described in my First Declaration—PAVS experienced an extraordinary single-session price movement, trading intraday from approximately $1.55 to approximately $26.69 on volume exceeding 200 million shares before collapsing; (c) PAVS and INHD utilize the same broker, AC Sunshine Securities LLC, which serves as the sales agent for PAVS's at-the-market offering and which I understand also brokered the sale of the INHD public shell for the same corrupt purpose; and (d) public filings confirm AC Sunshine Securities LLC's role as the sales agent for the PAVS at-the-market offering. These objective facts, considered together with the temporal proximity, overlapping intermediaries, and substantially similar trading patterns, demonstrate the implementation of the same fraudulent playbook described in my First Declaration.

**7.** The matters described above, together with the facts set forth in my First Declaration—including the use of USDT cryptocurrency, funds transmitted from Cambodia, and the concentration of trading control and funding in persons connected to the Prince Group and located in the People's Republic of China and Hong Kong—bear directly, in my professional assessment, on the risk that assets connected to the conduct described in my First Declaration could be moved, dissipated, or placed beyond reach if they are not preserved. The publicly documented similarities between INHD and PAVS further reinforce my assessment that the conduct described in my First Declaration was not unique to a single issuer but instead reflects a recurring pattern involving the same conspirators conducting the same market manipulation schemes and tactics.

## IV. THE ROLE OF THE ISSUER'S COUNSEL

**8.** In connection with my investigation, I reviewed certain of the Issuer's public filings with the U.S. Securities and Exchange Commission (the "SEC"). Those filings reflect that the same attorney, Lou, Esq., has served as counsel both to the investor group that acquired control of the Issuer and, thereafter and continuing, to the Issuer itself—and has done so across two successive law firms.

**9.** Specifically, and based on my review of the Issuer's SEC filings: (a) the securities purchase agreement dated September 6, 2024—the transaction through which control of the Issuer changed hands, as described in my First Declaration—designates Lou, Esq., then of Sichenzia Ross Ference Carmel LLP, as the recipient of copies of notices on behalf of the investor side of that transaction, and that agreement was filed as an exhibit to a Schedule 13D/A concerning the Issuer; (b) the Issuer's February 25, 2025 response to a comment letter from the SEC identifies Lou, Esq., then of Sichenzia Ross Ference Carmel LLP, as the Issuer's "outside securities counsel," and the Issuer's registration statements filed during this period, including on Form S-3 and Form S-8, likewise identify Lou, Esq. of that firm as counsel to the Issuer; and (c) the Issuer's subsequent filings, including exhibits to its Current Reports on Form 8-K filed in November 2025 and May 2026, identify Lou, Esq.—now of McCarter & English, LLP—as continuing counsel to the Issuer.

**10.** In my experience with cross-border securities transactions, the continuous involvement of a single attorney representing both the investor group that acquires control of an issuer and the issuer itself, across successive law firms and throughout the period at issue, is consistent with common control of the issuer and that investor group.

## V. COMMUNICATIONS WITH THE ISSUER'S COUNSEL REGARDING DELAY

**11.** On June 12, 2026 at approximately 2:00 p.m. Eastern Time, and again on June 15, 2026 at approximately 3:00 p.m. Eastern Time, I participated in telephone conversations with Lou, Esq., counsel to the Issuer. Based on those conversations, and consistent with the matters described in my First Declaration, I understood that counsel had been directed by the Issuer's Chairman and Chief Executive Officer, Ding Wei, and others associated with the Issuer, to prolong the resolution of this matter; that the Issuer's representatives and counsel were at the same time receiving numerous inquiries from short sellers seeking to cover their positions in INHD; and that the object of the delay was to maintain the T12 Halt so that short sellers would remain unable to cover their positions while elevated borrowing charges continued to accrue against them.

**12.** I understand that a further telephone communication with counsel for the Issuer occurred in which I did not personally participate. I do not purport to describe the substance of that communication.

## VI. THE ISSUER'S LACK OF GENUINE OPERATIONS

**13.** The Issuer's public filings further reflect that the Issuer has divested its operating businesses conflicting with the motion. Among other things, and based on my review of the Issuer's SEC filings, the Issuer disposed of its principal operating subsidiaries for nominal consideration during 2025—including the sale of subsidiaries for as little as $100 and $1,000—dismissed its U.S.-based independent registered public accounting firm and engaged a Singapore-based firm in its place, and now describes its operations as being conducted in Hong Kong.

**14.** Consistent with my First Declaration, the development-services transaction the Issuer publicized on or about June 8 and June 10, 2026—announced in the Issuer's own name—was in fact contracted through a British Virgin Islands subsidiary, ApexVest Holdings Limited, with a Hong Kong counterparty, under Hong Kong law, and was signed by Ding Wei. In my assessment, the Issuer's public announcement of that transaction in its own name, when the contracting party was a non-issuer affiliate, is a further indication that the Issuer was creating the appearance of operating activity that it did not in fact have.

## VII. CONCLUSION

**15.** The foregoing Declaration supplements, and should be read together with, my First Declaration. My investigation is continuing, and I have endeavored to distinguish throughout between facts within my personal knowledge and matters stated on information and belief, which remain subject to further verification. I am prepared to testify to the matters stated in this Supplemental Declaration and to provide further information, including with respect to the identities of the persons described above at an expedited evidentiary hearing in the State of Texas.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on _____June 30_____, 2026, at _____Sierra Madre_____, California.

**Jim Wang**
Declarant