## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| KINGBIRD VENTURES LLC, a foreign limited liability company, | § § § § | |
| Plaintiff, | § § | Case No. 4:26-cv-05000 |
| v. | § § | |
| INNO HOLDINGS INC., a Texas corporation; DING WEI, an individual; PRINCE HOLDING GROUP, a Cambodian corporation, and its successor and affiliated entities; CHEN ZHI, a/k/a "VINCENT," an individual; JOHN DOE, a/k/a "MR. LI," an individual, and JOHN DOES 1-10, individuals, | § § § § § § § § § § § | |
| Defendants. | § § | |

## INNO HOLDINGS INC. AND DING WEI'S MOTION TO DISSOLVE TEMPORARY RESTRAINING ORDER AND OPPOSITION TO PLAINTIFF'S MOTION TO EXTEND TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

**Page**

Introduction.................................................................................................................1

Background ...............................................................................................................3

    I.     The Parties .................................................................................................3

    II.    The June 8, 2026 Price Spike and Subsequent T12 Halt .......................................4

    III.   Kingbird Brings this Action based on False Allegations........................................6

    IV.   The Ex Parte TRO...................................................................................10

Argument ...............................................................................................................12

    I.     Kingbird has not shown a TRO or injunction is warranted. ...................................12

        A.    Kingbird is not likely to succeed on the merits.........................................13

            1.    Kingbird's substantive claims are likely to fail on the merits.................................................................................................13

            2.    The Court lacks personal jurisdiction over Ding Wei. .................16

        B.    Kingbird cannot show that it will suffer irreparable harm absent the TRO; in fact, its prior pleas of irreparable harm have been proven false. ..............................................................................................16

        C.    The balance of the equities tips decisively in favor of the Inno Holdings Defendants because the TRO has not prevented Kingbird's supposedly irreparable harm...................................................18

        D.    The TRO does not further the public interest. ...........................................19

    II.    The TRO is vague and overbroad in multiple respects........................................20

        A.    Paragraph 1 ...........................................................................................21

        B.    Paragraph 2 ...........................................................................................22

        C.    Paragraph 3 ...........................................................................................23

        D.    Paragraph 4 ...........................................................................................23

        E.    Paragraph 5 ...........................................................................................24

Conclusion ...............................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*,
 878 F.2d 806 (5th Cir. 1989) ...................................................................................................16

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
 493 F.3d 87, 100 (2d Cir.2007)................................................................................................14

*Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*,
 875 F.2d 1174, 1179 (5th Cir. 1989) .......................................................................................16

*Barnhart v. Thomas*,
 540 U.S. 20 (2003).....................................................................................................................21

*Capricorn Power Co. v. Siemens Westinghouse Power Corp.*,
 220 F.R.D. 429 (W.D. Pa. 2004) ..............................................................................................24

*In re Citigroup Auction Rate Sec. Litig.*,
 700 F. Supp. 2d 294 (S.D.N.Y. 2009)......................................................................................14

*DFW Metro Line Servs. v. Sw. Bell Tel. Co.*,
 901 F.2d 1267 (5th Cir. 1990) ........................................................................................... 17-18

*Diveroli v. United States*,
 803 F.3d 1258 (11th Cir. 2015) ..................................................................................................4

*In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*,
 540 F. Supp. 2d 800 (S.D. Tex. 2007) .....................................................................................15

*FDIC v. Munn*,
 804 F.2d 860 (5th Cir. 1986) ....................................................................................................15

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct*,
 592 U.S. 351 (2021).....................................................................................................................16

*In re Fredeman Litig.*,
 843 F.2d 821 (5th Cir. 1988) ............................................................................................. 23-24

*Gilead Scis., Inc. v. Safe Chain Sols., LLC*,
 684 F. Supp. 3d 51 (E.D.N.Y. 2023) .......................................................................................13

*Grass v. Credito Mexicano, S.A.*,
 797 F.2d 220 (5th Cir. 1986) ....................................................................................................15

*Gross v. Diversified Mortg. Inv'rs*,
 438 F. Supp. 190 (S.D.N.Y. 1977) ...........................................................................................15

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
  527 U.S. 308 (1999)..................................................................................................................23

*Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*,
  921 F.3d 522 (5th Cir. 2019) ...................................................................................................16

*Humble Oil & Ref. Co. v. Sun Oil Co.*,
  175 F.2d 670 (5th Cir. 1949)....................................................................................................24

*Incarcerated Ent., LLC v. CNBC LLC*,
  331 F. Supp. 3d 352 (D. Del. 2018)...........................................................................................4

*Int'l Longshoremen's Ass'n, Loc. 1291 v. Philadelphia Marine Trade Ass'n*,
  389 U.S. 64 (1967)................................................................................................................ 21-22

*John Doe #1 v. Veneman*,
  380 F.3d 807 (5th Cir. 2004) ...................................................................................................20

*Maddox Defense, Inc. et al. v. Diveroli Group, et al.*,
  Case No. 3:26-c-02992, ECF No. 1 (S.D. Cal. May 13, 2026) ..................................................4

*Meadows v. Hartford Life Ins. Co.*,
  492 F.3d 634 (5th Cir. 2007) ...................................................................................................15

*Miss. Power & Light Co. v. United Gas Pipe Line Co.*,
  760 F.2d 618 (5th Cir. 1985) ...................................................................................................13

*N.Y.S. Ass'n for Retarded Child., Inc. v. Carey*,
  456 F. Supp. 85 (E.D.N.Y. 1978) .............................................................................................23

*Nathenson v. Zonagen Inc.*,
  267 F.3d 400 (5th Cir. 2001) ...................................................................................................14

*Nianga v. Wolfe*,
  435 F. Supp. 3d 739 (N.D. Tex. 2020) .....................................................................................16

*Phillips v. Charles Schreiner Bank*,
  894 F.2d 127 (5th Cir. 1990) ...................................................................................................15

*PMC, Inc. v. Sherwin–Williams Co.*,
  151 F.3d 610 (7th Cir. 1998) ...................................................................................................21

*Scott v. Schedler*,
  826 F.3d 207 (5th Cir. 2016) ...................................................................................................20

*Seattle-First Nat. Bank v. Manges*,
  900 F.2d 795 (5th Cir. 1990) ...................................................................................................21

*Shambaugh & Son, L.P. v. Steadfast Ins. Co.*,
  91 F.4th 364 (5th Cir. 2024) ....................................................................................................16

*Tex. Med. Providers Performing Abortion Servs. v. Lakey*,
   667 F.3d 570 (5th Cir. 2012) ...................................................................................................12

*Texas Laurel Ridge Hosp., LP v. Kennedy*,
   No. SA-26-CA-02701-JKP, 2026 WL 1194244 (W.D. Tex. Apr. 28, 2026) ...........................12

*Trump v. CASA, Inc.*,
   606 U.S. 831 (2025) .................................................................................................................20

*U.S. Steel Corp. v. United Mine Workers of Am.*,
   519 F.2d 1236, 1246 n. 20 (5th Cir. 1975) .............................................................................20

*United States v. St. Bernard Par.*,
   756 F.2d 1116 (5th Cir. 1985) .................................................................................................19

*Valley v. Rapides Par. Sch. Bd.*,
   118 F.3d 1047, 1051 (5th Cir. 1997) .......................................................................................12

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008).............................................................................................................12, 18

**Statutes**

15 U.S.C. § 78u-4(b).....................................................................................................................14

**Rules**

FED. R. CIV. P. 65(b)(1) ...............................................................................................................12

FED. R. CIV. P. 65(b)(2).................................................................................................................11

Fed. R. Civ. P. 65(c) .....................................................................................................................20

FED. R. CIV. P. 65(d)(1) .....................................................................................................20, 23, 24

iv

Defendants Inno Holdings Inc. and Ding Wei (the "Inno Holdings Defendants") file this Motion to Vacate the Court's June 26, 2026 Temporary Restraining Order, ECF No. 6 (the "TRO"), and opposition to Plaintiff's Motion to Extend the TRO, ECF No. 25.

### INTRODUCTION

On June 25, 2026, Plaintiff Kingbird Ventures, LLC sought and obtained a TRO from the court *ex parte*, on an emergency basis. ECF Nos. 2, 6. The TRO is incredibly broad—so broad that it effectively prevents Inno Holdings, a publicly traded company, from functioning. The TRO will expire in three days by operation of law, but Kingbird has requested that it be extended for another fourteen. ECF No. 25. The TRO should be vacated, not extended, because Kingbird has not met its burden of establishing that an injunction is warranted.

First, Kingbird is unlikely to succeed on the merits. Its Complaint hangs its convoluted narrative of fraud almost entirely on the hearsay account of an alleged co-conspirator who (1) Kingbird conspicuously declined to identify until *after* securing the TRO and (2) the Inno Holdings Defendants have *never heard of*. Kingbird's claims are predictably threadbare and not likely to survive a motion to dismiss for a host of reasons, much less prevail at trial. And Mr. Wei is not subject to personal jurisdiction in this Court in any event.

Second, Kingbird has not shown that it will suffer irreparable harm absent an injunction. The only tangible injury Kingbird claims is ongoing daily interest and fees of up to $15,000-$20,000 imposed by a non-party broker related to its short position. As Kingbird concedes, such monetary losses generally do not qualify as irreparable injury. And Kingbird has not shown any special reason why it should be exempt from that rule here. Kingbird's alarmist pleas—made without submitting any evidence of its overall financial condition—that it will go out of business without a TRO have been proven false; the TRO has not stopped the broker's charges, yet Kingbird continues. And even if Kingbird did go out of business, monetary damages would be adequate. Finally, Kingbird's speculation that it may not be able to collect a judgment or that

1

making payments owed to its broker might violate Office of Foreign Assets Control ("OFAC") regulations cannot satisfy its burden.

Third, the balance of the equities decisively favors the Inno Holdings Defendants. This factor is decisive on its own. The TRO causes ongoing harm to the Inno Holdings Defendants, putting Inno Holdings at risk of, for example, eviction from its lease and losing its key employees. Yet, the TRO has not stopped, and cannot stop, the irreparable harm Kingbird claims it is suffering—the payment of fees and interest to its broker for the shares it borrowed to sell short. Because the TRO is ineffectual, it is improper.

Fourth, the public interest weighs against the TRO. The TRO is preventing Inno Holdings, a publicly traded company, from functioning and is harming its employees for no reason, much less a good reason. If prolonged, these effects may prevent the company from timely filing its SEC filings (which can create a risk of delisting for its shareholders) and, ironically, from paying the consultants it needs to respond to Nasdaq and resolve the very T12 halt Kingbird complains about. Those results are clearly *not* in the public's interest.

Even if some temporary restraining order or injunction were warranted, the TRO Kingbird prepared and asks to extend is egregiously vague and overbroad and ignores the constraints that the Federal Rules of Civil Procedure and controlling Fifth Circuit precedent impose on injunctive relief. Several provisions of the injunction are ambiguous. The injunction is not self-contained but rather impermissibly cross-references other documents in violation of Rule 65 and Fifth Circuit case law. It imposes a blanket freeze on the Inno Defendants' assets, again in violation of binding precedent. It extends relief to the direct benefit of absent third parties— something the Supreme Court has made clear is impermissible. And it reaches conduct well outside the supposed violations of law that Kingbird has attempted to allege in the Complaint.

These are not mere foot faults. They represent violations of procedural protections and limits on judicial power that safeguard procedural fairness and due process. That the TRO was

2

entered *ex parte* only further aggravates these defects.

The TRO inflicts damage on Inno Holdings every day that it remains in effect. The Court should vacate it immediately, not renew it. Accordingly, and for the reasons that follow, the Inno Holdings Defendants' motion should be granted, and Kingbird's motion should be denied.

**BACKGROUND**

**I.    The Parties**

Inno Holdings is a publicly traded corporation organized under Texas law. Wei Decl. ¶¶ 5-6. Despite being incorporated in Texas, Inno Holdings maintains no business operations and makes no sales in Texas and has not done so since October 2024. Wei Decl. ¶ 9. Like many publicly traded companies, Inno Holdings has a number of subsidiaries through which it operates various aspects of its business. Wei Decl. ¶ 5. Inno Holdings' common stock, traded under the symbol INHD, is listed on the Nasdaq. Wei Decl. ¶ 7.

Since October 2024, Inno Holdings has engaged in the business of recycled consumer electronic devices. Wei Decl. ¶ 11. The company sources and purchases pre-owned consumer electronic devices, such as smartphones and tablets, from suppliers; refurbishes and repairs them; and sells them to customers. *Id.* Inno Holdings leases office and warehouse space in Hong Kong for its ongoing business operations. *Id.* ¶ 14. It has two leases for these locations, for which rent is due on the first day of each month. *Id.* And it has eight full-time employees and is expanding its workforce in anticipation of growing its sales in 2026. *Id.* ¶ 15.

Plaintiff Kingbird is a Wyoming LLC organized in 2021. Atty Decl., Ex. 1. It describes itself as "a professional investment firm that prioritizes disciplined risk management, thorough due diligence, and exacting execution of its trading strategies—including certain short-selling strategies—in a responsible manner." ECF No. 1-6, ¶ 2, 1-7 ¶ 2. Unlike Inno Holdings, which files regular annual, quarterly, and other reports with the SEC (including audited financial statements), Kingbird is a black box. It has no website, and relevant internet search results

3

concern only litigation in which Kingbird has been involved. Kingbird's papers do not disclose any information about its investments, the source of its funds, or its total assets.

This opaqueness is no accident. It appears that Kingbird is affiliated with the Diveroli Investment Group, a "family run investment firm" based out of Miami, Florida[1] whose "strategic advisor" is Efraim Diveroli. Mr. Diveroli is a former arms dealer who was indicted on 85 counts of making false statements, major fraud against the United States, wire fraud, and conspiracy. *Diveroli v. United States*, 803 F.3d 1258, 1261 (11th Cir. 2015). Confronted with "overwhelming evidence of [his] guilt," Mr. Diveroli pleaded guilty to the conspiracy charge and was sentenced to 48 months imprisonment. *Id.* at 1260.

Mr. Diveroli's story was so "outlandish" that it "inspired an article in Rolling Stone, a book, and a . . . comedy film," *War Dogs*. *Diveroli*, 803 F.3d at 1260. Mr. Diveroli proceeded to sue anyone and everyone who dared to tell the story of his criminal exploits without paying him, including a film studio, a TV network, and his cellmate. *See, e.g.*, *Incarcerated Ent., LLC v. CNBC LLC*, 331 F. Supp. 3d 352 (D. Del. 2018). His litigious bent has continued in his role as founder of Diveroli Investment Group. [2]

## II.     The June 8, 2026 Price Spike and Subsequent T12 Halt

On June 8, 2026, Inno Holdings entered into an agreement ("AI Agreement") with Hong Kong-based AI service provider Ninetech Technology (Hongkong) Limited to develop an AI-powered used mobile phone sales and customer acquisition AI agent system for the company.

---

[1] *See* Diveroli Invest. Grp., *Kingbird Ventures Files Legal Action against LQR House Inc. Seeking Court-Appointed Receiver,* PUEBLO CHIEFTAIN (July 17, 2025), https://www.chieftain.com/press-release/story/3021/kingbird-ventures-files-legal-action-against-lqr-house-inc-seeking-court-appointed-receiver/ (Diveroli Investment Group press release describing "Kingbird Ventures, LLC" as "an affiliate of Diveroli Investment Group (DIG)" and quoting "Efraim Diveroli, Strategic Advisor to Diveroli Investment Group").

[2] *See Maddox Defense, Inc. et al. v. Diveroli Group, et al.*, Case No. 3:26-c-02992, ECF No. 1 (S.D. Cal. May 13, 2026) (alleging that Diveroli's business model is "built around litigation leverage" and employs coercive tactics like threats of shareholder strike suits); *see also supra* n.**Error! Bookmark not defined.**.

4

Wei Decl. ¶ 16. The same day, Inno Holdings issued a press release announcing the AI Agreement. Atty Decl., Ex. 2.2. On June 10, 2026, Inno Holdings filed a Form 8-K reporting the AI Agreement; the 8-K attached a redacted version of the Agreement and the press release. Atty Decl., Ex. 2, 2.1, 2.2.

The AI Agreement calls for the project development to occur over five phases, with a share of the total payment due at the completion of each phase. Atty Decl., Ex. 2.1. The first phase entails Ninetech's "complet[ing] the detailed requirements and system design results" and submitting them to Inno Holdings for "written review and approval." *Id.* The Company has received and is reviewing Ninetech's draft phase one deliverables. Wei Decl., ¶ 19.

On June 8, 2026, the day Inno Holdings announced the AI Agreement, the company's stock price opened at $1.11 per share before increasing sharply throughout the day. Atty Decl., Ex. 3. Inno Holdings' share price reached an intraday high of $43.37 per share before closing at $39.45 per share. Atty Decl., Ex. 3.

Kingbird says that it "opened short positions against INHD's common stock" in response to the June 8 increase in Inno Holdings share price, which it openly admits it "did not find" to be "warrant[ed]" by the "press release" issued that day. ECF Nos. 1-6 ¶5, 1-7 ¶ 4. While Kingbird offers no details about exactly when it opened its short position or how many Inno Holdings shares it shorted, its papers imply that it took its short position after Inno Holdings' share price had risen "dramatically." ECF No. 1-7 ¶¶ 3–4.

After trading closed on June 8, 2026, Nasdaq imposed a T12 halt on trading of Inno Holdings shares. The halt code "T12" means trading activity in a security has been halted pending receipt of additional information by Nasdaq. Atty Decl., Ex. 4. As of July 4, 2026, 18 Nasdaq-listed securities were subject to T12 halts; all but one have been halted longer than Inno Holdings. Atty Decl., Ex. 5. Inno Holdings neither asked Nasdaq to impose the halt nor instructed anyone else to do so, and Inno Holdings was not advised in advance that the halt

would be imposed. Wei Decl. ¶35. Inno Holdings has no incentive to prolong the halt of trading of its own stock, wants the halt to be lifted, and has timely responded in good faith to all inquiries from Nasdaq. *Id.* ¶ 36.

**III.     Kingbird Brings this Action based on False Allegations**

On June 24, 2026, Kingbird filed this lawsuit and an emergency motion for a preliminary injunction and temporary restraining order. ECF Nos. 1 & 2.[3] Kingbird's papers tell a story of a criminal scheme as "outlandish" as Mr. Diveroli's own fraud. But, unlike Mr. Diveroli's story, the one Kingbird tells is pure fiction.

The material allegations in Kingbird's Complaint and "facts" supporting its motion come from a single source—Jim Wang. Mr. Wang lacks any personal knowledge of any of these supposed facts; instead, he claims to have gotten his information from a handful of third parties who either claim direct knowledge or claim to have heard something from yet someone else.[4]

Although he chose not to fully identify them in his original declaration, Mr. Wang has now identified three of his supposed sources of information: "Gang Li" and "Dewei Tong," who are supposedly affiliated with the Prince Group, and someone he calls "Lou, Esq.," *see* ECF No. 10-1 ¶¶ 4, 8–11, an apparent reference to Huan Lou, a McCarter & English Partner who represents Inno Holdings in transactional and corporate securities matters, Lou Decl. ¶ 1.

Mr. Li is Mr. Wang's principal source. Mr. Wang's declaration attributes the following assertions to Mr. Li: Mr. Li "control[s] a large number of brokerage accounts." ECF No. 10-1 ¶ 3. He is affiliated with the Prince Group (a criminal organization based on Cambodia). ECF

---

[3] Inno Holdings and Ding Wei executed waivers of service on July 2, 2026. ECF No. 18–19. Kingbird has not requested summons for Prince Holding Group, Chen Zhi, or "John Doe a/k/a Mr. Li."

[4] Kingbird asserts that these statements are not hearsay because they are opposing party statements under Rule 802(d)(2). ECF No. 2 ¶ 11 n.2. As to the Inno Holdings Defendants, they do not qualify as opposing party statements because there is not even a plausible basis to suggest that Inno Holdings or Mr. Wei adopted or authorized Mr. Li's statements or formed an agency relationship with Mr. Li, nor that Mr. Li's statements to Mr. Wang were in furtherance of even the extravagant conspiracy Mr. Wang hypothesizes.

6

No. 10-1 ¶ 4. He "acquired INHD from the company's founder, Dekui Liu, for approximately $7 million" using funds provided by the Prince Group transmitted by USDT from Cambodia. ECF No. 1-5 ¶ 14. Mr. Li then installed "individuals he described as his own associates" on the board of directors of Inno Holdings. *Id.* Inno Holdings "was not particularly active," "had no meaningful operations," and is "a total fraud." *Id.* ¶ 18. Mr. Li "was responsible for . . . coordinated trading in" Inno Holdings stock on June 8. *Id.* ¶ 13. Finally, Inno Holdings had instructed counsel to delay resolution of the T12 hold so that lenders of its shares could collect interest from short sellers. *Id.* ¶ 24. Mr. Wang does not explain whether (much less how) he knows that this "Mr. Li" is who he says he is, or why Mr. Li would confess his elaborate scheme to a total stranger. And, despite maligning Mr. Li as an admitted fraudster, Mr. Wang's declarations simply accept everything Mr. Li purportedly said.

Mr. Wang also claims to have communicated with an individual named Dewei Tong, "who identified himself as an associate of the Prince Group." ECF No. 10-1 ¶ 4. As with Mr. Li, Mr. Wang uncritically accepts Mr. Tong's supposed testimony. And, as with Mr. Li, Mr. Wang does not independently confirm Mr. Tong's identity or affiliation; instead, he just takes Mr. Tong's (supposed) word for it.

Mr. Wang claims to have spoken to Huan Lou on June 12 and June 15. *Id.* ¶ 11. Mr. Wang asserts that "[b]ased on those conversations," he "understood" that Ms. Lou "had been directed by . . . Ding Wei, and others associated with" Inno Holdings, "to prolong the resolution of . . . the T12 Halt" to extract more money from short sellers. *Id.* But Mr. Wang fails to say what Ms. Lou supposedly told him. Ms. Lou, on the other hand, makes clear that she never told Mr. Wang anything about any "instructions" Inno Holdings had given her or that Inno Holdings wanted, much less attempted, to delay resolution of the T12 halt. Lou Decl. ¶ 3. Mr. Wang's account of his "underst[anding]" from his calls from Ms. Lou is not credible. Mr. Wang would have the court believe that Ms. Lou would (1) participate in arguably unethical conduct by

7

delaying resolution of the T12 Halt, (2) admit to Mr. Wang that she had done so, *and* (3) divulge confidential client information to Mr. Wang. Mr. Wang's unreliable account of his conversations with Ms. Lou calls into question more broadly his recollection, candor, or both.

The rest of Mr. Wang's information about the supposed scheme comes from unnamed sources or no source at all. He cites without identification "the principal individuals I understand to be operating, financing, or otherwise in contact and coordinating" the scheme for his claims that Mr. Li (1) owns and operates servers used to conduct coordinated trading activity on June 8, and (2) "procured the brokerage accounts through which" the coordinated trading activity was conducted. ECF No. 10-1 ¶ 4. Mr. Wang also attributes to these "individuals" his assertion that Tong, "together with . . . Ding Wei," oversees Inno Holdings day-to-day operations—the same operations that his prior declaration dismissed as not "meaningful," *id.* ¶ 4—and that Mr. Wei knows that he (Mr. Wei) is dealing with Prince Group affiliates. *Id.* ¶ 4.

Mr. Wang cites "information I have gathered through my professional network" and "statements made to me by persons with direct knowledge of relevant events" to support his conclusion that persons affiliated with Inno Holdings, including Ding Wei, anticipated and brought about the T12 halt. ECF No. 1-5 ¶ 11. According to Mr. Wang, the co-conspirators sent "a WeChat conversation relating to a pump-and-dump scheme"[5] to Nasdaq and contributed to Nasdaq's decision to impose the T12 halt. *Id.* Mr. Wang offers no details about the supposed WeChat conversation, such as who participated or what was said. Yet, he dubiously asserts that (1) the Inno Holdings Defendants could predict when Nasdaq would impose a T12 halt and (2) Mr. Wang knows why Nasdaq imposed a T12 halt.

---

[5] Mr. Wang says the June 8, 2026 increase in Inno Holdings' stock price is "highly consistent with . . . a 'pump and dump' scheme," which involves the use of "[s]ocial media and other promotional channels" to "attract retail investors at inflated prices." ECF No. 1-5 ¶ 9. But Mr. Wang never identifies any such promotional activity, much less activity attributable to Inno Holdings or Mr. Wei.

Mr. Wang's attempts to corroborate his outlandish story only discredit it further. For example, Mr. Wang emphasizes that Inno Holdings operates in Hong Kong, rather than Texas. ECF No. 1-5 ¶¶ 17–18. But that, of course, is not evidence of fraud. As Mr. Wang is surely aware, a company is not required to conduct business where it is incorporated.

Mr. Wang also suggests that Inno Holdings sought to conceal that the AI Agreement was made in the name of a subsidiary, rather than Inno Holdings itself. But Mr. Wang only knows the AI Agreement was with an Inno Holdings subsidiary because *Inno Holdings disclosed the redacted AI Agreement in its Form 8-K*. Atty Decl., Exs. 2, 2.1, 2.2. Mr. Wang apparently regards the failure to name the subsidiary in the press release as a "red flag," ECF No. 1-5 ¶ 18, but he does not explain how omitting the subsidiary's name from a press release while disclosing it in an exhibit to the release would advance the conspiracy he imagines. And a publicly traded holding company's operation through affiliates is plainly not evidence of deception.

Mr. Wang's attempt to connect Inno Holdings to Paranovus Entertainment Technology Ltd.—which he claims, without citation, that Prince Group used to implement the "same scheme"—likewise fails. ECF No. 10-1 ¶ 6. Mr. Wang's suggestion that Paranovus and Inno Holdings "utilize the same broker," AC Sunshine Securities LLC, *id.*, is false. Wei Decl., ¶ 38.[6]

The hearsay allegations in Mr. Wang's declarations are entirely unfounded. The central premise on which Kingbird's entire claim hinges—that there is some connection between the Prince Group and Inno Holdings' management—is false. Mr. Wei does not know Mr. Li, Mr. Tong, or Mr. Zhi, and neither Mr. Wei nor Inno Holdings has any relationship with any of those individuals. Wei Decl., ¶¶ 24–29. Inno Holdings has never raised any funds from Mr. Li, Mr. Tong, Mr. Zhi, or the Prince Group. *Id.* ¶ 32. Mr. Li, Mr. Tong, Mr. Zhi, and the Prince

---

[6] In addition, Paranovus was never the subject of a T12 Halt—yet the Inno Holdings T12 Halt is supposedly central to the alleged "scheme" at issue here. *See* ECF No. 10-1 ¶ 6.

Group have never appeared on the shareholder list provided by the Company's transfer agency. *Id.* Mr. Li, Mr. Tong, Mr. Zhi, and the Prince Group do not control the Company. *Id.* Likewise, neither Inno Holdings nor Mr. Wei was involved in a pump-and-dump scheme involving coordinated trading activity. *Id.* ¶ 34. And Inno Holdings neither anticipated, precipitated, nor is trying to prolong the T12 halt. *Id.* ¶¶ 35–36.

Simply put, Mr. Wang's story lacks credibility. He posits an international scheme spanning at least three countries (Cambodia, the People's Republic of China, and the United States), which managed to assume control over a publicly traded company without generating any documentary evidence. For his story to be true, not only would Inno Holdings and its management have to be in on this scheme, but so would its counsel, its auditors, and the third-party vendor with which it entered into the AI Agreement. At the same time, Mr. Wang would have the Court believe that part of this well-concealed scheme involved the conspirators *ratting themselves out to Nasdaq*; that its masterminds—Mr. Li and Mr. Tong of Prince Group— volunteered the details of their criminal exploits to him; and that Ms. Lou confessed that her own client was engaged in some sort of malfeasance.

## IV.    The Ex Parte TRO

Since learning of the TRO on June 26, 2026, Inno Holdings has complied with it in all respects. Wei Decl., ¶ 39. Since the TRO was entered, two facts have become clear. First, the TRO has caused and will continue to cause irreparable harm to Inno Holdings. And second, the TRO is not preventing the ostensible harm to Kingbird that the TRO was intended to prevent.

The TRO has imposed, and will continue to impose, significant cost on Inno Holdings. Wei Decl., ¶ 40. Inno Holdings has been unable to pay its July rent since it came due on July 1, 2026. *Id.* ¶ 41. Inno Holdings' landlords already have inquired about the missing payments and may evict Inno Holdings if payment is not forthcoming. *Id.* ¶ 42. Eviction from the warehouse lease will cause Inno Holdings additional harm, including potential loss of more than $2.4

10

million in inventory stored there. *See* Atty Decl., Ex. 6; Wei Decl., ¶ 43.

Inno Holdings has likewise been unable to pay its employees' June wages, which harms the company in multiple ways. Wei Decl., ¶ 44. These unpaid wages are currently accruing interest. Atty Decl., Ex. 7. Failure to pay them potentially exposes Inno Holdings and its officers and directors to criminal liability. *See id.* Finally, nonpayment of wages may result in Inno Holdings employees leaving, which would seriously harm the Company's business. *See* Atty Decl., Ex. 8 at 10 ("[Inno Holdings] future success depends on our continuing ability to attract, develop, motivate, and retain highly qualified and skilled employees. . . . [T]he loss of any of our senior management or key employees could materially adversely affect our ability to execute our business plan, and we may not be able to find adequate replacements.").

Finally, the TRO is preventing the Company from paying its vendors, including legal counsel, auditors, and accountants. Wei Decl., ¶ 45. If the TRO remains in place, the Company will be unable to make the phase one payment to Ninetech under the AI Agreement. *Id.* ¶ 46. If the Company is unable to pay its accountants and auditors, it will be unable to timely file its quarterly report with the SEC. Wei Decl., ¶ 47.

At the same time, as Kingbird's own filings prove, the TRO is not preventing the supposed injury about which Kingbird complains. On July 2, 2026, Kingbird filed an emergency motion to expedite discovery. The emergency? The TRO was not preventing the "irreparable harm" that Kingbird claimed it would prevent:

> This Court has already entered a Temporary Restraining Order (Dkt. 6) finding a substantial likelihood of success on Plaintiff's claims of securities fraud. However, the ongoing Nasdaq T12 trading halt imposed on June 8, 2026 continues to trap Plaintiff, and other short sellers, in positions incurring massive daily borrow fees and interest charges from brokers, which is then being transmitted to other individuals, some of whom appear to be affiliated with OFAC sanctioned entities. The harm is irreparable and compounding daily.

ECF No. 21 at 2. The next day, Kingbird filed a motion to extend the TRO, ECF No. 25, which will otherwise expire on July 9, 2026, *see* FED. R. CIV. P. 65(b)(2). Kingbird claims it wants to

11

serve subpoenas for documents that "go to the heart of the *ongoing* harm to Kingbird . . . ." ECF No. 25 at 2 (emphasis added). In that same motion, Kingbird complained that "[i]nterest charges on Plaintiff's short position are thousands upon thousands of dollars a day while Plaintiff has no mechanism to close its position," and that these charges "risk[] leaving Plaintiff insolvent." *Id.* at 4. And, despite the TRO, "Plaintiff's brokers are continuing to debit thousands and thousands of dollars from Plaintiff's account on a daily basis . . . ." *Id.* at 5.

### ARGUMENT

### I.    Kingbird has not shown a TRO or injunction is warranted.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "[A] preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements." *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012) (internal quotation marks omitted).

To obtain a temporary restraining order, a plaintiff must make the same showing required for a preliminary injunction. *Texas Laurel Ridge Hosp., LP v. Kennedy*, No. SA-26-CA-02701-JKP, 2026 WL 1194244, at \*7 (W.D. Tex. Apr. 28, 2026) (citing *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997)). In addition, a temporary restraining order may be entered without notice to the adverse party "only if, (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." FED. R. CIV. P. 65(b)(1).

Rule 65(b)(4) expressly authorizes a party to move to dissolve a preliminary injunction

12

"[o]n 2 days' notice to the party who obtained the order," and "[t]he court must then hear and decide the motion as promptly as justice requires." *Id.* 65(b)(4). When an adverse party seeks to dissolve a TRO pursuant to Rule 65(b)(4), "[t]he burden is on the party seeking the restraint to show that it is justified." *Gilead Scis., Inc. v. Safe Chain Sols., LLC*, 684 F. Supp. 3d 51, 63 (E.D.N.Y. 2023).

### A.    Kingbird is not likely to succeed on the merits.

First, Kingbird must establish a "substantial likelihood that [it] will prevail on the merits." *Texas Med. Providers Performing Abortion Servs.,* 667 F.3d at 574. "An absence of likelihood of success on the merits is sufficient to make the district court's grant of a preliminary injunction improvident as a matter of law." *Id.* (internal quotation marks omitted).

Kingbird cannot carry this burden for at least two reasons. First, Kingbird has not shown that it will likely survive a motion to dismiss, much less ultimately succeed on any of its claims. Second, this Court lacks personal jurisdiction over Ding Wei in any event.

### 1.    Kingbird's substantive claims are likely to fail on the merits.

To assess the likelihood of success on the merits, the court must "determine what is the proper standard to be applied in evaluating plaintiff's claims, and then . . . apply that standard to the facts presented in the record." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 622 (5th Cir. 1985). Kingbird cannot show substantial likelihood of success on the merits because it has failed to sufficiently plead any of its claims. Most glaringly, the Complaint does not abide by Rule 9(b) and the Private Securities Litigation Reform Act's ("PSLRA") command that it plead with particularity the fraudulent or deceptive action that Inno Holdings or Mr. Wei actually undertook—rather than alluding to a "scheme" attributed to an amorphous mass of "defendants." Beyond that, additional legal defects abound.

*Count I: Exchange Act Section 10(b)/Rule 10b-5.* To state a section 10(b) claim, "a plaintiff must allege, in connection with the purchase or sale of securities, (1) a misstatement or

13

an omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately caused the plaintiffs' injury." *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406–07 (5th Cir. 2001) (internal quotation marks omitted). Under the PSLRA, a plaintiff must (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" and (2) plead "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b).

Most of the conduct alleged in the Complaint does not consist of misstatements or omissions actionable under Section 10(b) or Rule 10b-5. *See* ECF No. 1 ¶ 81(a), (b), (c), (f). With respect to the single specifically challenged statement—regarding the AI Agreement—the omission of the contracting subsidiary's identity from the 8-K or press release could not have rendered that challenged statement misleading because the agreement attached to the 8-K disclosed that very information. Atty Decl., Ex. 2, 2.1, 2.2. Moreover, Kingbird has not pleaded reliance.

*Count II: Exchange Act Section 9(a)*. Whether as a matter of damages or reliance, "[t]he deception [in a market manipulation claim] arises from the fact that investors are misled to believe that *prices* at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 306 (S.D.N.Y. 2009) (second alteration in original & emphasis added) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 100 (2d Cir.2007)). But Kingbird alleges the exact opposite—that it entered a market it believed was being manipulated seeking to profit from that manipulation. So, its claimed injury has nothing to do with purchasing at an allegedly manipulated price.

*Count III: Exchange Act Section 18.* To state a Section 18 claim, a plaintiff "must plead that (1) a document filed pursuant to the Exchange Act, or any rule or regulation promulgated under it, contained a false or misleading statement; (2) the defendant made or caused to be made

14

the false or misleading statement; (3) the plaintiff *actually relied* on the false statement; and (4) that reliance caused loss to the plaintiff." *In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 540 F. Supp. 2d 800, 813 (S.D. Tex. 2007) (emphasis added). This claim falls short in multiple respects, including Kingbird's failure to allege either a misleading statement or actual reliance. *See Gross v. Diversified Mortg. Inv'rs*, 438 F. Supp. 190, 195 (S.D.N.Y. 1977).

*Count IV: Texas Deceptive Trade Practices Act.* To bring a DTPA claim, the plaintiff must be "a consumer by purchase or lease of goods or services." *Grass v. Credito Mexicano, S.A.*, 797 F.2d 220, 222 (5th Cir. 1986) (citation modified). And securities such as stocks do not qualify as goods or services for purposes of the DTPA. *FDIC v. Munn*, 804 F.2d 860, 863-64 (5th Cir. 1986) (collecting cases).

*Count V: Civil Conspiracy.* Kingbird's failure to plead its substantive claims means its civil conspiracy claim will fail, too. *See Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 640 (5th Cir. 2007) ("Under Texas law, civil conspiracy is a derivative tort. If a plaintiff fails to state a separate underlying claim . . . , then a claim for civil conspiracy necessarily fails.").

In short, Kingbird's claims will not even survive a motion to dismiss, and that should be the end of its TRO request. But even if that were not the case, and the Court were to consider the evidence that Kingbird has presented, it falls woefully short of carrying Kingbird's burden of proving a likelihood of success on the merits. Its claims rest entirely on Mr. Wang's declarations, which in turn rely on hearsay statements, some of which are completely unattributed and most of which are from people who are, by Mr. Wang's account, criminals. As explained above, *see supra* pp. 6-10, Mr. Wang's declarations are not credible. They certainly do not "clearly carr[y]" Kingbird's "burden of persuasion." *Tex. Med. Providers*, 667 F.3d at 574.[7]

---

[7] While the law precludes Kingbird's claims from proceeding, the facts are, at a minimum, in dispute, and issuance of an injunction (or extension of a TRO) would therefore require "a hearing on disputed questions of fact . . . ." *Phillips v. Charles Schreiner Bank*, 894 F.2d 127, 130 (5th Cir. 1990)

### 2.    The Court lacks personal jurisdiction over Ding Wei.

"A party seeking a TRO cannot establish a 'substantial likelihood of success on the merits' of his claim if the court concludes that it lacks jurisdiction to adjudicate the claim altogether." *Nianga v. Wolfe*, 435 F. Supp. 3d 739, 743 (N.D. Tex. 2020). Such is the case for Mr. Wei, as Kingbird cannot show the Court has personal jurisdiction over him.

"Because the Texas long-arm statute extends to the limits of federal due process," the Court has jurisdiction over Mr. Wei only if the exercise of jurisdiction complies with due process. *Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 539 (5th Cir. 2019). For specific[8] jurisdiction to exist, "the plaintiff 's claims … must arise out of or relate to the defendant's contacts with the forum." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct*, 592 U.S. 351, 359 (2021). Here, Mr. Wei has no contacts with Texas. He is a citizen and resident of the People's Republic of China and has never visited Texas. Wei Decl., ¶¶ 2–3. Neither Inno Holdings nor Mr. Wei is alleged to have directed any conduct at Texas. Kingbird does not allege that it executed the short sales or suffered any injury in Texas. Indeed, the only identified link between *any* party and Texas is that Inno Holdings is incorporated here. But that fact cannot support specific jurisdiction over Mr. Wei because it has no connection to Kingbird's claims.

### B.    Kingbird cannot show that it will suffer irreparable harm absent the TRO; in fact, its prior pleas of irreparable harm have been proven false.

Threat of irreparable harm turns on "whether the plaintiff's injury could be compensated by money damages." *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1989). Monetary injury is generally insufficient to establish irreparable harm. ECF No. 2 ¶ 29. Kingbird raises two ostensible exceptions to this rule. First, it asserts that the monetary injury it is suffering threatens its business's existence. ECF No. 2 ¶ 30–31 (citing *Atwood Turnkey*

---

[8] "General personal jurisdiction applies 'only when a defendant is essentially at home'" in a state. *Shambaugh & Son, L.P. v. Steadfast Ins. Co.*, 91 F.4th 364, 372 (5th Cir. 2024) (quoting *Ford*, 592 U.S. at 358). Mr. Wei is not "essentially at home" in Texas, which he has never visited. Wei Decl., ¶ 3.

*Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989)). But Kingbird presents no *evidence* that it would be "driv[en] . . . to bankruptcy" absent a TRO. ECF No. 2 ¶ 31. It simply asserts that the fees and interest being charged are "existential in nature" and "capable of driving [it] to bankruptcy if left unabated." *Id.* The "existential" nature of an ongoing business expense can only be measured in relation to the business's overall financial position. And Kingbird fails to provide a shred of information about its overall financial condition.

Furthermore, the events of the last two weeks have irrefutably shown that a TRO was not necessary to keep Kingbird in business. The TRO has not relieved Kingbird of its obligation to pay interest and fees to its brokers. *See supra* pp. 12-13; *see also* ECF No. 25 at 3–4. But Kingbird has not filed for bankruptcy.

Moreover, even if its continued existence were at risk, Kingbird cannot explain why that injury could not be remedied with monetary damages, particularly because Kingbird was apparently formed in 2021 as an investment vehicle and there is no evidence that it conducts any business operations or has goodwill.[9] *See DFW Metro Line Servs. v. Sw. Bell Tel. Co.*, 901 F.2d 1267, 1269 (5th Cir. 1990) (affirming denial of preliminary injunction because "any potential injury suffered by DFW (*including its going out of business*) could be calculated and recompensed in the form of damages").

The nature of Kingbird's business further undermines its claim that damages could not redress its failure. Kingbird does not appear to have a website. Its declarations reveal that it has a "primary capital source" and complain about the effect of its current predicament on its relationship with that source. ECF No. 1-7 ¶ 7. Kingbird says nothing to suggest that it has any other clients or investors. Kingbird thus appears to be a vehicle for a person (or, at most, a small

---

[9] Indeed, Plaintiff was administratively dissolved in 2023 and 2024 for failure to pay Wyoming franchise tax. Atty. Decl. Ex. 1.

17

number of persons) to invest capital. If it becomes insolvent, the Diveroli Investment Group can just organize another affiliate.

Second, Kingbird argues that a judgment would be uncollectable because Inno Holdings and Ding Wei are located abroad. This contention is groundless. Inno Holdings' solvency and liquidity are not in doubt. As of its last quarterly report, Inno Holdings had approximately $42 million in current assets, more than three quarters of which were cash and cash equivalents and thus highly liquid. Atty Decl., Ex. 6. Kingbird makes no effort to show that a court in Hong Kong would not enforce a judgment entered in this action. And Kingbird's suggestion that Inno Holdings or Mr. Wei may try to hide assets is pure speculation.

Kingbird's concerns relating to OFAC sanctions are likewise bald speculation. Kingbird does not cite a single OFAC regulation, much less attempt to show that payment of contractually owed interest and fees to its broker somehow violates OFAC.

Finally, Kingbird's complaints about lost goodwill or reputation also lend no support to its claim of irreparable harm. *DFW* makes clear that lost goodwill of a relatively new business is remediable by money damages. 901 F.2d at 1269. Moreover, Kingbird offers no evidence establishing that its reputation is worth anything in the first place.

Kingbird has not met its burden of showing irreparable harm, and its prior claim of irreparable harm supporting its emergency TRO application has been proven false.

**C.      The balance of the equities tips decisively in favor of the Inno Holdings Defendants because the TRO has not prevented Kingbird's supposedly irreparable harm.**

Before granting an injunction or restraining order, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (2008). That exercise is easy in this case. Because the TRO harms the Inno Holdings Defendants without helping Kingbird, the balance of the equities cuts decisively against the TRO.

18

As discussed above, the TRO has imposed, and will continue to impose unless lifted or allowed to expire, substantial costs on the Inno Holdings Defendants. Meanwhile, the TRO has been in place for over a week, yet Kingbird still faces the interest and fees it claimed to urgently need to prevent. That is no surprise, since Kingbird's *brokers*, not the Inno Holdings Defendants, are the ones charging Kingbird interest and fees on shares it borrowed to sell short. Those brokers are not before the Court. Their relationships with Kingbird are governed by contracts (that Kingbird has not shared) and to which the Inno Holdings Defendants are not parties.

The fact that the TRO has not prevented Kingbird's supposedly "irreparable" injury is reason enough to vacate it without considering the harm it has wreaked on the Inno Holdings Defendants. "It is black letter law that an injunction will not issue when it would be ineffectual." *United States v. St. Bernard Par.,* 756 F.2d 1116, 1123 (5th Cir. 1985).

### D.       The TRO does not further the public interest.

Finally, the TRO undermines the public interest. It has already harmed Inno Holdings' employees, who have gone for a week without the wages they are owed. The TRO is also harming Inno Holdings, and that harm compounds the longer the TRO goes on. That harm will ultimately be felt by investors in Inno Holdings. Most prominently, the TRO will jeopardize Inno Holdings' ability to timely file its upcoming quarterly report with the SEC, which would create a risk of delisting that negatively impacts all shareholders. Wei Decl. ¶ 47.

Kingbird's analysis of the public interest presupposes Mr. Wang's veracity, but, as explained above, his declarations are unreliable. Kingbird further argues that the TRO advances the public interest by protecting other Inno Holdings short sellers. But, as discussed below, the fact that the injunction directly benefits third parties is not a virtue but a fatal flaw. *See infra* p. 21.

Because Kingbird cannot satisfy its burden on any of the four elements of the temporary restraining order/preliminary injunction analysis, the TRO should be dissolved, not extended.

19

**II.    The TRO is vague and overbroad in multiple respects.**

A TRO or injunction is not warranted. But even were an injunction appropriate, the TRO entered here violates various legal principles. It is vague, including by impermissibly cross-referencing other documents; it is overbroad; it grants a remedy unauthorized by Rule 65; and it effectively grants relief to nonparties.[10]

An injunction must not be "overbroad or vague." *John Doe #1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004). A restraining order is vague if it fails to satisfy Rule 65(d)(1)'s specificity requirements. *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016). Under that Rule, every "restraining order must . . . state its terms specifically . . . and describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." FED. R. CIV. P. 65(d)(1)(B), (C). For an order to satisfy these requirements, "an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed." *Scott*, 826 F.3d at 211 (quoting *U.S. Steel Corp. v. United Mine Workers of Am.*, 519 F.2d 1236, 1246 n. 20 (5th Cir. 1975)). A restraining order is overbroad if it is not "narrowly tailor[ed] . . . to remedy the specific action which gives rise to the order" as determined by the substantive law at issue, *John Doe #1*, 380 F.3d at 818, or if it directly, rather than merely incidentally, benefits third parties, *Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025).

As the Inno Holdings Defendants' motion to modify and reply in support (ECF Nos. 9, 13) explained, Paragraphs 1 and 4 of the TRO violate these standards. As demonstrated below, these defects actually pervade the *entirety* of the TRO and demand its dissolution.

---

[10] The TRO also rests on a bond of merely $10,000, which is grossly disproportionate to the magnitude of harm associated with effectively shutting down a publicly traded company. While the TRO should be dissolved in its entirety, if it is allowed to persist at all, it must be secured by an amount sufficient "to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

### A.    Paragraph 1

Paragraph 1 suffers from numerous flaws. To start, it is syntactically ambiguous. The phrase "involving the halted securities or related accounts, transactions, instruments, or proceeds at issue in this action" immediately follows a list of nouns ("business, brokerage, securities, or associated trading activity"). TRO ¶ 1. The phrase could modify only the last noun in the list ("associated trading activity"), or it could modify all of the nouns in the list, depending on whether the "'rule of the last antecedent,"—whereby "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows," *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)—applies, an often-debated rule that is "not absolute and can be overcome by other indicia of meaning," *id.*

Another problem with this paragraph is that the list of prohibited activities is nonsensical. The list in the first sentence includes "continuing," "clearing," and "lending" but fails to explain "continuing," "clearing," and "lending" of *what*. TRO ¶ 1. If the intent were "any business, brokerage, securities, or associated trading activity involving the halted securities or related accounts, transactions, or proceeds at issue in this action," that begs the questions how does one "continu[e]" a "securit[y]," "clear[]" a "business," or "lend[]" "associated trading activity"? *Id.*

This paragraph also contravenes Rule 65(d)'s prohibition on cross-referencing other documents. The Fifth Circuit construes this "no-reference requirement . . . strictly . . . to require that parties be able to interpret the injunction from the four corners of the order." *Seattle-First Nat. Bank v. Manges*, 900 F.2d 795, 800 (5th Cir. 1990) (internal quotation marks omitted). Put another way, an injunction or restraining order must "be precise and self-contained, so that a person subject to it who reads it and nothing else has a sufficiently clear and exact knowledge of the duties it imposes on him that if he violates it he can be adjudged guilty of criminal contempt." *PMC, Inc. v. Sherwin–Williams Co.*, 151 F.3d 610, 619 (7th Cir. 1998); *accord Int'l Longshoremen's Ass'n, Loc. 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 69, 74–76

21

(1967) (an injunction requiring a party "to comply with and abide by" an arbitrator's award violated Rule 65(d)'s requirement to state in specific terms the acts required or prohibited).

Paragraph 1 improperly cross-references terms that should be, but are not, defined or identified anywhere else in the order. For example, it references "the halted securities" and "the proceeds at issue in this action." TRO ¶ 1. But to ascertain what these paragraphs are referring to, the Inno Defendants must cross-reference other documents, such as the Complaint or Kingbird's motion papers. Moreover, the last sentence demands compliance with halts, restrictions, freezes, suspensions, or other regulatory limitations, inquiries, or prohibitions by a wide variety of third-party public and private entities, without specifying what those third-party commands are. *Id.* An injunction requiring a party to follow unspecified commands of a third party is improper. *See Int'l Longshoremen's Ass'n*, 389 U.S. at 74–76.

Finally, no matter how it is interpreted, Paragraph 1 is impermissibly overbroad. It begins with a list of 11 separate actions, followed by a list of four things that do not fit with each other or with all of the listed actions, such that it purports to forbid actions that are impossible. This paragraph was written with one purpose: to cover as much conduct as possible. And it achieves that goal. Under any reading, it prohibits "continuing . . . business . . . involving the halted securities"—language that appears to encompass continued operation of Inno Holdings' business. In effect, Paragraph 1 enjoins Inno Holdings' continued business operations. Such a sweeping injunction is not "narrowly tailor[ed] . . . to remedy the specific action" giving rise to the TRO. *Veneman*, 380 F.3d at 818.

### B.    Paragraph 2

Neither Inno Holdings nor Mr. Wei "collect[s], assess[es], impos[es], or receive[s]" fees, charges, or interest associated with Kingbird's or anyone else's short selling. TRO ¶ 2. But this paragraph is also vague and overbroad in multiple ways. It is vague because it prohibits collection or receipt of fees or charges "to the extent such fees or charges exceed the rates that

would prevail in the absence of the artificial float restriction and T12 Halt described herein." *Id.* Compliance with this provision requires speculation about what "fees or charges" would prevail in the absence of the T12 Halt and the supposed "artificial float restriction." It also violates Rule 65(d)(1)(C) because neither the T12 Halt nor the "artificial float restriction" are "described" in the order, but only in Kingbird's moving papers. Likewise, Paragraph 2 is overbroad because it is not limited to "fees or charges" assessed to Kingbird as a result of its short position, but fees or charges assessed to anyone with a short position in INHD. *See id.* Because it directly, rather than merely incidentally, benefits nonparties, the TRO "falls outside the bounds of a federal court's equitable authority under the Judiciary Act" of 1789. *CASA,* 606 U.S. at 847.

### C.     Paragraph 3

Paragraph 3 is also vague and overbroad because it fails to describe with any specificity the conduct that it prohibits. *See N.Y.S. Ass'n for Retarded Child., Inc. v. Carey*, 456 F. Supp. 85, 98 (E.D.N.Y. 1978) (an injunction barring a union and its members "from taking any action to impede" a takeover of state residential care facility "would certainly be vague and overbroad").

### D.     Paragraph 4

Paragraph 4 violates Rule 65(d)(1)(C) by referring to "the scheme described in the Complaint." TRO ¶ 4. In addition, like Paragraph 1, it contains a syntactic ambiguity arising from a modifier ("derived from the scheme described in the Complaint") following the last item in a list ("cash, cryptocurrency (including USDT and any other digital assets), securities, brokerage accounts, real property and any proceeds"), raising again the question of whether the modifier applies only to the last item in the list or all of them. *See id.*

Moreover, Paragraph 4 exceeds the Court's authority under Rule 65 because it effectively freezes all the Inno Holdings Defendants' assets regardless whether they are subject of Kingbird's claims. *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 333 (1999); *In re Fredeman Litig.*, 843 F.2d 821, 824–28 (5th Cir. 1988). As the Fifth Circuit

explained in *Fredeman*, an asset-freeze injunction or TRO "cannot issue under Rule 65" because it "is in the nature of an attachment whose availability is governed by Federal Rule of Civil Procedure 64." *Id.* at 826. Such a freeze may only target particular assets "subject to equitable remedies," and may not be issued "to secure a potential money damage judgment." *Id.* at 825 (citing *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 560, 565 (5th Cir. 1987)).

### E.       Paragraph 5

Paragraph 5 violates Rule 65(d)(1)(C) with more impermissible references to the Complaint. *See* TRO ¶ 5(e) ("the securities transactions described in the Complaint"); *id.* ¶ 5(f) ("any accounts, entities, or individuals involved in the scheme described in the Complaint").[11] It is also unnecessary; the Inno Holdings Defendants understand and are complying with their duty to preserve documents and information relevant to this lawsuit.

CONCLUSION

For all of these reasons, the Inno Holdings Defendants respectfully request that the Court grant this motion, dissolve and decline to extend the TRO, and grant the Inno Defendants all other relief to which they are justly entitled.

---

[11] If the Court wants to enter a preservation order that cross-references pleadings, it can simply invoke its "power to control the discovery process and overall case management" as a more appropriate source of authority. *Capricorn Power Co. v. Siemens Westinghouse Power Corp.*, 220 F.R.D. 429, 432–33 (W.D. Pa. 2004); *see also Humble Oil & Ref. Co. v. Sun Oil Co.*, 175 F.2d 670, 671 (5th Cir. 1949) (reversing injunction requiring a party to permit a survey of a tract of land, because there was no "necessity or reason" to "employ a substitute procedure for that provided in the [discovery] rules"). Such an order, if it is entered, should be directed to all parties.

Respectfully submitted,

*OF COUNSEL:*                                   BAKER BOTTS L.L.P.
David D. Sterling
S.D. Tex. No. 07079
Texas Bar No. 19170000                         By*: /s/ Amy Pharr Hefley*
Anthony J. Lucisano                                   Amy Pharr Hefley
S.D. Tex. No. 3369146                                 *Attorney-In-Charge*
Texas Bar No. 24102118                                S.D. Tex. No. 870378
BAKER BOTTS L.L.P.                                    Texas Bar No. 24046046
910 Louisiana Street                                  910 Louisiana Street
Houston, Texas 77002                                  Houston, Texas 77002
david.sterling@bakerbotts.com                         (713) 229-1270
anthony.lucisano@bakerbotts.com                       (713) 229-2770 (Fax)
                                                      amy.hefley@bakerbotts.com


MCCARTER & ENGLISH, LLP

        Joseph R. Scholz (pro hac forthcoming)
        Scott Weingart (pro hac forthcoming)
        Four Gateway Center
        100 Mulberry St.
        Newark, NJ 07102
        973.639.6999
        973.624.7070 (Fax)
        jscholz@mccarter.com
        sweingart@mccarter.com


**Attorneys for Defendants Inno Holdings Inc.
and Ding Wei**

25

## CERTIFICATE OF CONFERENCE

I hereby certify that on July 3, 2026, I emailed Plaintiff's counsel to confer regarding the relief requested in this motion, and on July 6, 2026, Plaintiff's counsel confirmed that Plaintiff is opposed.

*/s/ Anthony J. Lucisano*
Anthony J. Lucisano

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of July, 2026, a true and correct copy of the foregoing document was served on all counsel of record via the Court's CM/ECF system.

*/s/ Amy Pharr Hefley*
Amy Pharr Hefley