**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| KINGBIRD VENTURES LLC, a foreign limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>INNO HOLDINGS INC., a Texas corporation; DING WEI, an individual; PRINCE HOLDING GROUP, a Cambodian corporation, and its successor and affiliated entities; CHEN ZHI, a/k/a "VINCENT," an individual; JOHN DOE, a/k/a "MR. LI," an individual, and JOHN DOES 1-10, individuals,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 4:26-cv-05000 |

**DEFENDANT INNO HOLDINGS INC.'S RULE 12(b)(6)**
**MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iii

I. Introduction and Summary of Argument .......... 1

II. Background Facts .......... 3

A. Inno Holdings' business .......... 3

B. On June 8, 2026, Inno's stock price spikes on unusually high trading volume, Kingbird shorts the stock, and Nasdaq halts trading .......... 5

C. Nasdaq lifts the halt and trading resumes. .......... 6

D. Kingbird files the Complaint. .......... 6

III. Argument and Authorities .......... 7

A. Kingbird fails to state an Exchange Act claim (Counts I-III). .......... 7

1. Legal standards governing Kingbird's Exchange Act claims. .......... 7

2. Kingbird fails to state a Section 10(b) claim. .......... 10

a. Kingbird fails to plead a manipulative act. .......... 10

b. Kingbird fails to plead a materially misleading statement .......... 12

c. Kingbird also fails to plead facts raising a strong inference of scienter. 16

d. Kingbird also fails to plead reliance. .......... 21

e. Kingbird fails to plead loss causation. .......... 23

3. Kingbird fails to plead a Section 9(a) claim. .......... 23

4. Kingbird fails to plead a Section 18 claim. .......... 24

B. Kingbird has withdrawn its DTPA claim (Count IV). .......... 25

C. Kingbird's conspiracy claim fails without a separate, underlying claim (Count V). .......... 25

IV. Conclusion .......... 25

Certificate of Service .......... 27

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*ABC Arbitrage v. Tchuruk*,
291 F.3d 336 (5th Cir.2002) ....................10, 17

*Abrams v. Baker Hughes Inc.*,
292 F.3d 424 (5th Cir. 2002) ....................20

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006)....................23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................19

*ATSI Comms., Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)....................8, 10, 11, 12, 22

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)....................15, 21, 22

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)....................19

*Callinan v. Lexicon Pharm.*,
479 F. Supp. 3d 379 (S.D. Tex. 2020) ....................15

*Cobos v. Robinhood Fin. LLC*,
2021 WL 1035123 (C.D. Cal. Feb. 10, 2021)....................9

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)....................23

*ECD Inv'r Grp. v. Credit Suisse Int'l*,
2017 WL 3841872 (S.D.N.Y. Sep. 1, 2017)....................11

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011)....................21, 22

*FDIC v. Munn*,
804 F.2d 860 (5th Cir. 1986) ....................25

*Fin. Acquisition Partners, LP v. Blackwell*,
440 F.3d 278 (5th Cir. 2006) ....................3, 10, 11, 19

*Gurary v. Winehouse*,
190 F.3d 37 (2d Cir. 1999)....................10

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)....................22

*Heinze v. Tesco Corp.*,
971 F.3d 475 (5th Cir. 2020)....................15, 16

*Hemi Grp., LLC v. City of New York*,
559 U.S. 1 (2010)....................23

*Hershey v. Energy Transfer Partners, L.P.*,
610 F.3d 239 (5th Cir. 2010)....................9

*Higginbotham v. Baxter Int'l, Inc.*,
495 F.3d 753 (7th Cir. 2007)....................17

*In re Alstom SA*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005)....................9, 24

*In re Baker Hughes Sec. Litig.*,
136 F. Supp. 2d 630 (S.D. Tex. 2001), *aff'd sub nom. Abrams v. Baker Hughes Inc.*, 292 F.3d 424 (5th Cir. 2002)....................21

*In re Banco Bradesco S.A. Sec. Litig.*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017)....................20

*In re Citigroup Auction Rate Sec. Litig.*,
700 F. Supp. 2d 294 (S.D.N.Y. 2009)....................22

*In re Enron Corp. Sec. Deriv. & ERISA Litig.*,
235 F. Supp. 2d 549 (S.D. Tex. 2002)....................10

*In re Enron Corp. Secs., Derivative*,
540 F. Supp. 2d 800 (S.D. Tex. 2007)....................24, 25

*In Re JP Morgan Auction Rate Sec. Mktg. Lit.*,
2014 WL 4953554 (S.D.N.Y. Sep. 30, 2014)....................11

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
501 F. Supp. 2d 452 (S.D.N.Y. 2006)....................24

*Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
537 F.3d 527 (5th Cir. 2008)....................8, 9, 12, 13, 14, 17

*Izadjoo v. Helix Energy Sols. Grp., Inc.*,
237 F. Supp. 3d 492 (S.D. Tex. 2017)....................3, 17

*Lovelace v. Software Spectrum Inc.*,
78 F.3d 1015 (5th Cir. 1996) ....................20

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
601 U.S. 257 (2024)....................12, 15

*Meadows v. Hartford Life Ins.*,
492 F.3d 634 (5th Cir. 2007) ....................25

*Phunware, Inc. v. UBS Sec. LLC*,
2024 WL 1465244 (S.D.N.Y. Apr. 4, 2024)....................9

*R2 Invs. LDC v. Phillips*,
401 F.3d 638 (5th Cir. 2005) ....................9, 16, 18

*Richman v. Goldman Sachs Grp., Inc.*,
868 F. Supp. 2d 261 (S.D.N.Y. 2012)....................15

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)....................13

*Santa Fe Indus., Inc. v. Green*,
430 U.S. 462 (1977)....................10

*Shivangi v. Dean Witter Reynolds, Inc.*,
825 F.2d 885 (5th Cir. 1987) ....................20

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
365 F.3d 353 (5th Cir. 2004) ....................10, 11, 16, 18, 19, 20

*Spears v. Next Bridge Hydrocarbons, Inc.*,
2026 WL 538520 (W.D. Tex. Jan. 28, 2026) ....................8

*Stone Family Tr. v. Credit Suisse AG*,
19 Civ. No. 5192 (AT), 2022 WL 954743 (S.D.N.Y. Mar. 30, 2022) ....................23, 24

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
552 U.S. 148 (2008)....................21

*Tellabs, Inc. v. Makor Issues & Rights, LTD.*,
551 U.S. 308 ....................16, 21

*Warren v. Rsrv. Fund, Inc.*,
728 F.2d 741 (5th Cir. 1984) ....................20

*Wu Winfred Huang v. EZCORP, Inc.*,
259 F. Supp. 3d 563 (W.D. Tex. 2017)....................18

**STATUTES**

15 U.S.C. § 78i(a)(2)........................................................................................................8

15 U.S.C. § 78i(f)...............................................................................................................8

15 U.S.C. § 78j(b)..............................................................................................................7

15 U.S.C. § 78r(a)..............................................................................................................9

15 U.S.C. § 78u-4(b)(1)...................................................................................................25

15 U.S.C. § 78u-4(b)(1)-(2), (4)........................................................................................9

15 U.S.C. § 78u-4(b)(1)(B)..............................................................................................10

15 U.S.C. § 78u-4(b)(2)(A)..............................................................................................10

**OTHER AUTHORITIES**

17 C.F.R. § 230.424(b)....................................................................................................25

17 C.F.R. §240.10b-5.........................................................................................................8

17 C.F.R. § 240.10b-5(b)..................................................................................................12

FED. R. CIV. P. 9(b)......................................................................................................9, 10

https://www.investopedia.com/terms/h/holdingcompany.asp ..........................................3

*Inno Holdings Inc.*, NASDAQ (Jul. 31, 2026), https://ir.nasdaq.com/news-releases/news-release-details/nasdaq-resumes-trading-inno-holdings-inc.....................................................6

*Nasdaq*, NASDAQ (Jul 30, 2026), https://www.nasdaq.com/press-release/inno-holdings-inc-updates-trading-time-resumption-trading-nasdaq-2026-07-30;................................................6

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff Kingbird Ventures is a short seller that bet against Inno's stock at the wrong time.[1] The same "irregular market activity" that prompted Kingbird's short sales drove the stock from $1.11 to $39.49 in a single session and attracted the attention of Nasdaq, which instituted a (now-lifted) trading halt that Kingbird claims froze its positions, impeded its ability to cover, and subjected it to high-interest borrow rates charged by its brokers. The Complaint asks this Court to bail Kingbird out of its misguided trade and hold Inno and its CEO Ding Wei responsible for alleged losses that every factual allegation in the Complaint attributes to *someone else*.

The Complaint is long on rhetoric—transnational criminal organizations, forced-labor camps, cryptocurrency laundering—but short on factual allegations connecting any of it to the Inno Holdings Defendants. When stripped of the conspiracy language, the operative facts alleged against the Inno Holdings Defendants are these: the Company conducted securities offerings, filed 8-Ks disclosing their terms, and announced a business agreement (attaching the underlying contract as an exhibit). That is not fraud. That is corporate disclosure.

The Court should dismiss the Complaint with prejudice because it fails at every element required to state an Exchange Act claim against the Inno Holdings Defendants:

*No deceptive act or manipulation.* The Complaint attributes all trading conduct—the coordinated volume, the float concentration, the halt prolongation—to "Defendants" collectively without identifying a single trade, account, or order placed by Inno or Mr. Ding. That is classic "group pleading" that is not permitted in this Circuit.

---

[1] We refer to Inno Holdings, Inc. as "Inno Holdings," "Inno," or the "Company"; to Inno Holdings and its CEO Ding Wei as the "Inno Holdings Defendants"; to Kingbird Ventures as "Kingbird"; to ApexVest Holdings Ltd. as "ApexVest"; and to Ninetech Technologies (Hong Kong) Ltd. as "Ninetech Technologies" or "Ninetech."

*No actionable misstatement.* The only two statements Kingbird specifically challenges—Inno's disclosures of an AI-development agreement and a private investment in public equity ("PIPE") transaction—contain no false statement. The *holding* Company's announcement of an AI-development Agreement was not somehow rendered misleading by the unremarkable fact that the party to the agreement was Inno's wholly owned (and publicly disclosed) subsidiary through which Inno conducts business. And the PIPE 8-K accurately disclosed the offering's material terms. Kingbird's theory reduces to a complaint that Inno did not disclose *more*—but there was no duty to do so, and no affirmative statement was rendered misleading by the alleged omission.

*No scienter.* The Complaint pleads no communication, no insider trade, no profit, and no motive attributable to the Inno Holdings Defendants. Even worse, Kingbird's theory is economically irrational: that Inno engineered the destruction of its own stock's value and its Nasdaq listing for the benefit of third parties from whom it received nothing.

*No reliance.* Kingbird admits it shorted Inno's stock "in response to irregular market activity"—a judicial admission that Kingbird did not rely on market integrity. And Kingbird does not allege it was even aware of the challenged filings when it traded, having learned of them only through a post-halt investigation weeks later. That lack of reliance is fatal.

*No loss causation.* Kingbird's only alleged injury—the daily borrow fees it allegedly paid—were set by third-party brokers and accrued during a halt imposed by Nasdaq that arose from trading the Complaint attributes to a Mr. Li, a member of a transnational criminal organization. The Inno Holdings Defendants did not cause the daily borrow fees.

Finally, Kingbird has abandoned its DTPA claim, and its civil conspiracy claim necessarily fails with the substantive claims upon which that claim depends.

## II. BACKGROUND FACTS

### A. Inno Holdings' business.

Inno is a small public company based in Hong Kong and listed on Nasdaq. Comp. ¶¶ 3,15. It was incorporated in Texas in September 2021 and went public through an initial public offering in December 2023. *Id.* ¶ 26; Ex. 1, 12/15/2025 10-K at 7.[2] As a holding company, Inno owns equity in subsidiaries that conduct business operations.[3] At the time of its IPO, Inno manufactured steel building materials and conducted its operations through various subsidiaries based in Texas. Ex. 1, 12/15/2025 10-K at 1. This business was not profitable. In fiscal year 2024 (ended on September 30, 2024), Inno generated no revenue and had a net loss of over $3.2 million. *Id*. at 17-18.

In October 2024, the Company began a new business initiative focused on recycled consumer electronics devices and acquired two Hong Kong-based subsidiaries to conduct this business. *Id*. at 1. It later formed a third, ApexVest, in January 2026. Ex. 2, 2/3/2026 10-Q at 21. In Q2 2025, the Company discontinued its steel manufacturing business and, over the next few months, completed disposition of its Texas-based steel manufacturing subsidiaries. Ex. 1, 12/15/2025 10-K at 1. Inno now focuses exclusively on its recycled consumer electronic device business—sourcing, purchasing, refurbishing, and reselling used iPhones and iPads through its Hong Kong-based subsidiaries. *Id*.

Given its business transition, Inno is now based in Hong Kong. As the Company explained to investors, "Hong Kong is one of the busiest ports and enjoys the advantage of duty-free status,

---

[2] "[I]n securities actions, the court may ... rely on public ... documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit, without, pursuant to Rule 12(b), converting the motion into one for summary judgment," *Fin. Acquisition Partners, LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006), and "courts may take judicial notice of the contents of public disclosure documents that the law requires be filed with government agencies, such as the SEC," *Izadjoo v. Helix Energy Sols. Grp., Inc.*, 237 F. Supp. 3d 492, 506 (S.D. Tex. 2017).

[3] https://www.investopedia.com/terms/h/holdingcompany.asp ("A holding company is a parent company that owns and oversees other businesses").

making it a major hub for the global recycled electronic devices industry." *Id*. at 2. Operating from Hong Kong thus allows Inno to "conveniently receive recycled electronic devices from, and have them dispatched to, most the regions in the world" without paying import or export duties. *Id.*

In connection with its business transition, Inno replaced its independent auditor, California-based Simon & Edwards ("S&E"), with JWF Assurance PAC, a Singapore-based accounting firm registered with the U.S. Public Company Accounting Oversight Board (PCAOB). Ex. 3, 1/16/2025 8-K at 2. Inno disclosed the change in a January 13, 2025 8-K, in which both the Company and S&E confirmed that there had been "no 'disagreements'" between them "on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure" and no undisclosed "reportable events," all as defined under SEC rules. *Id*. at 2, Ex. 16.1.

Inno's new recycled electronics business is small but growing. In fiscal year 2025 (ending September 30, 2025), Inno generated $2.8 million of revenue, all from the sale of recycled iPhones. Ex. 1, 12/15/2025 10-K at 17. And, for the first three quarters of fiscal 2026 (through June 30, 2026), Inno has generated more than $4.4 million in revenue from the sale of recycled iPhones and iPads. Ex. 4, 8/18/2026 10-Q at 2. Ding Wei has been Inno's Chairman and CEO since it began its transition to focus on recycled consumer electronics in October 2024. Compl. ¶ 35; Ex. 1, 12/15/2025 10-K at 22.

As Inno disclosed, it primarily funds its operations through "cash generated from operations, private and public shares offering, as well as through borrowing." *Id*. at 18. As to share offerings, the Company disclosed that it raised money to fund its business by selling shares of its common stock to non-U.S. investors through a series of private placements in 2024 and 2025 and through a PIPE transaction in December 2025. *See* Compl. ¶¶ 28-29, 46-49; Ex. 1, 12/15/2025 10-K at 18; Ex. 2, 2/3/2026 10-Q at 25-26; Ex. 5, 12/29/2025 8-K at 2.

In June 2026, to further grow its recycled consumer device business, Inno commissioned an AI services provider, Ninetech Technologies, to develop an AI-powered used mobile phone sales agent system ("AI Sales Agent Agreement"). Compl. ¶ 49; Ex. 6, 6/10/2026 8-K at 2. In the AI Sales Agent Agreement, Inno's subsidiary ApexVest agreed to pay Ninetech $3 million to develop this system. Ex. 6, 6/10/2026 8-K at Ex. 10.1. Inno announced the AI Sales Agent Agreement in a press release when it was executed on June 8, 2026 ("AI Agreement Press Release") and filed an 8-K on June 10, 2026, providing investors both the AI Agreement Press Release and the underlying AI Sales Agent Agreement. Compl. ¶ 49; Ex. 6, 6/10/2026 8-K.

**B. On June 8, 2026, Inno's stock price spikes on unusually high trading volume, Kingbird shorts the stock, and Nasdaq halts trading.**

On June 8, 2026, after announcing the AI Sales Agent Agreement's execution, Inno's stock price spiked on unusually high trading volume. According to the Complaint, the price increased from "approximately $1.11 at the open to approximately $43.37 at its intraday high, closing the regular session at approximately $39.49," and reported trading volume "was approximately 278,900,100 shares, compared to 144,300 shares traded the day before." Compl. ¶¶ 51, 52.

Kingbird observed the trading event and chose "to short the shares in response to irregular market activity." *Id.* ¶ 8.

After the market closed on June 8, Nasdaq halted trading in Inno's stock and announced that trading would "remain halted until Inno Holdings Inc. has fully satisfied Nasdaq's request for additional information." *Id.* ¶¶ 8, 60, Ex. A. Kingbird claims that during the trading halt, it was "unable to purchase shares in the market to close [its] short positions" and that "[b]orrowing rates on INHD short positions ... reached as high as 600% per annum at certain broker-dealers, resulting in interest charges to Kingbird routinely approaching and sometimes exceeding $15,000 to $20,000 per day." *Id.* ¶¶ 70, 71.

**C. Nasdaq lifts the halt and trading resumes.**

On July 30, 2026, Inno announced that Nasdaq was lifting the trading halt, and trading resumed the next day. *See Inno Holdings Inc. Updates Trading Time for the Resumption of Trading on Nasdaq*, NASDAQ (Jul 30, 2026), https://www.nasdaq.com/press-release/inno-holdings-inc-updates-trading-time-resumption-trading-nasdaq-2026-07-30; *Nasdaq Resumes Trading in Inno Holdings Inc.*, NASDAQ (Jul. 31, 2026), https://ir.nasdaq.com/news-releases/news-release-details/nasdaq-resumes-trading-inno-holdings-inc.[4]

**D. Kingbird files the Complaint.**

On June 24, 2026, Kingbird filed its Complaint against the Inno Holdings Defendants, Prince Holding Group, Chen Zhi a/k/a "Vincent," John Doe a/k/a "Mr. Li," and ten other unidentified John Does. Compl. ¶ 1. The Complaint is based largely on a supposed investigation conducted by Jim Wang, a purported "expert" who Kingbird engaged on June 8. Compl. ¶¶ 31-32, 37; *id.* Ex. D ¶ 4. Kingbird describes Mr. Wang as having "approximately 17 years of experience in investment banking and private equity with particular expertise in the listing and trading of securities of Asian companies on U.S. national exchanges." *Id.* ¶ 32. Mr. Wang has no personal knowledge of any transaction, communication, or trading decision attributed to any defendant. *See id.* Ex. D ¶¶ 5, 12-16; *id.* ¶¶ 32-35. His "investigation" rests entirely on anonymous and unidentified sources. *Id.*

As part of the investigation, Mr. Wang allegedly "contact[ed] someone named 'Mr. Li' who would not further identify himself." *Id.* ¶ 19 n.7. Mr. Wang stated that "Mr. Li" confessed that he "orchestrated the coordinated trading activity" on June 8 and claimed to be "among the

[4] Since trading resumed, Inno's stock has traded at a price far below its freeze price, and Kingbird has presumably closed out its positions at substantial profit.

primary lenders of INHD shares to broker-dealers." *Id.* ¶¶ 58-59. Mr. Wang also claims that "Mr. Li" disclosed details of an elaborate scheme whereby he and affiliated accounts acquired Inno from its founder for approximately $7 million using funds provided by a Defendant Prince Group associate, then replaced the board with scheme-affiliated personnel to ensure the company operated under their complete control. *Id.* ¶ 33. Without any documents or evidence to support its belief, Kingbird asserts that these funds were "transmitted in a USDT cryptocurrency from Cambodia" and "involve sanctioned funds that were and are being potentially laundered." *Id.* Mr. Wang also reported that "Mr. Li" and "a separate contact" (who is also unnamed and unidentified) "confirmed" that approximately 410,000 freely tradeable Inno shares were deposited in trading accounts but deliberately withheld from the market. *Id.* Ex. D ¶ 7.

Inno Holdings now moves to dismiss.

## III. ARGUMENT AND AUTHORITIES

### A. Kingbird fails to state an Exchange Act claim (Counts I-III).

#### 1. Legal standards governing Kingbird's Exchange Act claims.

Kingbird asserts claims under three distinct, but related, Exchange Act provisions: Section 10(b) (the general anti-fraud provision), Section 9(a) (prohibiting market manipulation), and Section 18 (prohibiting false statements in documents filed with the SEC under the Exchange Act).

**Count I: Section 10(b) and SEC Rule 10b-5.** Section 10(b) makes it unlawful to "use or employ ... any manipulative or deceptive device or contrivance" that violates SEC rules. 15 U.S.C. § 78j(b). SEC Rule 10b-5, in turn, makes it "unlawful for any person … in connection with the purchase or sale of any security,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material

> fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person ...."

17 C.F.R. §240.10b-5. Thus, Rules 10b-5(a) and (c) prohibit fraudulent conduct—*i.e.* market manipulation—in connection with securities transactions, while Rule 10b-5(b) prohibits fraudulent misrepresentations. *See Spears v. Next Bridge Hydrocarbons, Inc.*, 2026 WL 538520, *4, n.4 (W.D. Tex. Jan. 28, 2026) ("Section 10(b), in proscribing the use of a manipulative or deceptive device or contrivance, prohibits not only material misstatements but also manipulative acts." (quotations omitted)) (quoting *ATSI Comms., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) ("*ATSI*")).

To plead a Section 10(b) market manipulation claim, Kingbird must allege "(1) manipulative acts; (2) damage; (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities." *ATSI*, 493 F.3d at 101. To plead a Section 10(b) fraudulent misrepresentation claim, Kingbird must allege "a material misrepresentation or omission; a defendant with scienter concerning the fraud; reliance; damages; and loss causation." *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 532 (5th Cir. 2008).

**Count II: Section 9(a).** Section 9 prohibits manipulation of securities prices. Section 9(a) makes it unlawful for any person to "effect … a series of transactions in any security … creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others." 15 U.S.C. § 78i(a)(2). And Section 9(f) provides that "[a]ny person who willfully participates in any act or transaction in violation of [Section 9(a)] shall be liable to any person who shall purchase or sell any security *at a price which was affected by such act or transaction*." 15 U.S.C. § 78i(f) (emphasis added). Thus,

to state a Section 9 claim, Kingbird must plead both that (1) the Inno Holdings Defendants (a) engaged in transactions that artificially raised or depressed the price of Inno securities, (b) with scienter, and (c) for the purpose of inducing others to purchase or sell those securities; and (2) Kingbird "purchase[d] or sold" Inno securities "at a price which was affected by" the Inno Holdings Defendants' alleged Section 9(a) violation. *See Phunware, Inc. v. UBS Sec. LLC*, 2024 WL 1465244, at *3 (S.D.N.Y. Apr. 4, 2024); *Cobos v. Robinhood Fin. LLC*, 2021 WL 1035123, at *2 (C.D. Cal. Feb. 10, 2021).

**Count III: Section 18**. A Section 18 claim requires Kingbird to plead that "(1) a false or misleading statement was contained in a document filed pursuant to the Exchange Act (or any rule or regulation thereunder); (2) [the Inno Holdings Defendants] made or caused to be made the false or misleading statement; (3) [Kingbird] relied on the false statement; and (4) the reliance caused loss to [Kingbird]." *In re Alstom SA*, 406 F. Supp. 2d 433, 478 (S.D.N.Y. 2005); 15 U.S.C. § 78r(a).

**Heightened Pleading Standards.** To satisfy Rule 12(b)(6), Kingbird must plead facts sufficient to "state a claim that is plausible on its face." *Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 245 (5th Cir. 2010) (citation omitted). "[C]onclusory allegations, unwarranted deductions, or legal conclusions" do not suffice. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005).

But this is no ordinary Rule 12(b)(6) motion. Securities fraud claims are also subject to heightened pleading standards under Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). 15 U.S.C. § 78u-4(b)(1)-(2), (4). Rule 9(b)'s heightened standard requires Kingbird to plead "with particularity the circumstances constituting fraud." FED. R. CIV. P. 9(b). In addition, "the PSLRA enhance[s] the particularity requirements for pleading fraud under [Rule] 9(b) in two ways." *Shaw*, 537 F.3d at 533. First, it requires Kingbird to "specify" (i) "each statement alleged

to have been misleading," (ii) "the reason or reasons why the statement is misleading," and (iii) "if an allegation regarding the statement or omission is made on information and belief, … state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B); *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 361-62 (5th Cir. 2004). Second, the PSLRA requires Kingbird to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

In short, "PSLRA complaints must allege specific facts demonstrating material misstatements or omissions made with scienter." *Blackwell*, 440 F.3d at 286. "General allegations not tied to the defendants or resting upon speculation are insufficient." *ATSI*, 493 F.3d at 102. "A district court must dismiss a securities-fraud claim failing to satisfy either the PSLRA's pleading requirements or those of Rule 9(b)." *Blackwell*, 440 F.3d at 287 (citing *ABC Arbitrage v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002).

**2. Kingbird fails to state a Section 10(b) claim.**

**a. Kingbird fails to plead a manipulative act.**

"[T]he term 'manipulation' as used in § 10(b) is 'virtually a term of art when used in connection with securities markets' and refers to practices 'such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.'" *In re Enron Corp. Sec. Deriv. & ERISA Litig.*, 235 F. Supp. 2d 549, 567 n.8 (S.D. Tex. 2002) (quoting *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977)). "The gravamen of manipulation is *deception* of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *Id.* (emphasis added) (quoting *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999)).

To plead market manipulation under Rule 9(b) and the PSLRA, Kingbird must plead with particularity "what manipulative acts were performed, which defendants performed them, when

the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *ATSI*, 493 F.3d at 102. In doing so, Kingbird must "distinguish among those [it] sue[s] and enlighten *each defendant* as to his or her particular part in the alleged fraud." *Southland*, 365 F.3d at 365. "[G]roup pleading ... is *not* permitted." *Blackwell*, 440 F.3d at 285.

Kingbird fails to meet these standards in multiple respects. First, Kingbird alleges that "beginning in late 2025 and continuing through June 8, 2026, *the Defendants* orchestrated a carefully choreographed sequence of securities and business transactions designed to concentrate control of the Issuer's float while maintaining the appearance of legitimate capital formation and business development." Compl. ¶ 45 (emphasis added). But this allegation utterly fails to allege "what manipulative acts were performed, which defendants performed them, [or] when the manipulative acts were performed." *ATSI*, 493 F.3d at 102.

Second, Kingbird alleges that Inno sold stock to outside investors in a September 10, 2025 Securities Purchase Agreement and a December 26, 2025 PIPE transaction. Compl. ¶¶ 46-47. But Kingbird fails to identify anything manipulative or misleading about these transactions. There is no dispute that the transactions' material terms were accurately disclosed. And there can be no market manipulation when "the activity complained of was adequately disclosed to the market." *In Re JP Morgan Auction Rate Sec. Mktg. Lit.*, 2014 WL 4953554, at *8 (S.D.N.Y. Sep. 30, 2014); *ECD Inv'r Grp. v. Credit Suisse Int'l*, 2017 WL 3841872, at *26 (S.D.N.Y. Sep. 1, 2017) ("The market is not misled when a transaction's terms are fully disclosed." (citation omitted)).

Third, Kingbird points to the spike in trading volume in Inno stock and the resulting increase in its stock price on June 8, 2026 and offers the speculative conclusion that "the Defendants executed [a] coordinated trading event" and "[t]his coordinated trading activity created the appearance of massive active trading and drove the share price from approximately $1.11 to

approximately $43.37 in a single session." Compl. ¶¶ 50, 88. But Kingbird does not provide any details about this supposed "coordinated activity." It certainly does not say "what manipulative acts were performed" or "which defendants performed them." *ATSI*, 493 F.3d at 102. While Kingbird alleges that trading volume radically increased on June 8, it does not even attempt to tie the increased trading volume to the Inno Holdings Defendants. As the Second Circuit explained in *ATSI*, allegations about trading volumes do not suffice to plead market manipulation if the complaint fails to "particularly allege what the defendants did ... or state how this activity affected the market." *ATSI*, 493 F.3d at 104 ("The inference ATSI asks us to draw [based on unusual trading activity] is too speculative even on a motion to dismiss").

The most Kingbird can say is that "Mr. Li confirmed to Jim Wang that he and scheme-affiliated trading accounts orchestrated the coordinated trading activity that drove INHD's share price on June 8, 2026." *Id.* ¶ 58. But even if this vague allegation were enough to plead that *Mr. Li* engaged in market manipulation, it does not tie any supposed manipulative conduct to Mr. Ding or Inno, as required to plead market manipulation. *See ATSI*, 493 F.3d at 102 ("General allegations not tied to the defendants or resting upon speculation are insufficient."). Kingbird's remaining allegations are even more vague and speculative and likewise fail to connect any supposed manipulative conduct to the Inno Holdings Defendants. *See* Compl. ¶ 56.

**b. Kingbird fails to plead a materially misleading statement.**

To state a Section 10(b) misstatement claim, Kingbird must plausibly allege that Mr. Ding or Inno made an "untrue statement of a material fact" or misleading omission of material fact. 17 C.F.R. § 240.10b-5(b); *Shaw*, 537 F.3d at 532. Section 10(b) "do[es] not create an affirmative duty to disclose any and all material information"; it requires disclosure "only when necessary to make ... statements made ... not misleading." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024). Thus, an omission is actionable only if it renders some "statement

made" misleading. A statement is misleading only if it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Shaw*, 537 F.3d at 541. Kingbird must "do more than say that the statement[ ] ... w[as] false and misleading; [it] must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).

Kingbird alleges that Inno "made material misrepresentations" by (1) "publicly announcing a development-services agreement as the Issuer's own while the actual contracting party was [its subsidiary] Apexvest" and (2) "disclosing the PIPE Transaction ... without disclosing the identities of th[e] investors ...." Compl. ¶¶ 81, 91. Neither allegation comes close to identifying an actionably misleading statement.[5]

***First***, on June 8, 2026, Inno issued a press release announcing an agreement with an AI services provider for development of an AI-powered sales agent:

> INNO HOLDINGS INC. … today announced the execution of a Development Services Agreement (the 'Agreement') with a Hong Kong based AI service provider (the 'Service Provider'). Under the Agreement, the Service Provider will develop an AI-powered used mobile phone sales agent system (the 'Sales AI Agent Project') on behalf of the Company, with a total contracted service value of USD 3,000,000….
>
> The Sales AI Agent Project is currently in its early development stage and has not yet been deployed in the Company's commercial operations. The Agreement reflects the Company's decision to invest in the development of the Sales AI Agent ....

[5] The Complaint also critiques—but does not appear to actually challenge as false or misleading—Inno's disclosure of its outstanding share count because that number differed from the number of freely tradeable shares (the "free float"). Compl. ¶¶ 80-81, 88. But there is no dispute Inno accurately disclosed its number of outstanding shares. And Inno also disclosed that it had a limited free float, thereby expressly disclosing the information that Kingbird implies Inno concealed. *See* Ex. 1, 12/15/2025 10-K at 12 ("Recently, a number of publicly traded companies, *particularly those with relatively small public floats*, have experienced extreme stock price run-ups followed by rapid price declines and elevated volatility. We have been and may continue to be susceptible to significant stock price volatility, extreme price run-ups, lower trading volume and reduced liquidity than large-capitalization companies.") (emphasis added).

Ex. 6, 6/10/2026 8-K at Ex. 99.1. The AI Agreement Press Release accurately disclosed "the execution of" the AI Sales Agent Agreement under which Inno agreed to pay an AI-services provider $3 million to "develop an AI-powered used mobile phone sales agent system ... on behalf of the Company." On June 10, 2026, Inno then filed a Form 8-K with the SEC, attaching both the June 8 AI Agreement Press Release and the underlying AI Sales Agent Agreement itself. Ex. 6, 6/10/2026 8-K. That AI Sales Agent Agreement reflected the unremarkable fact that the named parties were Ninetech and Inno's wholly owned subsidiary ApexVest. *Id.*

Kingbird argues that the AI Agreement Press Release was misleading because "the actual contracting party ... was not the Issuer, but Apexvest." Compl. ¶ 49. But Inno Holdings is—as its name suggests—a *holding* company that conducts business through subsidiaries. And Inno repeatedly and prominently disclosed this fact to investors. The "overview" section of Inno's quarterly SEC reports begins by explaining that the company is "a Texas holding company ... that engages in the business of recycled consumer electronic devices" through "operating subsidiaries." Ex. 8, 5/1/2026 10-Q at 24.[6] And Inno likewise repeatedly disclosed that one of those subsidiaries was ApexVest.[7] In this context, Kingbird cannot explain how the omission of the name of the signatory subsidiary "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Shaw*, 537 F.3d at 541.

Kingbird argues that the AI Agreement Press relesae misleadingly "generate[d] the appearance of legitimate business activity." Compl. ¶¶ 35, 49. But Kingbird does not contest the authenticity of the AI Sales Agent Agreement or that it committed Inno to pay Ninetech millions

[6] *See also* Ex. 1, 12/15/2025 10-K at 1 (disclosing that Inno "conduct[s] [its] business of recycled consumer electronic devices through ... wholly-owned subsidiaries").

[7] *See* Ex. 2, 2/3/2026 10-Q at 21 ("On January 20, 2026, the Company incorporated a new wholly-owned subsidiary, ApexVest Holdings Limited, in the British Virgin Islands."); Ex. 8, 5/1/2026 10-Q at 5 (same).

of dollars to develop an AI sales agent for the Company. In other words, as Inno told investors, "[t]he [AI Sales Agent] Agreement reflect[ed] the Company's decision to invest in the development of the Sales AI Agent." Kingbird fails to explain how the omission of ApexVest's name from the AI Agreement Press Release created an affirmatively misleading impression. Nor does Kingbird even try to explain why a reasonable investor would have found the allegedly omitted information "'significant in making the decision to invest.'" *Callinan v. Lexicon Pharm.*, 479 F. Supp. 3d 379, 399 (S.D. Tex. 2020) (quoting *Basic, Inc. v.* Levinson, 485 U.S. 224 (1988)).

***Second***, on December 29, 2025, Inno disclosed that it had entered into the PIPE Transaction, through which the Company sold 3 million newly issued shares of common stock for $1.31 per share (the market price immediately preceding the announcement) to ten non-U.S. investors. Ex. 5, 12/29/2025 8-K. Kingbird does not contest that Inno accurately disclosed the PIPE Transaction's material terms. Instead, Kingbird complains that Inno's disclosures omitted "the identities of th[e] investors." Compl. ¶ 91(b). But Section 10(b) "do[es] not create an affirmative duty to disclose any and all material information." *Macquarie*, 601 U.S. at 264. And "revealing one fact about a subject" does not "trigger a duty to reveal all facts on the subject." *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012). Kingbird fails to identify any specific statement in the December 2025 8-K that was rendered affirmatively misleading by omission of the investors' identities.[8] And a "pure omission" claim "untethered to any specific false or misleading representation … [is] not cognizable" under the Exchange Act.

[8] Because Rule 10b-5(b) requires an affirmatively misleading statement, *see Macquarie*, 601 U.S. at 264, even an omission in the face of a regulatory duty to disclose does not give rise to a cognizable claim. But Kingbird does not even suggest that SEC rules required Inno to disclose the investors' identities. To the contrary, Kingbird asserts that "the transaction was deliberately structured under Regulation S as an 'offshore transaction,' a structure that placed the shares *beyond the reach of ordinary U.S. disclosure requirements*." Compl. ¶ 47 (emphasis added). In other words, Kingbird concedes that the transaction was *not* subject to any additional SEC disclosure requirements.

*Heinze v. Tesco Corp.*, 971 F.3d 475, 483 (5th Cir. 2020).

**c. Kingbird also fails to plead facts raising a strong inference of scienter.**

The PSLRA also requires Kingbird to "state with particularity facts giving rise to a strong inference" that each defendant acted with scienter, that is, an "intent to deceive, manipulate or defraud or ... severe recklessness." *R2 Invs.*, 401 F.3d at 641, 645. Such scienter cannot rest on "the collective knowledge of all the corporation's officers and employees acquired in the course of their employment," but rather must be based on facts establishing that "the individual corporate officer making the statement" or committing the allegedly deceptive act had scienter. *Southland*, 365 F.3d at 366. "[T]he inference of scienter must be more than merely 'reasonable' or permissible'—it must be cogent and compelling." *Tellabs, Inc. v. Makor Issues & Rights, LTD.*, 551 U.S. 308, 323, 324 (2007). To determine whether Kingbird met this standard, the Court must "take into account plausible opposing inferences." *Id.* The Complaint can survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

**i. Kingbird cannot plead scienter based on unreliable, anonymous statements.**

Kingbird's Complaint relies almost entirely on reports from Jim Wang, a purported "expert" that Kingbird retained after the Nasdaq trading halt. *See* Compl. ¶ 32. According to the Complaint, "[t]hrough his prior work and experience, Mr. Wang identified a co-conspirator referred to herein as Defendant 'Mr Li.'" *Id.* Apparently, "'Mr. Li' ... would not further identify himself" and may have been "using a common Chinese sur name to avoid further detection." *Id.* ¶ 19 n.7. Most of the Complaint's factual allegations are attributed either to "Mr. Wang's investigation" or to information that the anonymous "Mr. Li" or other unidentified "independent sources" purportedly supplied to Mr. Wang. *See* Compl. ¶¶ 31-35, 53, 58-59, 62; *id.* Ex. D. None

of these allegations suffice under the PSLRA's heightened pleading standards.

Courts are highly skeptical of attempts to meet the heightened PSLRA pleading requirements with allegations from anonymous sources. *See Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007) ("[A]llegations from confidential witnesses must be discounted …. Usually that discount will be steep." (quotations omitted)). And rightly so. "Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist." *Id.*

Accordingly, the Fifth Circuit has instructed courts to disregard allegations attributed to confidential sources unless either (1) "other facts, *i.e.*, documentary evidence," identified in the complaint provide an independent "adequate basis for believing" the allegations, or (2) the complaint identifies the anonymous source "with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information" attributed to the source. *ABC Arbitrage v. Tchuruk*, 291 F.3d 336, 353 (5th Cir. 2002). Thus, to rely on anonymous sources, "[i]n lieu of names, ... a complaint must give details such as (1) the person's job description, (2) individual responsibilities, (3) specific employment dates, and (4) where and when the confidential source came to know the information supporting an inference of scienter ...." *Helix*, 237 F. Supp. 3d at 510. In short, if a complaint relies on an unnamed source, it must contain particularized allegations that "support the probability that a person in the position occupied by the source ... would possess the information" ascribed to him. *Shaw*, 537 F.3d at 535, 539 (alteration in original). And, "[e]ven when a complaint sets out this type of information, the Fifth Circuit ... require[s] district courts to 'discount allegations from confidential sources' because these 'sources afford no basis for drawing plausible competing inferences.'" *Helix*, 237 F. Supp. 3d at 510 (quoting *Shaw Grp.*, 537 F.3d at 535).

The Complaint fails to describe its anonymous sources with sufficient particularity to warrant even "discounted" consideration of their allegations. It provides *no* description of the unnamed "independent sources" on whom Mr. Wang purportedly relies. *See* Compl. ¶ 53. As to "Mr. Li," it merely says he "identified himself as a senior operative responsible for orchestrating the coordinated trading activity in INHD on June 8, 2026." *Id.* ¶ 32. It says nothing about who "Mr. Li" is or why he would be expected to know the information attributed to him. In fact, Kingbird itself apparently does not know who "Mr. Li" is. *See id.* ¶ 19 n.7 (stating "[d]iscovery will determine if" Mr. Li was "using a common Chinese sur name to avoid further detection"). The Complaint likewise fails to provide any independent corroboration—through documentary evidence, named witnesses, or firsthand knowledge—of the facts attributed to anonymous sources.

As a result, the Complaint's "hearsay-within-hearsay" allegations based on information Kingbird's investigator supposedly learned from anonymous sources are simply "too unreliable to give rise to" a strong inference of scienter. *Wu Winfred Huang v. EZCORP, Inc.*, 259 F. Supp. 3d 563, 578 (W.D. Tex. 2017).

#### ii. Kingbird's general, conclusory circumstantial allegations fail to raise a cogent and compelling inference of scienter.

Because the Complaint "has not alleged a clear motive" as to the *Inno Holdings Defendants* "for the alleged misstatements or omissions, the strength of its circumstantial evidence of scienter must be correspondingly greater." *R2 Invs.*, 401 F.3d at 644. Kingbird must therefore allege concrete, particularized facts showing that the Inno Holdings Defendants "acted with an 'intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading [investors] [was] either known ... or ... so obvious that [Inno] must have been aware of it." *R2 Invs.*, 401 F.3d at 645 (quoting *Southland*, 365 F.3d at 366). The Complaint comes nowhere close.

Even if the Court were to consider allegations based on Mr. Wang's anonymous sources,

*supra* Part III.A.2.c.i, the Complaint is replete with improper group pleading and conclusory allegations that cannot support the required strong inference of scienter. Given the Fifth Circuit's "rejection of the 'group pleading' doctrine," *Southland*, 365 F.3d at 365, the Court should disregard the Complaint's unspecified references to the "Defendants" or the "Defendants and their co-conspirators," *see* Compl. ¶¶ 1, 5, 8, 10-11, 31, 33, 35-36, 38, 40-41, 43-48, 50, 53-54, 59, 62-63, 65, 68, 70-71, 76, 79-84, 88, 100-101. These allegations do not meet the PSLRA's requirement that Kingbird "distinguish among those [it] sue[s] and enlighten *each defendant* as to his or her particular part in the alleged fraud." *Southland*, 365 F.3d at 365 (quotations omitted). Accordingly, the Court should "not construe allegations contained in the [c]omplaint against the 'defendants' as a group as properly imputable to any particular individual defendant." *Id.*

The Court should also disregard the Complaint's conclusory allegations that "Defendants knew" certain facts or "acted with knowing and deliberate scienter." *See* Compl. ¶¶ 80, 82. These "'naked assertion[s]' devoid of 'further factual enhancement'" fail even under notice-pleading standard. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). And they fall well short of the PSLRA's heightened pleading requirements. *See Blackwell*, 440 F.3d at 289-90 ("Plaintiffs fail to adequately plead scienter for any Individual Defendant because the SAC makes only general allegations and conclusory statements, such as stating they knew, or were reckless in failing to disclose, adverse material.").

Kingbird's only specific allegations are that Inno transitioned to a new business strategy, moved its operations from Texas to Hong Kong, replaced its auditor, and sold stock to raise money to fund its operations. *See* Compl. ¶¶ 28-35. There is nothing suspicious about these activities. Inno disclosed its legitimate business reasons for operating its recycled electronic device business out of Hong Kong. Ex. 1, 12/15/2025 10-K at 2. Inno also disclosed its change of auditors. Ex. 3,

1/16/2025 8-K at 2, Ex. 16.1. And, as Inno's outgoing auditor confirmed, there was no dispute about the propriety of Inno's accounting. *See Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 434 (5th Cir. 2002) ("resignation of key accounting officials" without facts suggesting "accounting irregularities … were the reason for their resignations," does not carry "any scienter implications"); *see also Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1021 (5th Cir. 1996) (even if "Defendants changed auditors because of a difference in judgment about generally accepted accounting principles," which did not happen here, it still "does not establish conscious behavior"). Inno's stock offerings were, as Kingbird tacitly concedes, *supra* n.8, likewise fully disclosed in compliance with SEC regulations. Inno's compliance with its disclosure obligations weighs heavily against an inference of fraud. *See Shivangi v. Dean Witter Reynolds, Inc.*, 825 F.2d 885, 889 (5th Cir. 1987) (fact that defendant "fully disclosed all that the SEC specifically require[d]" weighed against a finding of scienter); *Warren v. Rsrv. Fund, Inc.*, 728 F.2d 741, 745 (5th Cir. 1984) (compliance with SEC requirements indicates lack of severe recklessness).

**iii. Alleged guilt-by-association does not establish scienter.**

Because Kingbird lacks any scienter facts as to the Inno Holdings Defendants, the Complaint openly asks the Court to impute a Cambodian network's criminal intent as if it were Mr. Ding and Inno's scienter—all based on "Mr. Li's" convoluted, rank hearsay. But the PSLRA requires plaintiffs to "plead circumstances providing a factual basis for scienter for *each defendant*," which means "guilt by association is impermissible." *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 664 (S.D.N.Y. 2017). Thus, Prince Group's OFAC designation and DOJ indictment add nothing to scienter as to the Inno Holdings Defendants. Allegations of unadjudicated wrongdoing by *other* defendants do not establish the Inno Holdings Defendants' intent to defraud. *See Southland*, 365 F.3d at 365 (prohibiting group pleading). Such attempts at guilt-by-association are not particularized pleading.

**iv. The nonculpable inference is far more cogent and compelling.**

Under *Tellabs*, the nonculpable inference overwhelms. *See* 551 U.S. at 323-24. The Complaint theorizes that the Inno Holdings Defendants engineered a market event to trigger a regulatory halt of trading in their *own stock*—all for the benefit of third parties from whom they are not alleged to have received a dime. That is not "cogent and compelling." *Id.* at 324. It defies economic reason. *See In re Baker Hughes Sec. Litig.*, 136 F. Supp. 2d 630, 644 (S.D. Tex. 2001) (finding that "allegations of motive" that defied economic reason "fail to raise the requisite strong inference of scienter"), *aff'd sub nom. Abrams v. Baker Hughes Inc.*, 292 F.3d 424 (5th Cir. 2002).

**d. Kingbird also fails to plead reliance.**

The Complaint's failure to plead reliance presents yet another reason to dismiss. "Reliance by the plaintiff upon the defendant's deceptive acts is an essential element" of a Section 10(b) claim. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 159 (2008). "This is because proof of reliance ensures that there is a proper 'connection between a defendant's misrepresentation and a plaintiff's injury.'" *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) ("*Halliburton I*") (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988)).

"The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction—e.g., purchasing common stock—based on that specific misrepresentation." *Id.* Absent such direct reliance, a securities fraud plaintiff may—in some circumstances—invoke "a rebuttable presumption of reliance, based on what is known as the 'fraud-on-the-market theory" first recognized in *Basic, Inc. v. Levinson*. *Id*. at 811. According to the "fraud-on-the-market" theory, "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations," such that "an investor relies on public misstatements whenever he 'buys or sells stock at the price set by the market.'" *Id.* (quoting *Basic*,

485 U.S. at 244, 246). But Kingbird fails to plead either "direct" reliance or facts supporting application of the "*Basic* presumption."

**i. Kingbird fails to allege direct reliance.**

To plead direct reliance on an alleged misstatement, a plaintiff must allege facts "showing that he was aware of a company's statement and engaged in a relevant transaction … based on that specific misrepresentation." *Halliburton I*, 563 U.S. at 810. But Kingbird fails to allege any facts suggesting that it had read or was aware of the AI Agreement Press Release, the PIPE 8-K, or any other Inno public statement when it shorted Inno stock.

**ii. Kingbird did not rely on the integrity of the market price.**

A plaintiff may invoke the *Basic* presumption by showing that a stock traded in an informationally efficient market and that it "traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014). But, even if a plaintiff can make this showing, "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Id.* at 268-69.

Kingbird does not allege that it "deci[ded] to trade at a fair market price." It alleges the opposite: that it shorted INHD "in response to *irregular* market activity." Compl. ¶ 8 (emphasis added). In other words, Kingbird shorted Inno's stock because it believed the market price was artificially inflated by manipulative trading. But "[t]he deception [in a market manipulation claim] arises from the fact that investors are misled to believe that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 306 (S.D.N.Y. 2009) (quoting *ATSI*, 493 F.3d at 100). A plaintiff who enters the market believing prices are *irregular*

cannot then claim it was "misled to believe" those prices reflected natural supply and demand.

**e. Kingbird fails to plead loss causation.**

Loss causation requires "a causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005). The securities laws are intended to "protect [investors] against those economic losses that misrepresentations actually cause," not to provide "broad insurance against market losses." *Id.* at 345. Proximate causation requires a "direct relation between the injury asserted and the injurious conduct alleged." *Anza v. Ideal Steel Sup. Corp.*, 547 U.S. 451, 457 (2006). Where damages depend on "the independent actions of third ... parties," they are "too remote" as a matter of law. *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9, 15 (2010).

Kingbird's alleged losses of $15,000 to $20,000 per day in borrow fees, Compl. ¶¶ 70-71, have no causal connection to any act by the Inno Holdings Defendants. The causal chain Kingbird must trace is this: (1) the Inno Holdings Defendants performed some act prohibited by the Exchange Act; (2) that act caused the June 8 trading event; (3) that act caused the T12 Halt; *and* (4) that act caused the borrow fees. No such chain exists. The Complaint does not—and cannot—allege that any act of the Inno Holdings Defendants caused the price spike, triggered the halt, or set borrow rates. Rather, the chain is broken by multiple independent actors. Kingbird admits that "*Nasdaq* imposed a trading halt under Code T12" not the Inno Holdings Defendants. Compl. ¶ 60 (emphasis added). And *broker-dealers* set and charge the borrow fees, not the Inno Holdings Defendants. *Id.* ¶¶ 70-71. By its own allegations, Kingbird's alleged losses are the product of a regulatory decision and commercial pricing by parties other than the Inno Holdings Defendants.

**3. Kingbird fails to plead a Section 9(a) claim.**

"The analysis of claims under Section 9(a) 'closely parallels' the analysis of claims under Section 10(b)." *Stone Family Tr. v. Credit Suisse AG*, 19 Civ. No. 5192 (AT), 2022 WL 954743,

at *6 (S.D.N.Y. Mar. 30, 2022). Because Kingbird fails to state a Section 10(b) claim for the multiple reasons outlined above, *supra* Part III.A.2, its Section 9(a) claim also fails.

**4. Kingbird fails to plead a Section 18 claim.**

To state a Section 18 claim, Kingbird "must allege that [it] actually read and relied on" a "false or misleading statement … contained in a document filed pursuant to the Exchange Act." *In re Alstom*, 406 F. Supp. 2d at 479-80 ("Section 18 requires actual, or what has sometimes been referred to as 'eyeball,' reliance"); *see also In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 493 (S.D.N.Y. 2006) ("Section 18 requires that plaintiffs allege actual reliance on specific statements in covered Exchange Act filings."). Thus, Kingbird's Section 18 claim fails because, as shown above, the Complaint fails to plead either a "false or misleading statement" or "direct reliance." *See supra* Parts III.A.2.b, .d. The claim fails for the additional, independently sufficient reason that Kingbird fails to allege reliance on a misstatement in a document "filed pursuant to" the Exchange Act. *See In re Enron Corp. Secs., Derivative,* 540 F. Supp. 2d 800, 813 n. 12 (S.D. Tex. 2007) (Section 18 "does not apply to filings made solely under the 1933 Act or any of the other securities laws").

In support of its Section 18 claim, Kingbird alleges misstatements in "documents filed with the SEC, including: (a) the June 2026 Form 8-K publicly announcing the development-services agreement … ; (b) the Issuer's prospectus supplement (Form 424B5) and related filings disclosing the PIPE Transaction…; and (c) the Issuer's Current Reports on Form 8-K and periodic filings that described the Issuer's business and operations in materially misleading terms." Compl. ¶ 91. But none of these documents supports a Section 18 claim.

First, Kingbird cannot assert a claim based on an alleged misstatement in the Form 8-K announcing the AI Sales Agent Agreement because it was not filed until June 10, 2026, two days ***after*** Kingbird shorted Inno stock on June 8. *See* Compl. ¶ 60.

Second, Kingbird cannot assert a claim based on the prospectus supplement for the PIPE Transaction because it was filed under Rule 424(b) of the Securities Act of 1933—not under the Exchange Act. *See* Ex. 7, 5/15/2026 Prosp. Supp.; 17 C.F.R. § 230.424(b) (requirements for filing of prospectuses); *Enron*, 540 F. Supp. 2d at 813 n.12 ("Section 18 applies only to documents filed pursuant to the Exchange Act; it does not apply to filings made solely under the 1933 Act or any of the other securities laws.").

Third, Kingbird's vague reference to Inno's "Current Reports on Form 8-K and periodic filings that described the Issuer's business and operations in materially misleading terms," Compl. ¶ 91(c), fails to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading," as the PSLRA requires. 15 U.S.C. § 78u-4(b)(1).

**B. Kingbird has withdrawn its DTPA claim (Count IV).**

Kingbird has agreed to withdraw Count IV (its DTPA claim). *See* ECF 40 at 15 ("Plaintiff agrees to withdraw its Count IV for violation of DTPA."). And the Fifth Circuit has squarely held that the DTPA does not apply to securities transactions. *FDIC v. Munn*, 804 F.2d 860, 863-64 (5th Cir. 1986) (collecting cases). The Court should dismiss Count IV with prejudice.

**C. Kingbird's conspiracy claim fails without a separate, underlying claim (Count V).**

"Under Texas law, civil conspiracy is a derivative tort." *Meadows v. Hartford Life Ins.*, 492 F.3d 634, 640 (5th Cir. 2007). "If a plaintiff fails to state a separate underlying claim ... , then a claim for civil conspiracy necessarily fails." *Id.* Because Kingbird has failed to adequately plead its Exchange Act claims or its DTPA claim, its conspiracy claim falls with them. *See* Compl. ¶¶ 99-103. The Court should dismiss Count V with prejudice.

## IV. Conclusion

For these reasons, Inno Holdings respectfully requests that the Court dismiss the Complaint with prejudice.

Dated: August 31, 2026

Respectfully submitted,

BAKER BOTTS L.L.P.

By: */s/ Amy Pharr Hefley*

Amy Pharr Hefley
*Attorney-In-Charge*
S.D. Tex. No. 870378
Texas Bar No. 24046046
910 Louisiana Street
Houston, Texas 77002
(713) 229-1270
(713) 229-2770 (Fax)
amy.hefley@bakerbotts.com

MCCARTER & ENGLISH, LLP

Joseph R. Scholz (*pro hac vice*)
Scott Weingart (*pro hac vice*)
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
973.639.6999
973.624.7070 (fax)
jscholz@mccarter.com
sweingart@mccarter.com

**Attorneys for Defendant Inno Holdings Inc. and Ding Wei**

*OF COUNSEL:*
David D. Sterling
S.D. Tex. No. 07079
Texas Bar No. 19170000
Anthony J. Lucisano
S.D. Tex. No. 3369146
Texas Bar No. 24102118
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002
david.sterling@bakerbotts.com
anthony.lucisano@bakerbotts.com

James J. Beha II (*pro hac vice*)
30 Rockefeller Plaza
New York, New York 10112
(212) 408-2500
jim.beha@bakerbotts.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2026, a true and correct copy of the foregoing document was served on all counsel of record via the Court's CM/ECF system.

*/s/ Amy Pharr Hefley*
Amy Pharr Hefley