**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| KINGBIRD VENTURES LLC, a foreign limited liability company, individually and on behalf of others similarly situated, | § | **CASE NUMBER 4:26-cv-05000** |
| *Plaintiffs*, | § | |
| v. | § | **CLASS ACTION** |
| INNO HOLDINGS INC., a Texas corporation; DING WEI, an individual; GANG LI, an individual; DEWEI TONG, an individual; and JOHN DOES 1-10, individuals, | § | **DEMAND FOR JURY TRIAL** |
| *Defendants*. | § | |

## AMENDED CLASS ACTION COMPLAINT

Plaintiff, Kingbird Ventures LLC, ("Kingbird" or "Plaintiff") files this Amended Class Action Complaint against Defendants Inno Holdings Inc. ("Inno Holdings," "INHD," or "Issuer"), a Texas corporation; Ding Wei ("Wei"), an individual; Gang Li ("Li"), an individual; Dewei Tong ("Tong"), an individual, and John Does 1-10 (collectively "Defendants") and, in support thereof, states as follows.

## I. PRELIMINARY STATEMENT

1. On June 8, 2026, Kingbird sold short 22,000 shares of INHD common stock on Nasdaq and bought to close its position on July 31 and August 3, after trading resumed. This case is about that trade and the trade of INHD stock.

2. After Inno Holdings' 2023 IPO, Ding Wei became CEO and executed agreements that placed large blocks of shares with unnamed foreign buyers—including 3,000,000 Regulation S shares to John Does 1–10—though no Schedule 13D was ever filed.

3. Inno Holdings then reported in public filings having an outstanding stock of 2.52 million shares after a May 4, 2026, reverse stock split, followed by a statement in its May 15, 2026, prospectus supplement that there were 4.52 million outstanding shares.

4. After Wei and Inno Holdings issued a press release on June 8, 2026 to the effect that Inno Holdings had entered into an AI Service Agreement with a stated value of $3 million, INHD stock ran from $1.11 to $43.37, and questionable trading volume surged. The Financial Industry Regulatory Authority ("FINRA") reported approximately **151.6 million shares** of volume of which approximately **86.78 million** was marked short. The Wharton Research Data Services ("WRDS")[1] aggregated approximately **129.8 million shares** marked short. Those totals were ten times higher than either share count Inno Holdings had filed and cannot be reconciled with ordinary transfer of a 2.5 or even 4.52 million-share public float, especially considering that a portion of this float was owned by insiders and undisclosed investors.

5. Following this irregular trading volume, Nasdaq issued a T12 halt on June 8, 2026, at the close of trading. This trading halt was a foreseeable result of the June 8 trading activity, leaving Plaintiff and others similarly situated unable to close out their positions while the halt remained in place.

6. Plaintiff thereafter prompted an investigation of these events. During this investigation, Defendant Li stated to Plaintiff's investigator, Jim Wang, that Li controlled the tradeable float and ran the coordinated June 8 trading. (Doc. 1-5 ¶¶ 13–16.) Defendant Dewei Tong procured the brokerage accounts used and described himself as overseeing day-to-day operations

---

[1] The WRDS Short Volume database provides the aggregation of individual daily short sale volume files reported by various trading venues, including NYSE, NASDAQ, CBOE/BATS, and FINRA's Trade Reporting Facility ("TRF"), the Alternative Display Facility ("ADF"), as well as for trades in securities traded over-the counter and reported to FINRA's Over the Counter Reporting Facility ("ORF").

on behalf of, or together with, Defendant Ding Wei. (Doc. 10-1 ¶ 4.) Their concentrated efforts and their long book created the appearance of a real Nasdaq market—the market into which Kingbird sold.

7. Two days after the T12 halt, Inno Holdings filed an 8-K describing a $3 million development agreement as Inno's, while the attached contract named ApexVest Holdings Limited––not Inno Holdings—as the party to that agreement. At the time this filing was made, INHD's stock price had already surged, Kingbird and others had already shorted the stock, and Nasdaq had already halted INHD under T12.

8. Kingbird thus sold 22,000 shares as a participant in what appeared to be a genuine Nasdaq market: a listed name Inno Holdings had described as having 4,520,698 shares outstanding, trading on a national exchange, on a day the company attributed a $3 million development agreement to itself. Kingbird would not have sold at those prints had it known the session was a concentrated float and coordinated transactions rather than ordinary public trading of that share count.

9. This class action arises from this coordinated market-manipulation and deceptive scheme and separate disclosure misconduct, on behalf of short sellers who sold INHD on June 8, 2026, remained obligated during the T12 trading halt, covered after trading resumed, and suffered net loss after offsets. Kingbird sues Defendants Inno Holdings, Ding Wei, Gang Li, Dewei Tong, and John Does 1–10 under § 10(b), Rule 10b-5(a) and (c), and § 9(a)(2), and also sues Defendants Inno Holdings and Ding Wei only under Rule 10b-5(b).

## II. JURISDICTION, VENUE, AND PARTIES

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more Class members,

(ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one member of the class of plaintiffs and one defendant are citizens of different States.

11. Additionally, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because this action is between citizens of different states and citizens or subjects of foreign states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12. This Court also has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because the claims arise under Sections 9 and 10 of the Exchange Act and Rule 10b-5 promulgated thereunder. Section 27 confers exclusive federal jurisdiction over those claims.

13. Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1391 because Inno Holdings is incorporated in Texas and maintains a registered agent and registered office in the State of Texas. The Issuer's principal executive offices and registered place of business in the United States is listed as 2465 FM359, Brookshire, Texas 77423, which is located within the Southern District of Texas, Houston Division.

14. Plaintiff Kingbird is a limited liability company organized under the laws of the State of Wyoming, whose members are not citizens of the State of Texas or any other jurisdiction in which any Defendant is domiciled or incorporated.

15. Defendant Inno Holdings is a corporation incorporated under the laws of the State of Texas, with its principal place of business located in Hong Kong, China.

16. Defendant Ding Wei is a citizen and resident of the People's Republic of China. He has been Inno Holdings' Chairman and Chief Executive Officer since approximately October 24, 2024, and has caused statements, reports, and filings to be made in the United States in connection

with INHD, a Texas corporation, which have caused harm to the United States securities market and American investors.

17. Defendant Gang Li is a citizen and resident of Qingdao, People's Republic of China. As alleged below, he controlled the accounts used in the June 8, 2026, INHD trading and arranged the purchase of control from Inno Holdings' founder, causing harm to the United States securities market and American investors.

18. Defendant Dewei Tong is a citizen and resident of Hong Kong. As alleged below, Tong procured the brokerage accounts used in the June 8, 2026, trading, causing harm to the United States securities market and American investors.

19. Defendants John Does 1–10 are the ten unidentified non-U.S. investors who acquired an aggregate of 3,000,000 shares of INHD common stock in the December 26, 2025, Private Investment in Public Equity ("PIPE") Transaction.

20. This Court has personal jurisdiction over each defendant under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and the Texas long-arm statute. Inno Holdings is incorporated in Texas and listed INHD on Nasdaq. Ding Wei signed Inno Holdings' United States filings and share issuances. Defendants Li and Tong are alleged to have used brokerage accounts to effect June 8, 2026 transactions in INHD on Nasdaq pursuant to a conspiracy with Defendants Wei and Inno Holdings. Defendants John Does 1–10 purchased INHD in a placement Inno Holdings reported to the SEC.

21. All conditions precedent to the filing of this lawsuit have been performed, excused or waived.

## III. STATEMENT OF FACTS

### A. The Issuer After the Control Change and the Events Leading Up to June 8, 2026.

22. Inno Holdings, whose historic business was light-gauge steel, completed a Nasdaq Initial Public Offering ("IPO") in or about December 2023. Since going public, Inno Holdings has traded common stock on the Nasdaq Capital Market under the symbol INHD.

23. Following the IPO, in 2024–2025, Inno Holdings discontinued that business, sold operating subsidiaries for nominal consideration (including sales for as little as $100 and $1,000 as reflected in Inno Holdings' SEC filings), and moved its operations to Hong Kong.

24. Also following the IPO, Inno Holdings' historic board exited and a new board was put in place in or about September–October 2024. Among the new board members, Defendant Ding came in as Chairman and CEO of INHD.

25. Inno Holdings also dismissed its U.S.-based independent registered public accounting firm, Simon & Edward, LLP, and replaced it with a Singapore-based firm, JWF Assurance PAC, as disclosed in the Issuer's Current Report on Form 8-K filed with the SEC on January 16, 2025.[2] This Form 8-K was signed by Defendant Wei.

26. Towards the end of 2025 and the beginning of 2026, Defendant Ding signed and Inno issued stock under, at least the following transactions:

i. A September 10, 2025, Securities Purchase Agreement pursuant to which approximately **1,200,000 shares** at **$3.60** plus pre-funded warrants for up to 800,000 shares were sold to purchasers described only as institutional investors.[3]

ii. A December 26, 2025, transaction for **3,000,000** shares sold at **$1.31** as a Regulation S / PIPE-type placement to ten unidentified non-U.S. persons (Does 1–

---

[2] https://www.sec.gov/ix?doc=/Archives/edgar/data/0001961847/000149315225002551/form8-k.htm
[3] https://www.sec.gov/ix?doc=/Archives/edgar/data/0001961847/000164117225027144/form8-k.htm

10).[4] While Inno's December 29, 2025, Form 8-K described offering terms, it did not identify the purchasers or disclose common control among them.

iii. A January 16, 2026, Securities Purchase Agreement pursuant to which four unidentified investors purchased **1,332,000 shares** of INHD common stock at a purchase price of **$0.55** per share.[5]

27. Kingbird alleges those issuances as Inno Holdings' and Ding's acts which led to a substantial block of INHD having been placed with unidentified holders by June 8, 2026.

28. Despite these obscure transactions, no Schedule 13D identifies a person or group holding five percent or more of INHD.

29. On information and belief, these agreements were executed by Defendant Wei individually in order to concentrate control and obscure beneficial ownership into the hands of undisclosed co-conspirators and generate the appearance of legitimate business activity.

30. Then, on April 29, 2026, INHD announced a 1-for-20 Reverse Stock Split which would reduce the number of issued and outstanding shares of common stock from **50,413,224** to **2,520,662.**[6] This was also disclosed in INHD's Form 8-K dated May 4, 2026.[7]

31. A reverse stock split reduces the number of shares in the reported float while leaving the same economic claim in fewer pieces. Thus, after May 4, 2026, approximately 50.4 million shares became approximately 2.52 million, and the price per share reset upward by the same ratio.

[4] https://www.sec.gov/ix?doc=/Archives/edgar/data/1961847/000149315225029388/form8-k.htm
[5] https://www.sec.gov/ix?doc=/Archives/edgar/data/0001961847/000149315226003411/form8-k.htm
[6] https://www.sec.gov/Archives/edgar/data/1961847/000149315226021119/ex99-1.htm
[7] https://www.sec.gov/ix?doc=/Archives/edgar/data/0001961847/000149315226021119/form8-k.htm

32. However, only eleven days later on May 15, 2026, Inno Holdings' prospectus supplement stated that **4,520,698 shares** were issued and outstanding.[8] That figure is approximately two million shares higher than the May 4, 2026 post-split count.

33. Of the 2.52 million shares Inno Holdings said were outstanding after the split, or the 4.52 million figure on the May 15, 2026 prospectus, a large unnamed piece had already gone to buyers of the agreements discussed in paragraph 26 *supra*. Taking this into account, in addition to those shares owned by insiders, the stock that could actually trade on June 8 was a smaller public float than either headline count.

34. Later on, on July 29, 2026, Inno Holdings again reported that 2,520,581 shares were issued and outstanding—materially the same as the May 4 post-split figure.[9]

35. The unexplained difference was material to the size of the tradable float, the availability of shares to borrow, and the meaning of the reported June 8 trading volume.

**B. The June 8, 2026 Trading Events and Kingbird's Position**

36. On June 8, 2026, Inno Holdings issued a press release stating that it had entered into an AI Agreement with an unnamed Hong Kong-based artificial intelligence technology firm, with a stated value of $3 million.[10] This was widely reported on several American news outlets, including Yahoo finance.[11]

37. A reasonable investor deciding whether to buy, sell, or short INHD on June 8, 2026 would have treated a company-attributed $3 million development-services announcement as

---

[8] https://www.sec.gov/Archives/edgar/data/1961847/000149315226024367/form424b5.htm
[9] https://www.sec.gov/Archives/edgar/data/1961847/000149315226035577/ex99-1.htm
[10] https://www.sec.gov/Archives/edgar/data/1961847/000149315226028058/ex99-1.htm
[11] https://finance.yahoo.com/sectors/technology/articles/inno-holdings-inc-enters-development-134000393.html; https://www.tradingview.com/news/tradingview:70dc16beef345:0-inno-holdings-strikes-3-million-development-deal-for-ai-powered-used-phone-sales-agent/; https://www.investing.com/news/company-news/inno-holdings-signs-3m-ai-development-deal-for-used-phone-sales-93CH-4730911

significant. (Welborn Decl. at ¶ 13).[12] Inno Holdings had just reversed to a few million shares outstanding, had sold its historic steel operations for nominal consideration, was operating at a loss, and was presenting itself as pivoting into electronics and AI-related services. Against that cap table and that story, a $3 million contract—and the statement that Inno Holdings was the party and would own the project IP—was not routine filler. It supplied an apparent commercial reason for a name that otherwise looked like a thin, newly recast shell.

38. Following the announcement, INHD's stock price soared from $1.11 per share to an intraday high of $43.37 per share before closing at $39.49 per share on June 8, 2026.

39. Kingbird shorted 22,000 shares of INHD on Nasdaq on June 8, 2026. Short selling is a practice in which a trader borrows some quantity of shares from a lender in exchange for a "borrow fee" and sells them on the open market. To close out the trade, the short seller is obligated to buy and return to the lender the same quantity of borrowed shares. Short sellers typically engage in this strategy when they believe the price of the stock will decline as a result of natural market forces. If the stock price indeed falls, the short seller can repurchase the shares at a lower price, return them to the lender, and profit from the difference (minus borrow fees and other transaction costs). Short selling is a common and accepted trading mechanism.

40. When Kingbird shorted the INHD shares on June 8, 2026, Kingbird did so as a participant in what appeared to be a genuine two-sided market in a name Inno Holdings had described, eleven days earlier, as having 4,520,698 shares issued and outstanding.

41. Unfortunately, trading data shows that the June 8, 2026 trading activity was anything but regular. FINRA alone reported approximately **86.78 million shares of INHD sold**

[12] Attached hereto as Exhibit A is a Declaration of John Welborn.

**short** on June 8, 2026, out of a total reported volume of traded shares of **151.6 million**.[13] [14] FINRA's Short Sale Volume Data for June 8, 2026, is attached hereto as Exhibit B.

42. According to data from WRDS, the aggregated short sale volume across multiple venues was approximately **129,848,940 shares of INHD sold short** across all markets. (Welborn Decl. at ¶ 15.) Those short-sale totals are **more than fifty times** Inno Holdings' May 4, 2026 post-split outstanding count of 2,520,662 and **nearly thirty times** Inno Holdings' May 15, 2026 stated count of 4,520,698. Even when taking into account that not every marked short sale is a unique borrowed share, these numbers do not reflect ordinary trading of a 2.5–4.5 million-share name.

43. Short interest[15] was 146,641 as of May 29, 2026 and **2,704,440** as of June 15—more than eighteen times May 29, 2026, and still an order of magnitude below the June 8, 2026 short volume. (Welborn Decl. ¶¶17–18.) In the May 4–June 5 window, average daily volume was approximately 395,142 and average daily short volume approximately 116,477. June 8, 2026 was on the order of 680 times and 1,100 times those averages. (*Id.* at ¶18.) Those figures are not consistent with ordinary two-sided trading of a dispersed public float equal to Inno Holdings' stated 2.52 or 4.52 million shares. (*Id.* ¶¶16, 20.)

44. The improbability that sufficient shares were available to justify that level of short sales only increases when one considers that the public float—which excludes restricted and insider-held shares—was and is much smaller still, especially to the extent the shares subject to Securities Purchase Agreements referenced above in this Complaint remained restricted or concentrated. In fact, Plaintiff's investigations suggest that only approximately 410,000 INHD

[13] Compare this with the data for June 5, 2026: total short volume of 43,420 out of a total volume of 72,463.
[14] Short sale volume (also called short volume) is the total number of shares of a stock that were sold short during a specific trading period, most commonly a single trading day. It measures the gross volume of trades marked as short sales, reflecting actual short-selling activity that occurred that day rather than outstanding positions.
[15] Short interest represents the total number of borrowed shares that short sellers have sold and not yet bought back.

shares were freely tradeable on June 8, 2026. (Doc. 1-5 at ¶ 7). Thus, the reported single-day short sale volume was many multiples of the shares available to borrow.

45. Nasdaq subsequently placed Inno Holdings in a T12 trading halt on June 8, 2026, at approximately 17:18:58.[16]

46. After the Nasdaq T12 halt, Plaintiff contacted the brokers it held short positions with, Cobra Trading, LLC ("Cobra") and Velocity Clearing, LLC ("Velocity") to request information regarding Issuer. Neither produced the locate, contract or contra-party records Kingbird requested.

47. To attempt to understand what was taking place, how it was being accomplished, and who the participants were, Plaintiff engaged Jim Wang ("Mr. Wang"), who has worked in investment banking and private equity in the U.S. and Asian market for approximately 17 years.

48. Mr. Wang spoke with a person who identified himself as Gang Li. Defendant Li represented himself as responsible for INHD-related trading and for operations connected to the issuer. Li further "represented himself as the head of a trading operation with control over a large number of securities accounts" and as the person "responsible for the coordinated trading activity that drove INHD's share price on June 8, 2026." (Doc. 1-5 at ¶ 13). That is, Mr. Li stated that,

> (a) He and associated trading accounts acquired INHD from the company's founder, Dekui Liu, for approximately $7 million, and thereafter replaced INHD's board of directors with individuals he described as his own associates; (b) INHD's business was subsequently changed from light-gauge steel building materials manufacturing—its business at the time of its December 2023 Nasdaq IPO—to electronics trading conducted out of Hong Kong; (c) the funds used to acquire the

[16] https://ir.nasdaq.com/news-releases/news-release-details/nasdaq-halts-inno-holdings-inc

> INHD shell were provided … by an associate of the Prince Group[17] [18] …, and (d) funds were transmitted via USDT cryptocurrency from Cambodia.

(*Id.* at ¶ 14).

49. Defendant Li also told Mr. Wang that INHD's tradeable float was "concentrated in accounts he controls." (*Id.* at ¶ 16.)

50. Defendant Li's statements are consistent with the June 8 tape. Even allowing for intra-day turnover, a session of the size that occurred on June 8, 2026, according to FINRA and WRDS data, in a name with a few million stated shares, and with no 13D identifying the holders of the 2025–2026 blocks, was not ordinary two-sided trading of a dispersed public float. A coherent economic explanation for volume and price of that magnitude, given Defendant Li's claim that the tradeable float sat in accounts he controls, is that those accounts were used to drive the June 8, 2026 tape. (Welborn Decl. at ¶ 21).

---

[17] Prince Holding Group is a Phnom Penh–based organization. On October 14, 2025, the U.S. Department of the Treasury's Office of Foreign Assets Control designated Prince Group as a Transnational Criminal Organization under Executive Order 13581, as amended. *See* U.S. Dep't of the Treasury, Press Release SB0278 (Oct. 14, 2025), https://home.treasury.gov/news/press-releases/sb0278. The same day, the Department of Justice announced the indictment of Prince Group's chairman, Chen Zhi (also known as "Vincent"), on charges relating to alleged forced-labor scam compounds and cryptocurrency fraud. *See* U.S. Dep't of Justice, Press Release, "Chairman of Prince Group Indicted…" (Oct. 14, 2025). On June 23, 2026, Treasury announced additional OFAC designations of nine individuals and 26 entities described as linked to that organization. *See* U.S. Dep't of the Treasury, Press Release SB0538 (June 23, 2026), https://home.treasury.gov/news/press-releases/sb0278 and https://home.treasury.gov/news/press-releases/sb0538. Those designations and charging decisions are public record. They are offered only as context for Defendant Li and Tong's statements to Mr. Wang that they were Prince-affiliated and that acquisition funds came from a Prince associate in USDT from Cambodia. (Doc. 1-5 ¶14; Doc. 10-1 ¶4.)

[18] Kingbird named Prince Holding Group and Chen Zhi in the original complaint based on Li's and Tong's statements that they were Prince-affiliated and that acquisition funds came from a Prince associate. (Doc. 1-5 ¶14; Doc. 10-1 ¶4.) Those statements remain in this pleading as attributed background. After the original filing, Nasdaq resumed INHD, and Kingbird has confined this Amended Class Action Complaint to the defendants and acts for which it can presently allege a particularized Exchange Act claim: Inno Holdings, Ding Wei, Li, Tong, and Does 1–10, and the June 8 trading, unidentified float, and issuer filings described above. Kingbird does not retract Li's or Tong's statements, and it reserves the right to seek leave to add parties if discovery shows a Prince entity or Chen Zhi directed, financed, or executed that trading.

51. Mr. Wang's subsequent investigation uncovered corroborating evidence tying Defendant Li to Inno Holdings. Photographs obtained by Mr. Wang show Defendant Li hosting events in AC Sunshine Securities' ("AC Sunshine") office in Qingdao, China. (Doc. 40-7 at ¶ 3).

52. AC Sunshine is a Florida limited liability company with its principal address at 200 E. Robinson Street, Suite 295, Orlando, Florida 32801, and it has been disclosed by Inno Holdings as its underwriter for the IPO.[19]

53. Thus, information consistent with Defendant Li's involvement with INHD exists.

54. Furthermore, Mr. Wang learned that an individual by the name of Dewei Tong, who likewise identified himself as an associate of Prince Group, procured the brokerage accounts through which the coordinated trading of INHD shares took place on behalf of, and together with, Defendant Wei. (Doc. No. 10-1 at ¶ 4).

55. A market whose float is so held is not a legitimate public market in the sense § 9 and Rule 10b-5 require: the other side of the tape was not dispersed public supply. Kingbird would not have sold 22,000 shares at the June 8 prints had it known that.

**C. The Events Following the June 8, 2026 Trading Events**

56. It was not until two days after the T12 halt, on June 10, 2026, that INHD filed a Form 8-K in connection with the AI Agreement announced on June 8, 2026.[20] The body of that 8-K stated that "**Inno Holdings** … ("the Company") entered into a Development Services Agreement (the "Agreement") with a Hong Kong based AI service provider (the "Service Provider")" to "develop an AI-powered used mobile phone sales and customer acquisition AI agent system on behalf of the Company … for an aggregate contract value of $3 million."[21] Additionally,

[19] https://www.sec.gov/Archives/edgar/data/1961847/000149315225027805/form10-k.htm
[20] https://www.sec.gov/ix?doc=/Archives/edgar/data/0001961847/000149315226028058/form8-k.htm
[21] *Id.*

the 8-K stated that "all intellectual property rights in the software, source code, documentation and other work product under the project would be exclusively owned by [Inno Holdings]."[22] This was consistent with the press release issued on June 8, 2026.

57. However, the agreement attached as Exhibit 10.1 to the same 8-K does not name Inno Holdings as a contracting party. Instead, Exhibit 10.1 identifies Party A as ApexVest Holdings Limited.[23] ApexVest is a wholly owned British Virgin Islands subsidiary that Inno Holdings has described in prior filings as having been incorporated in January 2026. The 8-K does not state that ApexVest signed as agent for Inno Holdings, does not attach an assignment or guarantee, and does not reconcile the mismatch between the narrative ("the Company entered into" the agreement; IP "owned by the Company") and the exhibit (ApexVest is Party A).

58. In other words, INHD disclosed that ApexVest was the real party to the contract only ***after*** the extreme trading volume caused by the announcement and ***after*** the trading halt happened on June 8, 2026.

59. In sum, by June 8, 2026, Defendant Ding Wei had signed placements that left a large block of INHD in unidentified hands, and Inno Holdings' own filings put outstanding stock at either about 2.52 million or 4.52 million shares. Consistently, Defendant Li stated that he controlled INHD's float and ran the June 8, 2026 trading, while Defendant Tong procured the brokerage accounts used in that trading allegedly on behalf of Defendant Ding Wei. (Doc. 1-5 ¶¶13–16.) In reality, Li's accounts used the float Defendant Ding Wei's filings described to create the appearance of a real Nasdaq market—the market into which Kingbird sold short 22,000 shares. Then, after the AI Agreement announcement, the reported volume and short volume on June 8, 2026 were ***many*** times either figure, and Nasdaq imposed a trading halt that same day, leaving

---

[22] *Id.*
[23] https://www.sec.gov/Archives/edgar/data/1961847/000149315226028058/ex10-1.htm

short sellers trapped paying borrow fees for over two months. As the purported owner of INHD's float, Defendant Li stated to Mr. Wang that he was among the primary lenders of INHD shares and thus receiving a financial benefit from the halt. (*Id.* at ¶ 16).

60. Kingbird would not have sold those shares at the June 8, 2026 prints had it known that reported volume and price were the product of a concentrated, unidentified float and a coordinated series of transactions rather than ordinary public trading of that share count. To be clear, Kingbird does not allege that it sold short because the tape "looked irregular." Rather, Kingbird entered into short positions in INHD stock as a participant in what appeared to be a real Nasdaq market for which a short sale appeared to be a desirable trading mechanism.

**D. The Filing of This Lawsuit**

61. As a result of these events, Kingbird filed the instant lawsuit on June 24, 2026 (Dkt. 1), and sought an Emergency Ex Parte Application for Temporary Restraining Order (Dkt. 2). These filings alleged, *inter alia*, that Defendants caused or prolonged the T12 halt purposefully to continue benefitting of the extremely high borrow charged while short sellers were unable to close out their position.

62. The Court entered an Order Granting Temporary Restraining Order on June 25, 2026. (Dkt. 6). Among other things, that Order enjoined Defendants from taking any action designed or intended to prolong the halt or prevent resumption of ordinary trading in INHD. (*Id.* at ¶ 3.)

63. Defendants Inno Holdings and Ding Wei filed a Motion to Dissolve the Temporary Restraining Order on July 6, 2026 (Dkt. 26) and said Motion was heard on July 7, 2026, though neither Defendant Wei nor any other corporate representative attended the hearing on Inno Holdings' behalf.

64. The Temporary Restraining Order expired on July 9, 2026, and Defendants' Motion to Dissolve the Temporary Restraining Order was thereafter denied as moot. (Dkts. 42, 53).

65. Twenty days after the Temporary Restraining Order expired, on July 29, 2026, Inno Holdings announced that it would resume trading on July 31, 2026.[24] In this announcement, INHD was reported to have a total of **2,520,581 shares** of common stock outstanding (materially the same as the May 4, 2026 post-split count of 2,520,662).[25] Nasdaq resumed trading on Friday, July 31, 2026[26]—after this lawsuit had already been filed and after a Temporary Restraining Order was issued enjoining the Defendants from prolonging the trading halt. (Doc. 6 at ¶ 3).

66. The same day Nasdaq lifted the T12 halt, Plaintiff closed out its position on 6,000 of the INHD shares traded through Velocity. On Monday, August 3, 2026, Plaintiff closed out its position on 8,000 INHD traded through Velocity and another 8,000 shares traded through Cobra.

67. Kingbird thus no longer alleges that defendants are purposefully interfering with Nasdaq's information requests in order to prolong the T12 halt as a fraudulent device. Kingbird does maintain, however, that the halt was a foreseeable consequence of the Defendants' actions and the June 8, 2026 trading activity, and that damages arising in connection thereof for the almost two months during which Plaintiff and other short sellers could not buy or sell stock to exit the short position are attributable to Defendants' conduct.

68. Kingbird's and the purported class members' direct and proximate damages are the result of short selling on the June 8, 2026 tape and buying to close after Nasdaq resumed INHD trading on July 31, 2026.

---

[24] https://www.sec.gov/Archives/edgar/data/1961847/000149315226035577/ex99-1.htm
[25] https://www.sec.gov/Archives/edgar/data/1961847/000149315226021119/ex99-1.htm
[26] https://ir.nasdaq.com/news-releases/news-release-details/nasdaq-resumes-trading-inno-holdings-inc

## IV. CLASS ACTION ALLEGATIONS

69. Kingbird brings this lawsuit individually and on behalf of all others similarly situated, a Class who Kingbird alleges is composed of all persons or entities who, during regular trading hours on June 8, 2026, sold short shares of Inno Holdings common stock, Nasdaq ticker INHD, on Nasdaq; whose short positions remained open and subject to an obligation to cover at any time during the Nasdaq T12 trading halt imposed on June 8, 2026; who purchased INHD shares to cover those short positions after Nasdaq resumed trading on July 31, 2026; and who sustained a net economic loss from those transactions after accounting for the proceeds received from the short sale, the cost of purchasing shares to cover, and all transaction-level credits, rebates, dividends, and other offsets.

70. The proposed Class meets the class action requisites Rule 23(a) of the Federal Rules of Procedure.

71. First, the proposed class is so numerous that joinder of all members is impracticable. Given the short sale volume and short interest that INHD experienced on June 8, 2026, the number of class members is likely impracticable to join. "A plaintiff need not show the precise number of persons in the class to satisfy the requirement that joinder is impracticable where such a conclusion is clear from reasonable estimates." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Dynegy, Inc. (In re Dynegy, Inc. Sec. Litig.)*, 226 F.R.D. 263, 268 (S.D. Tex. Dec. 31, 2004).

72. Second, there are questions of law or fact common to the class, the answer of which will advance the litigation as a whole. These common questions include, but are not limited to the following:

i. Whether the events leading to the June 8, 2026 trading activity in INHD created a false appearance of genuine, active, and liquid two-sided trading.

ii. Whether Defendant Ding Wei, as Inno Holdings' Chairman and Chief Executive Officer, knowingly participated in, authorized, and/or facilitated the conduct that created the artificial market for INHD shares, including by signing or causing the issuance of the relevant share-issuance filings and share-count disclosures, thereby concentrating the tradable float, and issuing the June 8 AI-announcement materials.

iii. Whether Defendant Gang Li controlled a concentrated portion of INHD's tradable float and used accounts under his control to coordinate or influence the June 8, 2026 trading.

iv. Whether Defendant Dewei Tong procured or arranged the brokerage accounts used in the alleged coordinated trading.

v. Whether the coordinated trading artificially increased INHD's price and trading volume on June 8, 2026.

vi. Whether the alleged artificial trading caused class members to sell INHD short at prices affected by the same market manipulation.

vii. Whether the Nasdaq T12 halt was a foreseeable consequence of the June 8, 2026 trading and prevented class members from covering through ordinary market trading.

viii. Whether the alleged manipulation caused a common artificial-price impact on INHD shares sold short during the proposed class period.

ix. Whether the alleged conduct was a substantial or proximate cause of the class members' cover-price losses.

x. Whether the alleged conduct constitutes market manipulation under Section 10(b) and Rule 10b-5(a) and (c).

xi. Whether the alleged trading activity violated Section 9(a)(2) by creating apparent active trading or raising INHD's price for the purpose of inducing purchases or sales by others.

xii. Whether class members who sold INHD short on Nasdaq may invoke the fraud-on-the-market presumption of reliance.

xiii. Whether the alleged manipulation affected INHD's market price and trading conditions in a manner common to the proposed class.

73. Third, the claims of the named Plaintiff are typical of the claims of the proposed Class because Plaintiff and each Class member sold short INHD common stock on Nasdaq on June 8, 2026, during the same alleged period of coordinated trading and artificial price inflation; maintained an open short position during the Nasdaq T12 trading halt; and subsequently purchased INHD shares to cover after trading resumed on July 31, 2026. Plaintiff's claims arise from the same alleged course of conduct, including Defendants' creation of a false appearance of active and liquid trading through control of a concentrated tradable float, coordinated transactions, and related issuer conduct and disclosures. Plaintiff and the Class assert the same legal theories under Sections 9(a)(2) and 10(b) of the Exchange Act and Rule 10b-5, rely on common evidence concerning the June 8 trading activity, and seek recovery under the same primary damages methodology based on artificial-price cover losses. There are thus no unique defenses applicable to Plaintiff that would render its claims atypical.

74. Fourth, Plaintiff will fairly and adequately protect the interest of the Class. Plaintiff has a significant financial stake in the outcome of this litigation, having shorted 22,000 INHD

shares on June 8, 2026. As a short seller who was trapped in the very same wrongful pattern of conduct alleged on behalf of the Class, Plaintiff has no interests antagonistic to those of the Class. On the contrary, Plaintiff is committed to vigorously prosecuting this action on behalf of all victims similarly situated. To achieve that goal, Plaintiff has retained Dykema Gossett PLLC, competent counsel with experience in class action litigation and business disputes, to represent the Class.

75. Moreover, the putative Class also meets one or more of the requirements of Rule 23(b).

76. For instance, the Class may be certified under Rule 23(b)(1) because prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, risking the demand of incompatible standards of conduct for some or all of the Defendants. Adjudications in individual actions would also, as a practical matter, be dispositive of the interests of other Class members who are not parties to those actions and would substantially impair or impede their ability to protect their interests.

77. Moreover, the Court can certify the class under Rule 23(b)(3) because the questions of law or fact common to the class, as stated *supra*, predominate over any questions affecting only individual members. In addition, the reliance of the class members is presumed in case such as this one, where fraudulent misrepresentations or omissions affect the value of a security trading in a efficient market like Nasdaq. *Unger v. Amedisys Inc.*, 401 F.3d 316, 322 (5th Cir. 2005). Here, the integrity being relied on was that the tape was a genuine two-sided market in the disclosed float.

78. Individualized damages calculations, if necessary, can be handled efficiently through class-wide formulas or a claims administration process. Any differences in the amount of each Class member's cover loss, borrow charges, or other transaction-level damages do not defeat

typicality because those differences concern the calculation of damages, not the nature of the claims or the alleged liability-producing conduct.

79. Further, a class action is superior to other available methods for fairly and efficiently adjudicating this controversy. The potential smaller size of many individual Class members' claims, when compared to the expense and burden of individual litigation or arbitration makes separate actions impracticable. Moreover, as noted above, individual actions would create a significant risk of inconsistent adjudications and would waste judicial and party resources by repeatedly litigating the same core issues regarding Defendant's conduct.

80. A single class action will efficiently resolve the common issues for all affected short sellers, conserve judicial resources, and provide a fair and consistent resolution for the Class.

## V. CAUSES OF ACTION

### COUNT I
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a), (c)**
**(Against All Defendants)**

81. Plaintiff realleges and incorporates paragraphs 1 through 80 as if fully set forth herein.

82. Section 10(b) and Rule 10b-5(a) and (c) prohibit, in connection with the purchase or sale of a security, employing a device, scheme, or artifice to defraud, or engaging in a course of business that operates as a fraud or deceit, by use of the mails, interstate wires, or a national securities exchange.

83. Kingbird sold 22,000 shares of INHD short on Nasdaq on June 8, 2026, and purchased INHD shares on Friday, July 31, 2026 and Monday, August 3, 2026 to close that short, after trading resumed on July 31, 2026.

84. The June 8, 2026 tape was not a public market in a disclosed float. Defendants Wei and Inno Holdings built that float, hid who held it, told the market the wrong size of it, packaged a $3 million "Inno" contract the morning of the run, and left Li/Tong to print against that stage set. In other words, Wei's and Inno's role in the scheme was the public face of supply and news.

85. Defendant Li acted with scienter. He told Mr. Wang that he and associated accounts had taken control of INHD, that INHD's tradeable float was concentrated in accounts Li controls, and that he was responsible for the coordinated trading that drove INHD's price on June 8, 2026. (Doc. 1-5 ¶¶13–16.)

86. Defendants John Does 1–10 are the unidentified purchasers of millions shares of INHD pursuant to the September 10, 2025, December 26, 2025, and January 16, 2026, transactions. Kingbird alleges those unidentified blocks as part of the concentrated supply Defendant Li described.

87. Defendant Tong acted with scienter. He procured the brokerage accounts through which that June 8, 2026 trading was conducted and described himself as overseeing day-to-day operations of the issuer on behalf of, or together with, Defendant Wei. (Doc. 10-1 at ¶4.)

88. Defendants Li and Tong, through accounts they described as under their control, used a concentrated, unidentified float to create the appearance of active two-sided trading in a few-million-share name.

89. Defendant Wei acted with scienter. A CEO who leaves the market with two irreconcilable share counts on the eve of a 150-million-share day, who releases a company-attributed commercial catalyst the morning of that day, who remains in office after the person who claims the float and the session says he installed the board, and whose name Defendant Tong attaches to the accounts used that day, acted with intent to deceive or with severe recklessness as

to whether June 8, 2026 was ordinary public trading of the float he had just described. Those facts, taken collectively, give rise to a strong inference of scienter as to Wei that is at least as compelling as any competing inference of good faith. To be clear, Defendant Wei's scienter does not rest on the fact that as CEO he signed capital-markets documents; it rests on what Wei knew or recklessly disregarded about the book that would trade on June 8, and on what caused the market to see that morning.

90. Defendant Wei's scienter is attributable to Defendant Inno Holdings.

91. Kingbird and other short sellers similarly situated sold INHD shares on June 8, 2026 as participants in what appeared to be a genuine Nasdaq market: a listed name Inno Holdings had described on May 15, 2026, as having 4,520,698 shares outstanding, trading on a national exchange, on a day the company attributed a $3 million development agreement to itself. Short sellers would not have sold those shares at the June 8, 2026 prints had they known the session was the product of a concentrated float and coordinated transactions rather than ordinary public trading of that share count.

92. Kingbird and the putative class members were damaged in an amount to be proved at trial: the net of the June 8 short sales and the purchases that closed the short after trading resumed on July 31, 2026 plus locate and hard-to-borrow charges invoiced while a T12 halt, which were a foreseeable consequence of the June 8, 2026 session.

**WHEREFORE**, Plaintiff Kingbird Ventures LLC, respectfully requests that this Court enter judgment against Defendants, and grant the following relief: an award of compensatory damages in favor of the putative class against all Defendants, jointly and severally, for all losses sustained as a result of Defendants' manipulative scheme, fraudulent misrepresentations, and

omissions, in an amount to be proven at trial; an award of rescissory damages where applicable; attorneys' fees and costs and any other relief this Court deems just and proper.

**COUNT II**
**Violation of Section 9(a)(2) of the Exchange Act**
**(*Against All Defendants*)**

93. Plaintiff realleges and incorporates all paragraphs 1 through 80 as if fully set forth herein.

94. Section 9(a)(2) of the Exchange Act, 15 U.S.C. § 78i(a)(2), makes it unlawful for any person, directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, to effect, alone or with one or more other persons, a series of transactions in a security registered on a national securities exchange, creating actual or apparent active trading in that security, or raising or depressing the price of that security, for the purpose of inducing the purchase or sale of such security by others.

95. Section 9(a)(2) reaches a series of transactions that creates actual or apparent active trading, or that raises or depresses the price, when that series is effected for the purpose of inducing others to purchase or sell. 15 U.S.C. § 78i(a)(2). The statute is not limited to inducing purchases. A short sale is a sale. Plaintiff and the putative class were the "others" induced to sell INHD on Nasdaq on June 8. Defendants need not have preferred longs over shorts. The prohibited purpose is inducing trading by others at the appearance and price the series created. That is what the June 8 book did: it created the appearance of a deep, two-sided market in a few-million-share name and lifted the price from $1.11 to $43.37, which is what brought in the other side of the tape—including the short sales alleged here.

96. Defendant Li told Mr. Wang that he and associated accounts controlled INHD's tradeable float and that he was responsible for the coordinated series of transactions that drove

INHD's price on June 8, 2026. (Doc. 1-5 ¶¶13–16.) Li also said he was among the primary lenders of INHD and stood to receive borrow while shorts could not cover after the halt. Those are Li's series of trades in INHD.

97. Defendant Tong procured the brokerage accounts through which that series of June 8, 2026 transactions was effected and described himself as overseeing day-to-day issuer operations on behalf of, or together with, Defendant Wei. (Doc. 10-1 ¶4.) In this way, Tong effected or enabled the series by supplying those accounts.

98. Defendants John Does 1–10 took 3,000,000 unidentified shares in the December 26, 2025, Regulation S placement, though no Schedule 13D identified them. On information and belief, that unnamed supply was the concentrated float Defendant Li described as sitting in accounts he controls and was used to create apparent activity on June 8. Placing and holding that block without disclosing common control, then allowing it to be the long side of a session tens of times stated outstanding stock, was for the purpose of making INHD look actively traded and inducing others to buy or sell against that appearance.

99. Defendant Wei's purpose, which is also attributable to Inno Holdings, is inferred from the acts only he could perform as Chairman and CEO, and from their timing. He signed placements that put millions of shares with unidentified holders and never caused a 13D. Wei signed, eleven days apart, share counts of 2,520,662 and 4,520,698, which were the public measure of supply going into June 8, 2026. On the morning of the series, he and Inno Holdings issued a press release attributing a $3 million development agreement and project IP to Inno Holdings, a company-level announcement that would induce trading in a thin post-split name. Those steps are what made the June 8, 2026 series look like trading in a real listed company with a few million shares and a new $3 million contract.

100. Following the AI Agreement announcement, INHD ran from $1.11 to $43.37 and closed at $39.49 on about 152 million shares, with about 87 million (FINRA) to 130 million (WRDS) marked short. Inno Holdings had just told the market the company had only about 2.5 million or 4.5 million shares outstanding. A real public float that small does not ordinarily support a day that large unless the same shares are turning over again and again—or unless a concentrated book is being used to manufacture prints.

101. That is the manipulation tie; Defendant Li told Mr. Wang the tradeable float sat in accounts Li controls and that he ran the coordinated June 8, 2026 trading; Defendant Tong procured the accounts; Defendant John Does 1–10 held an unnamed 3 million-share block through Defendant Wei's assistance in executing the share sales agreements. Kingbird's allegation is not that Defendants Li and Tong marked the 87 million shorts. The shorts—including Kingbird's 22,000—are the other side of the tape: sellers who stepped in because the session looked like a deep, two-sided Nasdaq market in a few-million-share name. In reality, the concentrated long book and the coordinated prints created that appearance and lifted the price, which is what induced those sales.

102. The purpose of that series of transactions was to induce others to purchase or sell INHD. Kingbird, similar to many other short sellers, as suggested by the FINRA and WRDS data, sold 22,000 shares into that appearance. Short sellers would not have sold those shares at the June 8, 2026 prints had they known the activity was a concentrated float and coordinated transactions.

103. Defendants Li and Tong acted with the purpose Section 9(a)(2) requires: Li claimed the session; Tong claimed the accounts. Defendant John Does 1–10, Ding Wei, and Inno Holdings specifically provided the supply, listing, and filings specified above.

104. Kingbird and the putative class members were damaged in an amount to be proved at trial: the net of the June 8, 2026 short sales and the purchases that closed the short after the halt was lifted on July 31, 2026, plus locate and hard-to-borrow charges invoiced while a T12 halt, which were a foreseeable consequence of the June 8, 2026 series.

105. By reason of the foregoing, each Defendant named in this Count violated Section 9(a)(2) by the conduct attributed to that defendant above. Kingbird and other similarly situated individuals of the Class may recover the damages provided in Section 9(f), 15 U.S.C. § 78i(f).

**WHEREFORE**, Plaintiff Kingbird, respectfully requests that this Court enter judgment against Defendants, and grant the following relief: an award of damages in favor of the putative Class pursuant to Section 9(f) of the Exchange Act, 15 U.S.C. § 78i(f), equal to the damages sustained by Plaintiff as a result of the artificial price inflation and manipulative trading activity described herein, in an amount to be proven at trial; an award of rescissory damages where applicable; attorneys' fees and costs and any other relief this Court deems just and proper.

**COUNT III**
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5(B)**
**(Against Inno Holdings and Ding Wei)**

106. Plaintiff realleges and incorporates all preceding paragraphs 1 through 80 as if fully set forth herein.

107. Rule 10b-5(b) makes it unlawful, in connection with the purchase or sale of a security, to make an untrue statement of a material fact, or to omit a material fact necessary to make the statements made, in light of the circumstances, not misleading.

108. Defendant Ding Wei signed the filings that contained the statements in this Count. Inno Holdings is the maker of those statements.

109. Inno Holdings' prospectus supplement dated May 15, 2026, filed under Rule 424(b)(5), stated that as of that date 4,520,698 shares of common stock were issued and outstanding. Eleven days earlier, Inno Holdings' May 4, 2026 Form 8-K had stated that the reverse split reduced outstanding stock to 2,520,662. Inno Holdings' May 20, 2026 Form 8-K did not itemize an issuance of approximately two million shares between those dates. On July 29, 2026, Inno Holdings again stated outstanding stock of 2,520,581.

110. Defendant Inno Holdings and Ding Wei therefore put into the market, immediately before June 8, 2026 trading surge and halt, an incorrect share count that was the public measure of supply. That count was material to whether June 8, 2026 volume and price could be understood as ordinary trading of a few-million-share name.

111. Further, on June 8, 2026, Defendants Inno Holdings and Wei issued a press release that Inno Holdings had entered a development-services agreement with a stated value of $3 million. The announcement by Inno Holdings and Wei that Inno Holdings was the contracting party and would own the project IP was misleading when made. Two days later, Inno Holdings' June 10, 2026 Form 8-K repeated those points in Inno Holdings' name, while Exhibit 10.1 named ApexVest Holdings Limited—not Inno Holdings—as Party A.

112. Presenting a $3 million Inno Holdings contract and Inno-owned IP, when the only agreement furnished to the SEC was ApexVest's, omitted facts necessary to make the June 8, 2026 company-attributed announcement not misleading.

113. Short sellers such as Kingbird did not short INHD because they believed the $3 million contract would fail. Rather, short sellers sold into an apparent Nasdaq market whose publicly filed share count and publicly attributed commercial announcement were Defendants Inno

Holdings and Wei's statements. Those statements were part of the mix that made the June 8, 2026 session look like trading in a real public company with a few million shares outstanding.

114. Scienter as to Defendants Inno Holdings and Wei is inferred from Wei's signatures on the May 4, May 15/20, and June 10 filings, from the unexplained gap between 2.52 million and 4.52 million shares, and from filing a narrative that does not match Exhibit 10.1.

115. Kingbird and the putative class members were damaged in an amount to be proved at trial on the same short-and-cover and halt-period charges alleged in Counts I and II.

116. By reason of the foregoing, Defendants Inno Holdings and Ding Wei violated Section 10(b) and Rule 10b-5(b).

**WHEREFORE**, Plaintiff Kingbird, respectfully requests that this Court enter judgment against Defendants Inno Holdings and Wei, jointly and severally, and grant the following relief: an award of compensatory damages in favor of the putative Class for all losses sustained as a result of Defendants' material misrepresentations and omissions, in an amount to be proven at trial; an award of rescissory damages where applicable; attorneys' fees and costs and any other relief this Court deems just and proper.

**COUNT IV**
**CIVIL CONSPIRACY**
**(*Against All Defendants*)**

117. Plaintiff realleges and incorporates all paragraphs 1 through 80 as if fully set forth herein.

118. Defendants Li, Tong, Wei, Inno, and Does 1–10 conspired to create the appearance of a genuine, two-sided Nasdaq market in INHD on June 8, 2026, so that others, including Kingbird and the putative class, would buy or sell against a concentrated book at an artificial price.

119. Defendants Li and Tong agreed that Tong would procure brokerage accounts and that Li and associated accounts would trade INHD on June 8, 2026, in a name Inno Holdings had described as having about 2.52 million or 4.52 million shares outstanding. Li told Mr. Wang he controlled the tradeable float and ran that session. (Doc. 1-5 ¶¶13–16.) Tong procured the accounts and described himself as overseeing day-to-day operations on behalf of, or together with, Defendant Ding Wei. (Doc. 10-1 ¶4.)

120. Defendant Ding Wei signed the 2025–2026 placements to unidentified holders and Inno Holdings' May 4, May 20, and June 10 filings. Inno Holdings issued the stock and maintained the Nasdaq listing. Defendant John Does 1–10 took the unnamed 3,000,000-share Regulation S block.

121. The overt acts in furtherance of that agreement were: the June 8 series of transactions that created the appearance of active trading and raised INHD's price from $1.11 to $43.37 on volume tens of times Inno's stated share count; the concentration of unidentified supply in accounts Defendant Li described as under his control; and the Exchange Act filings that supplied the public share count and listing against which that session occurred.

122. Kingbird and other similarly situated short sellers sold INHD shares into that appearance on June 8, 2026 and bought to close after trading resumed on July 31. Kingbird and other similarly situated individuals were damaged in the net of that short and cover, plus the broker charges invoiced while Nasdaq's T12 halt, which were a foreseeable result of the June 8, 2026 session.

123. As a further consequence of the conspiracy, Plaintiff is entitled to punitive damages against all Defendants in an amount sufficient to punish and deter the conduct described herein.

**WHEREFORE,** Plaintiff Kingbird, respectfully requests that this Court enter judgment against all Defendants for compensatory damages for all losses caused by the conspiracy described herein, in an amount to be proven at trial; punitive damages in an amount sufficient to punish Defendants and deter the conduct described herein; pre-judgment interest; attorneys' fees and costs, and any such other relief this Court deems just and proper.

## VI. JURY DEMAND

124. Plaintiff demands a trial by jury on all causes of action so triable.

## VII. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, on behalf of itself and members of the proposed Class, pray for judgment as follows:

(a) Certification of the classes under Federal Rule of Civil Procedure 23;

(b) Appointment of Plaintiff as representatives of the Class and their counsel as class counsel;

(c) Compensatory and other damages for economic and non-economic damages;

(d) An award of restitution and/or disgorgement;

(e) Statutory pre-judgment and post-judgment interest on any amounts;

(f) Payment of reasonable attorneys' fees and recoverable litigation costs and expenses as may be allowable under applicable law; and

(g) Such other relief as the Court may deem just and proper.

Dated this 21st day of September 2026

Respectfully submitted,

**DYKEMA GOSSETT PLLC**

*/s/ Tiffany H. Eggers*
TIFFANY H. EGGERS
Florida Bar No. 0193968
Texas Bar No. 24151965
SDTX Federal Bar No. 3934304
Attorney in Charge for Plaintiff
1717 Main Street, Suite 4200
Dallas, Texas 75201
T: (214) 462-6400/ F: (214) 462-6401
TEggers@dykema.com

**ATTORNEY FOR PLAINTIFF INDIVIDUALLY AND ON BEHALF OF THE PROPOSED CLASS**